**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED, | ) | |
| JA SOLAR PV VIETNAM COMPANY LIMITED, | ) | |
| JA SOLAR NE VIETNAM COMPANY LIMITED | ) | |
| AND JA SOLAR USA INC | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| BOVIET SOLAR TECHNOLOGY CO., LTD., | ) | **Consol. Ct. No.** |
| | ) | **25-00157** |
| **Consolidated Plaintiff,** | ) | |
| | ) | |
| JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY | ) | |
| LIMITED, | ) | |
| | ) | |
| **Consolidated Plaintiff,** | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**ORDER**</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of Plaintiffs JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc, and all other pleadings, papers and proceedings herein, it is hereby

**ORDERED**, that the Rule 56.2 Motion is GRANTED, and it is further

**ORDERED**, that the final determination of the countervailing duty investigation and the resulting order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the Socialist Republic of Vietnam is remanded to the U.S. Department of Commerce

("Commerce") with instructions to revise its analysis and final determination in accordance with the Court's Opinion; and it is further

**ORDERED**, that Commerce shall provide the Court and parties with revised finding within 60 days of this order.  Parties shall have 30 days to submit briefs on the revised results to the Court.  Responses to those briefs shall be filed within 15 days.

Dated: _____
     New York, New York                           _____
                                                  Claire R. Kelly, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED,<br>JA SOLAR PV VIETNAM COMPANY LIMITED,<br>JA SOLAR NE VIETNAM COMPANY LIMITED<br>AND JA SOLAR USA INC<br><br>                  Plaintiffs,<br><br>                  v.<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD.,<br><br>            Consolidated Plaintiff,<br><br>JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY<br>LIMITED,<br><br>            Consolidated Plaintiff,<br><br>UNITED STATES,<br><br>                  Defendant. | Consol. Ct. No.<br>25-00157 |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS
JA SOLAR VIETNAM COMPANY LIMITED, JA SOLAR PV VIETNAM COMPANY
LIMITED, JA SOLAR NE VIETNAM COMPANY LIMITED AND JA SOLAR USA INC**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiffs JA

Solar Vietnam Company Limited ("JAVN"), JA Solar PV Vietnam Company Limited ("JAPV"),

JA Solar NE Vietnam Company Limited ("JANE") and JA Solar USA Inc (collectively, "JA

Solar"), hereby move for judgment upon the agency record. JA Solar challenges certain aspects

of the final determination of the countervailing duty ("CVD") investigation and the resulting order

on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules ("solar cells

and modules") from the Socialist Republic of Vietnam. See <u>Crystalline Silicon Photovoltaic Cells,</u>

<u>Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final</u> <u>Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances</u> <u>Determination, in Part</u>, 90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025) ("Final Determination") (P.R. 869); <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled</u> <u>Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations;</u> <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia,</u> <u>Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders</u>, 90 Fed. Reg. 26,791 (Dep't of Commerce June 24, 2025) ("<u>Order</u>") (P.R. 879). Specifically, as discussed in the Memorandum of Points and Authorities in support of this motion, the Plaintiffs seek judgment on the agency record because Commerce's Final Determination was unsupported by substantial evidence and otherwise not in accordance with law for seven reasons.

First, Commerce's determination to countervail the alleged transnational subsidy programs of the provision of silicon wafers, silver paste and solar glass from China for less than adequate remuneration ("LTAR") and Belt and Road Initiative ("BRI") policy lending from Chinese banks was unsupported by substantial evidence and otherwise not in accordance with law because (1) the plain language of the statue limits CVD investigations to subsidies bestowed by a single country and (2) the alleged transnational subsidies for inputs do not confer a benefit and are not specific as required under the statute.

Second, Commerce's determination to countervail JA Solar's purchase of silicon wafers was unsupported by substantial evidence and otherwise not in accordance with law because the only reasonable reading of the record was that (1) JA Solar purchased its silicon wafers from non-government of China authorities and (2) these wafers can be tied to the production of non-subject merchandise.

Third, Commerce's determination to value JA Solar's purchases of silicon wafers using U.N. Comtrade ("Comtrade") data instead of the Bloomberg data was unsupported by substantial evidence and otherwise not in accordance with law because (1) the Comtrade data were not specific to the silicon wafers used by JA Solar and (2) Commerce failed to provide sufficient reasoning for departing from its past practice to rely on the Bloomberg data.

Fourth, Commerce's determination to use Comtrade data instead of PVInsights to value JA Solar's purchases of solar glass was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to sufficiently support its reasoning for rejecting the PVInsights data given that these data were specific to the solar glass used by JA Solar.

Fifth, Commerce's determination to countervail JA Solar's loans as transnational BRI policy lending from China was unsupported by substantial evidence and otherwise not in accordance with law because JA Solar's loans were commercial loans that were not associated with any BRI projects.

Sixth, Commerce's application of adverse facts available against JA Solar with respect to the Import Duty Exemptions on Imported Equipment program was unsupported by substantial evidence and otherwise not in accordance with law because JA Solar fully cooperated with Commerce's investigation by reporting its imports of machinery during the POI.

Seventh, Commerce's determination to exclude Vietnamese export prices from its benchmarks for LTAR inputs was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to provide a reasonably discernable explanation in support of its finding that Vietnamese prices were distorted.

Plaintiffs, therefore, respectfully request that this Court:

(1)    find that Commerce's actions as described above were unsupported by substantial evidence and otherwise not in accordance with law;

(2)    order Commerce to recalculate the CVD rate assigned to JAVN, JAPV and JANE in the investigation by correcting the errors set forth above;

(3)    order Commerce to publish amended Final Determination and Order in the Federal Register in accordance with a final decision by this Court in this matter;

(4)    order Commerce to issue cash deposit instructions to U.S. Customs and Border Protection consistent with this Court's decision; and

(5)    provide such other relief as this honorable Court deems proper.

Respectfully submitted,

Dated: February 24, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Bryan P. Cenko
Clemence D. Kim
**Mowry & Grimson, PLLC**
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
jsg@mowrygrimson.com
*Counsel to JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc*

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED, JA SOLAR PV VIETNAM COMPANY LIMITED, JA SOLAR NE VIETNAM COMPANY LIMITED AND JA SOLAR USA INC<br><br>Plaintiffs,<br><br>v.<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD.,<br><br>Consolidated Plaintiff,<br><br>JINKO SOLAR (VIETNAM) INDUSTRIES COMPANY LIMITED,<br><br>Consolidated Plaintiff,<br><br>UNITED STATES,<br><br>Defendant. | Consol. Ct. No. 25-00157<br>Nonconfidential version |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS JA SOLAR VIETNAM COMPANY LIMITED, JA SOLAR PV VIETNAM COMPANY LIMITED, JA SOLAR NE VIETNAM COMPANY LIMITED AND JA SOLAR USA INC**

Jeffrey S. Grimson
Bryan P. Cenko
Clemence D. Kim
**Mowry & Grimson, PLLC**
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
jsg@mowrygrimson.com

February 24, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................................... 1

ISSUES PRESENTED ..................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

STANDARD OF REVIEW ................................................................................................ 8

SUMMARY OF THE ARGUMENT ..................................................................................... 9

ARGUMENT ............................................................................................................... 11

I. Commerce's Determination To Countervail the Transnational Subsidy Programs Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law .............. 11

 A. The Plain Language of 19 U.S.C. § 1671 Prohibits Transnational Subsidies ............. 12

 B. The Legislative History of 19 U.S.C. § 1677 Demonstrates that Congress Did Not Intend for Transnational Subsidies To Be Countervailable ................................................................ 17

 C. Commerce's Finding that the Transnational Subsidies Conferred a Benefit and Were Specific Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law 20

II. Commerce's Determination to Countervail JA Solar's Purchases of Silicon Wafers was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law .............. 23

 A. Commerce Unlawfully Countervailed JA Solar's Purchase of Silicon Wafers Given that JA Solar Purchased its Wafers from Non-GOC Authorities .................................................. 23

 B. Commerce Unlawfully Countervailed JA Solar's Purchase of Silicon Wafers Given that JA Solar Used Its Silicon Wafers to Produce Non-Subject Merchandise ............................ 27

III. Commerce's Determination to Use the Comtrade Data Instead of Bloomberg Data for Its Benchmark to Value Silicon Wafers was Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law ................................................................................. 30

IV. Commerce's Determination To Use the Comtrade Data Instead of The PVInsights Data for its Benchmark To Value Solar Glass Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ................................................................................. 34

V. Commerce's Determination to Countervail JA Solar's Loans was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ........................................... 36

VI. Commerce's Determination To Apply AFA Against JA Solar With Respect to the Import Duty Exemptions on Imported Equipment Was Unsupported by Substantial Evidence and Was Otherwise Not in Accordance with Law ................................................................................. 39

VII. Commerce's Determination To Exclude Vietnamese Export Prices from Its Benchmarks for LTAR Inputs Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law ................................................................................................................ 42

CONCLUSION AND RELIEF REQUESTED ........................................................................ 44

TABLE OF AUTHORITIES

**Cases**

Archer Daniels Midland Co. v. United States,
  37 CIT 760, 917 F. Supp. 2d 1331 (2013) ................................................................. 27

Arista Networks, Inc. v. Cisco Sys.,
  908 F.3d 792 (Fed. Cir. 2018) ...................................................................... 15, 20

Barnhart v. Sigmon Coal Co.,
  534 U.S. 438 (2002) ........................................................................................ 12

Beijing Tianhai Indus. Co. v. United States,
  39 CIT __, 52 F. Supp. 3d 1351 (2015) .................................................................. 30

Ceramica Regiomontana, S.A. v. United States,
  __ CIT __, 64 F.3d 1579 (1995) .......................................................................... 17

Changzhou Trina Solar Energy Co. v. United States,
  __ CIT __, 195 F. Supp. 3d 1334 (2016) .................................................................. 28

Changzhou Trina Solar Energy Co. v. United States,
  42 CIT __, 352 F. Supp. 3d 1316 (2018) .............................................................. 31, 35

Changzhou Trina Solar Energy Co. v. United States,
  44 CIT __, 466 F. Supp. 3d 1287 (2020) .............................................................. 31, 35

Changzhou Trina Solar Energy Co. v. United States,
  975 F.3d 1318 (Fed. Cir. 2020) ..................................................................... passim

Consol. Edison Co. v. NLRB,
  305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938) ...................................................... 9

Diamond Sawblades Mfrs. Coal. v. United States,
  986 F.3d 1351 (Fed. Cir. 2021) ......................................................................... 23

DuPont Teijin Films USA v. United States,
  407 F.3d 1211 (Fed. Cir. 2005) ....................................................................... 9, 30

Esteras v. United States,
  606 U.S. 185, 195 (2025) ................................................................................ 12

Glycine & More, Inc. v. United States,
    880 F.3d 1335 (Fed. Cir. 2018) ................................................................ 33

GPX Int'l Tire Corp. v. United States,
    37 CIT 19, 893 F. Supp. 2d 1296 (2013) ............................................ 37, 39

GPX Int'l Tire Corp. v. United States,
    780 F.3d 1136 (Fed. Cir. 2015) ................................................................ 37

Guangdong Wireking Housewares & Hardware Co. v. United States,
    745 F.3d 1194 (Fed. Cir. 2014) ................................................................ 25

Guangdong Wireking Housewares & Hardware Co. v. United States,
    37 CIT 319, 900 F. Supp. 2d 1362 (2013) ................................................ 25

Huayin Foreign Trade Corp. v. United States,
    322 F.3d 1369 (Fed. Cir. 2003) ............................................................ 9, 27

Kajaria Iron Castings Pvt. Ltd. v. United States,
    156 F.3d 1163 (Fed. Cir. 1998) ................................................................ 27

King v. Burwell,
    576 U.S. 473 (2015) ................................................................................ 15

La. Pub. Serv. Comm'n v. FCC,
    476 U.S. 355 (1986) ................................................................................ 11

Loper Bright Enterprises v. Raimondo,
    603 U.S. 369 (2024) .......................................................................... 14, 15

NMB Sing. Ltd. v. United States,
    557 F.3d 1316 (Fed. Cir. 2009) .............................................. 9, 20, 21, 43

Shelter Forest Int'l Acquisition, Inc. v. United States,
    __ CIT __, 497 F. Supp. 3d 1388 (2021) ................................................ 42

Shelter Forest Int'l Acquisition, Inc. v. United States,
    2022 U.S. App. LEXIS 16491 (Fed. Cir. 2022) ...................................... 42

SolarWorld Ams., Inc. v. United States,
    910 F.3d 1216 (Fed. Cir. 2018) .................................................................. 9

Swiff-Train Co. v. United States,
    793 F.3d 1355 (Fed. Cir. 2015) .................................................................... 9

Taizhou United Imp. & Exp. Co. v. United States,
    __ CIT __, 560 F. Supp. 3d 1316 (2022) ..................................................... 28

United States v. Wise,
    370 U.S. 405, 411 (1962) ............................................................................. 19

Ventura Coastal, LLC v. United States,
    __ CIT __, 736 F. Supp. 3d 1342 (2024) ..................................................... 14

Williams v. Taylor,
    529 U.S. 362, 367 (2000) ............................................................................. 15

Zhejiang Dunan Hetian Metal Co. v. United States,
    652 F.3d 1333 (Fed. Cir. 2011) ....................................................... 24, 26, 37

**Statutes**

19 U.S.C. § 1671(a) ................................................................................... 12, 19

19 U.S.C. § 1671(d) ........................................................................................ 15

19 U.S.C. § 1677(5) ........................................................................................ 22

19 U.S.C. § 1677(5A) ..................................................................................... 21

19 U.S.C. § 1677-1(a) ..................................................................................... 15

19 U.S.C. § 1677e ........................................................................... 23, 39, 40, 41

19 U.S.C. § 3512(d) ........................................................................................ 18

Tariff Act of 1930, § 303, 46 Stat. 687 ........................................................... 17

URAA, Pub. L. No. 103-465, § 251, 108 Stat. 4908 ....................................... 18

iv

**Other Authorities**

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 89 Fed. Reg. 43,816 (Dep't of Commerce May 20, 2024) ............................ 2, 4

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders, 90 Fed. Reg. 26,791 (Dep't of Commerce June 24, 2025) ............................................................................. 1

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021, 88 Fed. Reg. 88,575 (Dep't of Commerce Dec. 22, 2023) ................................................................................................................................ 32

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020, 87 Fed. Reg. 38,379  (Dep't of Commerce June 28, 2022) ...................................................................................................... 26

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part, 90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025) ................................................................................................... 1

Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 88 Fed. Reg. 29,850 (Dep't of Commerce May 9, 2023) ................................................................................................ 13

Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 89 Fed. Reg. 20,826 (Dep't of Commerce March 25, 2024) ............................................................................................. 13

Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments, 54 Fed. Reg. 23,366 (Dep't of Commerce May 31, 1989)…………………………………..16

S.1187—117th Congress at Sec. 201, "Addressing Cross-Border Subsidies In Countervailing Duty Investigations" (2021–2022) ................................................................................................ 19

URAA, Statement of Administrative Action, H.R. Doc. No. 103-316, 925 (1994) ..................... 18

Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination,
    86 Fed. Reg. 30,593 (June 9, 2021) ........................................................................... 16

## Regulations

19 C.F.R. § 351.108 ........................................................................................... 25

19 C.F.R. § 351.511 ...................................................................................... 30, 33

19 C.F.R. § 351.525 ........................................................................................... 27

19 C.F.R. § 351.527 ...................................................................................... 11, 13

**ADMINISTRATIVE DETERMINATION UNDER REVIEW**

Plaintiffs JA Solar Vietnam Company Limited ("JAVN"), JA Solar PV Vietnam Company Limited ("JAPV"), JA Solar NE Vietnam Company Limited ("JANE")[1] and JA Solar USA Inc (collectively, "JA Solar") challenge certain aspects of the final determination of the countervailing duty ("CVD") investigation conducted by the U.S. Department of Commerce ("Commerce") and the resulting order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells and modules") from the Socialist Republic of Vietnam ("Vietnam").  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part, 90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025) ("Final Determination") (P.R. 869); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Malaysia and Thailand: Amended Final Countervailing Duty Determinations; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Countervailing Duty Orders, 90 Fed. Reg. 26,791 (Dep't of Commerce June 24, 2025) ("Order") (P.R. 879).

**ISSUES PRESENTED**

1. Whether Commerce's determination to countervail the transnational subsidy programs was supported by substantial evidence and was otherwise in accordance with law?

2. Whether Commerce's determination to countervail JA Solar's purchases of silicon wafers was supported by substantial evidence and was otherwise in accordance with law?

3. Whether Commerce's determination to use U.N. Comtrade ("Comtrade") data instead of Bloomberg data for its benchmark to value silicon wafers was supported by substantial evidence and was otherwise in accordance with law?

---

[1] For ease of reference, JA Solar is used as a shorthand below for the collapsed mandatory respondent consisting of JAVN, its affiliates JAPV and JANE and excluding JA Solar USA Inc as the affiliated U.S. importer.

4. Whether Commerce's determination to use the Comtrade data instead of the PVInsights data for its benchmark to value solar glass was supported by substantial evidence and was otherwise in accordance with law?

5. Whether Commerce's determination to countervail JA Solar's loans was supported by substantial evidence and was otherwise in accordance with law?

6. Whether Commerce's determination to apply adverse facts available ("AFA") against JA Solar in respect to Import Duty Exemptions on Imported Equipment was supported by substantial evidence and otherwise in accordance with law?

7. Whether Commerce's determination to exclude Vietnamese export prices from its benchmark prices for silicon wafers, silver paste and solar glass was supported by substantial evidence and otherwise in accordance with law?

## STATEMENT OF FACTS

On April 24, 2024, the American Alliance for Solar Manufacturing Trade Committee ("Petitioner") filed a petition for the imposition of countervailing duties on imports of solar cells and modules from Cambodia, Malaysia, Thailand and Vietnam.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 89 Fed. Reg. 43,816 (Dep't of Commerce May 20, 2024) (P.R. 107).  On May 14, 2024, Commerce initiated a CVD investigation covering imports during the period of investigation ("POI") from January 1, 2023 through December 31, 2023.  See id.

Commerce selected Boviet Solar Technology ("Boviet") and JAVN as mandatory respondents for the investigation.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part, and Alignment of Final Determination With Final Antidumping Duty Determination, 89 Fed. Reg. 80,866, 80,867 (Dep't of Commerce Oct. 4, 2024) ("Prelim.") (P.R. 657), and accompanying Dec. Mem. ("Prelim. Dec. Mem.") (P.R. 646).

In August 2024, Petitioner submitted three new subsidy allegations ("NSAs"), specifically on the purported cross-border provisions of Chinese silicon wafers, silver paste, solar glass, aluminum solar frames and junction boxes for less-than-adequate remunerations ("LTAR") as well as alleged cross-border subsidization of raw material purchases through the Export Buyer's Credit program ("EBCP"). <u>See</u> Letter on Behalf of Petitioner to Commerce re: New Subsidy Allegations (Aug. 12, 2024) (P.R. 327-329); Letter on Behalf of Petitioner to Commerce re: New Subsidy Allegations (Aug. 26, 2024) (P.R. 482-496); Letter on Behalf of Petitioner to Commerce re: New Subsidy Allegations (Aug. 27, 2024) (P.R. 497-499).

JA Solar timely responded to Commerce's CVD questionnaire, supplemental questionnaires and NSA questionnaires. <u>See</u> Letter on Behalf of JAVN to Commerce re: JAVN Affiliation Questionnaire Response (Jul. 22, 2024) ("JA Solar Affiliation QR") (P.R. 301); Letter on Behalf of JAVN to Commerce re: Section III Questionnaire Response (Aug. 19, 2024) ("JA Solar Sec. III QR") (P.R. 456-464); Letter on Behalf of JAVN to Commerce re: First Supplemental Questionnaire Response (Sept. 20, 2024) ("JA Solar First SQR") (P.R. 606-607); Letter on Behalf of JAVN to Commerce re: Second Supplemental Questionnaire Response (Nov. 25, 2024) ("JA Solar Second SQR") (P.R. 764-765); Letter on Behalf of JAVN to Commerce re: New Subsidy Allegation Questionnaire Response of JA Solar Vietnam Company Limited and Affiliates (Oct. 8, 2024) ("Wafer NSA QR") (P.R. 664); Letter on Behalf of JAVN to Commerce re: New Subsidy Allegation Question 3 Benchmark Submission (Oct. 11, 2024) (P.R. 668); Letter on Behalf of JAVN to Commerce re: New Subsidy Allegation Questionnaire Response on Silver Paste and Solar Glass of JA Solar Vietnam Company Limited and Affiliates (Nov. 12, 2024) (P.R. 731).

On October 4, 2024, Commerce published its Preliminary Determination in the Federal Register. Prelim., 89 Fed. Reg. 80,866. Commerce calculated a preliminary CVD rate of 0.81% for Boviet and 2.85% for JA Solar. See id. at 80,868.

Relevant to the alleged transnational policy lending from Chinese banks for Belt and Road Initiative ("BRI") Capacity Cooperation Projects, Commerce preliminary found that JA Solar's outstanding loans from commercial banks were at rates higher than the applicable benchmark rates and determined that JA Solar's outstanding loans provided no measurable benefits. See Prelim. Dec. Mem. at 49-50 (P.R. 646). With regards to the NSAs on cross-border provision of Chinese silicon wafers, silver paste and solar glass for less than adequate remuneration ("LTAR"), Commerce deferred determining whether the mandatory respondents benefitted from these programs. See id. at 4-5.

Following the Preliminary Determination, Commerce issued a Post-Preliminary Decision Memorandum on March 13, 2025, detailing its findings on the alleged transnational subsidy programs on cross-border provision of Chinese silicon wafers, Chinese silver paste and Chinese solar glass for LTAR. See Mem from Scot Fullerton to Christopher Abbott re: Post-Preliminary Decision Memorandum (Mar. 13, 2025) ("Post-Prelim. Dec. Mem.") (P.R. 806).

The government of China ("GOC") reported that no Chinese producers of silicon wafers, solar glass or silver paste that supplied these inputs to the mandatory respondents were majority government-owned enterprises during the POI. See generally Final Determination, 90 Fed. Reg. 17,399, and accompanying Issues and Dec. Mem. at 33-34 ("Final I&D Mem.") (P.R. 858); Post-Prelim. Dec. Mem. at 4-8 (P.R. 806). Commerce nevertheless preliminarily found that the GOC failed to provide requested information for private, individual owned companies and relied on facts otherwise available, namely information from the Petitioner's allegations, to determine that these

producers were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).  See Final I&D Mem. at 36-44 (P.R. 858); Post-Prelim. Dec. Mem. at 4-8 (P.R. 806).

Further, Commerce relied on Petitioner's claim that at least 71 percent of purchases of silicon wafer and solar glass in the Vietnam market and at least 70 percent of purchases of silver paste in the Vietnam market were produced and supplied by GOC authorities, to find that prices for silicon wafers, solar glass and silver paste in  the Vietnamese market were distorted.  See Post-Prelim. Dec. Mem. at 7-11 (P.R. 806).  Accordingly, Commerce utilized tier-two benchmark prices to value these inputs.  See id.

Before Commerce issued its Post-Preliminary Decision, Petitioner and mandatory respondents submitted potential benchmarks to value silicon wafers, silver paste and solar glass. For silicon wafers, Petitioner submitted the Comtrade data for world-wide exports for 2023 and Global Trade Atlas data for Indonesia and Thailand world-wide imports for 2023 under Harmonized Tariff System ("HTS") subheading 3818.00.  See id. at 11.  Boviet submitted benchmark data from Bloomberg, specific to silicon wafers, during the POI.  See id; Letter on Behalf of Boviet to Dep't of Commerce re: Boviet NSA Questionnaire – Question 3 Benchmarks at Ex. NSAW-8 (Oct. 11, 2024) (P.R. 670).  Although Commerce found that the Bloomberg data were indeed specific to silicon wafers, Commerce preliminarily determined that the Comtrade data for HTS subheading 3818.00 were the most appropriate tier-two benchmark because it was unclear how the Bloomberg data were calculated and whether they contained exports from China and Vietnam.  See Post-Prelim. Dec. Mem. at 12 (P.R. 806).

For solar glass, Petitioner submitted Comtrade world export data for HTS subheading 7007.19, covering "safety glass, consisting of toughened (tempered) or laminated glass: Toughened (tempered) safety glass; Other."  See id. at 16.  JA Solar submitted PVInsights data

that contained monthly prices specific to solar glass.  See Letter on Behalf of JA Solar to Commerce re: New Subsidy Allegation Questionnaire Response on Silver Paste and Solar Glass of JA Solar Vietnam Company Limited and Affiliates (Nov. 12, 2024) (P.R. 731).  Commerce preliminarily found that the PVInsights data were more specific to the solar glass than the Comtrade data.  See Post-Prelim. Dec. Mem. at 16 (P.R. 806).

Following the Preliminary Determination, Commerce verified the Government of Vietnam ("GOV").  See Final I&D Mem. at 3 (P.R. 858).  During the verification, Commerce examined the Import Duty Exemptions of Imported Raw Materials for Export Processing Enterprises ("EPEs") and Export Processing Zones program and found that certain imported products would have been subject to AD duties, where Commerce confirmed that EPEs were exempt from import duties and antidumping ("AD") duties.  See id. at 8.  Commerce also found that JA Solar had imports of machinery during the average useful life ("AUL") period prior to the POI, granted duty-free treatment due to JA Solar's EPE status.  See id. at 86.  JA Solar's officials fully cooperated with Commerce during the verification to confirm the imported machinery.  See id.

Following the Post-Preliminary Decision Memorandum, JA Solar submitted case and rebuttal briefs addressing the issues relevant to this appeal and others for Commerce's consideration prior to the Final Determination.  See id. at 3-4 (noting that JA Solar submitted case and rebuttal briefs); see also Letter on Behalf of JA Solar to Commerce re: Case Brief (Mar. 24, 2025) (Public Version) ("JA Solar Case Brief") (P.R. 837); Letter on Behalf of JA Solar to Commerce re: Rebuttal Case Brief (Apr. 1, 2025) (Public Version) (P.R. 847).  On April 9, 2025, Commerce held a public hearing where JA Solar presented the arguments from its case and rebuttal case briefs.  See id. at 4.

On April 25, 2025, Commerce published the Final Determination in the Federal Register, calculating a CVD rate of 68.15 percent for JA Solar.  See Final Determination, 90 Fed. Reg. 17,399.  With regards to NSAs on the EBCP and aluminum solar frames and PV junction boxes for LTAR, Commerce determined to defer the decision to initiate an investigation until the first administrative review in the event the instant investigation resulted in a CVD order.  See Final I&D Mem. at 4 (P.R. 858).

In the Final Determination, Commerce disagreed with JA Solar's arguments and found that Commerce may investigate and countervail transnational subsidies because neither the statute nor the holding of Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024) constrain Commerce's ability to interpret the statute to permit countervailing transnational subsidies.  See id. at 22-27. Commerce subsequently determined that cross-border provision of Chinese origin polysilicon, silicon wafers, silver paste, and solar glass for LTAR programs were de facto specific and countervailable.  See id.

Commerce also determined that the record did not show that JA Solar's purchases of silicon wafers were tied to non-subject merchandise and continued to measure the benefits from JA Solar's purchases of silicon wafers without addressing JA Solar's arguments in its case brief that its purchases of silicon wafers were from non-GOC authorities.  See id. at 58-60.

In the Final Determination, Commerce agreed with JA Solar's arguments in its case brief that Commerce has previously utilized the proposed Bloomberg data to value silicon wafers and that the Comtrade data cover products dissimilar from silicon wafers used in solar cells and modules.  See id. at 51-56.  Nevertheless, Commerce determined that Comtrade data it placed on the record were the best information to value silicon wafers because these data were disaggregated and allow for the exclusion of "distorted markets."  Id.

Commerce also determined that JA Solar's loans were countervailable. Despite confirming that JA Solar's reporting of its loans was accurate, Commerce nevertheless found that it could not determine if any loans received by JA Solar were related to the BRI projects without a sufficient response on the program from the GOC. See id. at 48-50.

In the Final Determination, Commerce revised its Preliminary Determination and used the Comtrade data instead of the PVInsights data as its benchmark to value solar glass. See id. at 66-71. Despite acknowledging that "PV Insights data has been preferred in previous *Solar Cells China* cases{,}" and that PV Insight provides a more specific pricing for non-China solar glass prices, Commerce determined that the Comtrade data were preferrable in this case. Id. at 68-71. Commerce found that the Comtrade data allowed it to remove solar glass prices from the subsidy provider, China, and further allowed Commerce to disaggregate individual prices by country of origin. See id. Commerce also removed export prices from Vietnam based on its finding that the subsidy provider, China, constitutes a majority of the Vietnamese market.

Finally, Commerce determined to apply AFA to JA Solar with respect to both the import duty exemptions on imported equipment and to the import duty exemptions on imported raw materials for EPEs and export processing zones based on alleged lack of cooperation and failure to disclose and report purchases of equipment in the AUL. See id. at 91-93.

Following a final affirmative injury determination by the International Trade Commission, Commerce published the Order in the Federal Register on June 24, 2025. See Order, 90 Fed. Reg. 26,791.

## STANDARD OF REVIEW

"The Court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal quotation marks omitted); DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  Substantial evidence requires "more than a mere scintilla." See, e.g., Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (internal quotation marks omitted) (citation and quotation omitted).    Substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the "record... fairly detracts from {its weight}." Changzhou Trina Solar Energy Co. v. United States, 975 F.3d 1318, 1326 (Fed. Cir. 2020) (citation and quotation omitted) ("Trina").    Although Commerce does not have to provide perfect explanations, "the path of Commerce's decision must be reasonably discernable." NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009) .

### SUMMARY OF THE ARGUMENT

First, Commerce's determination to countervail the alleged transnational subsidy programs of the provision of silicon wafers, silver paste and solar glass from China for LTAR and BRI policy lending from Chinese banks was unsupported by substantial evidence and otherwise not in accordance with law because (1) the plain language of the statue limits CVD investigations to subsidies bestowed by a single country and (2) the alleged transnational subsidies for inputs do not confer a benefit and are not specific as required under the statute.

Second, Commerce's determination to countervail JA Solar's purchase of silicon wafers was unsupported by substantial evidence and otherwise not in accordance with law because the

only reasonable reading of the record was that (1) JA Solar purchased its silicon wafers from non-GOC authorities and (2) these wafers can be tied to the production of non-subject merchandise.

Third, Commerce's determination to value JA Solar's purchases of silicon wafers using Comtrade data instead of the Bloomberg data was unsupported by substantial evidence and otherwise not in accordance with law because (1) the Comtrade data were not specific to the silicon wafers used by JA Solar and (2) Commerce failed to provide sufficient reasoning for departing from its past practice to rely on the Bloomberg data.

Fourth, Commerce's determination to use Comtrade data instead of PVInsights to value JA Solar's purchases of solar glass was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to sufficiently support its reasoning for rejecting the PVInsights data given that these data were specific to the solar glass used by JA Solar.

Fifth, Commerce's determination to countervail JA Solar's loans as transnational BRI policy lending from China was unsupported by substantial evidence and otherwise not in accordance with law because JA Solar's loans were commercial loans that were not associated with any BRI projects.

Sixth, Commerce's application of AFA against JA Solar with respect to the Import Duty Exemptions on Imported Equipment program was unsupported by substantial evidence and otherwise not in accordance with law because JA Solar fully cooperated with Commerce's investigation by reporting its imports of machinery during the POI.

Seventh, Commerce's determination to exclude Vietnamese export prices from its benchmarks for LTAR inputs was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to provide a reasonably discernable explanation in support of its finding that Vietnamese prices were distorted.

**ARGUMENT**

**I. COMMERCE'S DETERMINATION TO COUNTERVAIL THE TRANSNATIONAL SUBSIDY PROGRAMS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce is prohibited by statute from assessing CVDs on subsidies provided by third countries. Pursuant to the plain text of 19 U.S.C. §§ 1671 and 1677, CVD investigations are limited by law to investigations of subsidies bestowed by a single country. Commerce's withdrawal of its regulation prohibiting transnational subsidy investigations under 19 C.F.R. § 351.527 can have no effect on the unambiguous mandate of the statute. See La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374-75 (1986) ("{t}o permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."); see also Final I&D Mem. at 24 (noting that "Commerce withdrew the self-imposed restriction previously found at 19 C.F.R. § 351.527") (P.R. 858). Commerce exceeded its authority by imposing CVDs on four alleged transnational subsidy programs in the Final Determination – namely, (1) silicon wafers, (2) silver paste, and (3) solar glass from China for LTAR, and (4) BRI policy lending from Chinese banks. See id. at 18–19.[2] Commerce's determination to countervail JA Solar's subsidies was unsupported by substantial evidence and otherwise not in accordance with law and this Court should remand Commerce's Final

---

[2] Commerce also initiated investigations of alleged transnational subsidies for provision of Chinese polysilicon, aluminum frames, and junction boxes for LTAR, as well as use of the EBCP. Commerce determined that JA Solar did not use Chinese-origin polysilicon and decided to postpone its determination with respect to aluminum frames, junction boxes and EBCP until the completion of the first administrative review. See Final I&D Mem. at 4, 19 (P.R. 858). JA Solar understands that if the Court rules in its favor with respect to the illegality of transnational subsidy investigations, Commerce would also be precluded from later applying countervailable subsidies from these deferred programs.

Determination with instructions to recalculate the CVD rate for JA Solar without regard for any transnational subsidies.

### A.  The Plain Language of 19 U.S.C. § 1671 Prohibits Transnational Subsidies

The plain text of the statute demonstrates that Commerce lacks the authority to impose CVDs for subsidies provided by more than one government in a single investigation.  "{C}ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  Barnhart v. Sigmon Coal Co., 534 U.S. 438, 461–62 (2002) (internal citation omitted).  19 U.S.C. § 1671(a) provides that Commerce shall impose a CVD only after it:

> determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States

19 U.S.C. § 1671(a) (emphasis added).  The statute's repeated use of the singular "a country" makes clear that Commerce's investigations, and subsequent imposition of CVDs, are limited to the investigation of subsidies bestowed by a single country.  Commerce's determination that it is permitted countervail transnational subsidies violates the interpretive statutory canon of expressio unius est exclusio alterius.  See, e.g., Esteras v. United States, 606 U.S. 185, 195 (2025) ("in plain English, 'expressing one item of {an} associated group or series excludes another left unmentioned.'") (citation omitted).  The fact that the statute allows for the imposition of CVDs on benefits provided by the government of a single country, explicitly excludes Commerce from imposing CVDs on benefits provided by a second country.[3]  If Congress had intended for a CVD

---

[3] Additionally, the 'major questions' doctrine demonstrates that Congress would need to give clear approval for such a significant expansion of agency authority.  It is well established that when an agency "claim{s} to discover in a long-extant statute an unheralded power" which would result in a "transformative expansion in {its} regulatory authority," the major questions doctrine requires the agency identify "clear congressional authorization" supporting that authority, rather than "a

investigation to cover alleged subsidies granted by multiple countries, such as through a transnational subsidy, Congress would have used the plural term "countries" in the statute.

Indeed, prior to its revocation in 2024, Commerce's regulation on transnational subsidies stated that "a subsidy does not exist if the Secretary determines that the funding for the subsidy is supplied in accordance with, and as part of, a program or project funded: (a) By a government of a country other than the country in which the recipient firm is located . . . ." 19 C.F.R. § 351.527 (2023). Commerce revoked this regulation in its entirety, without providing replacement language. See Final I&D at 24-26 (quoting and discussing Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 88 Fed. Reg. 29,850, 29870 (Dep't of Commerce May 9, 2023) (P.R. 858); Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, 89 Fed. Reg. 20,826, 20,827 (Dep't of Commerce March 25, 2024) ("Final Transnational Subsidy Rule")) (P.R. 858). Commerce relied on the removal of this prohibition as its legal support for countervailing transnational subsidies in this investigation. See Final I&D Mem. at 24-26 (P.R. 858). Commerce, however, provided no statutory analysis in support of its new interpretation of its obligations under 19 U.S.C. § 1671(a). See Final Transnational Subsidy Rule, 89 Fed. Reg. at 20,826–28. Instead, Commerce merely claimed that its new interpretation is based on its practical experience from past investigations, and the changing nature of global trade. See id. Commerce's practical experience cannot upend the language of the statute limiting its investigation to a single country. Commerce's

---

merely plausible textual basis." West Virginia v. EPA, 597 U.S. 697, 723–24 (2022). This Court should reject Commerce's interpretation that it is allowed to countervail transnational subsidies under the major questions doctrine because a power of such significance requires clear approval from Congress which the statute lacks.

reliance on the change to its regulation as its legal support for CVD transnational subsidies was not in accordance with law given that Commerce failed to support how its amended regulation did not conflict with the language of 19 U.S.C. § 1671(a).

In support of its interpretation of its statutory obligations in this investigation, Commerce found that the contested phrase "a country" as used in 19 U.S.C. § 1671(a) could refer to multiple countries, including countries without merchandise subject to investigation. See Final I&D Mem. at 23–27 (P.R. 858). The crux of Commerce's reasoning was that "{t}he use of the indefinite article in '<u>a</u> country' indicates that the country of the authority providing a countervailable subsidy may be distinct and separate from the country where the countervailable subsidy is received." <u>Id.</u> at 24 (emphasis in original). Commerce also noted that 19 U.S.C. § 1671(a) "does not specify that the 'government of a country or any public entity within the territory of a country' providing a countervailable subsidy must be the same government or public entity as the government of the country within which that subsidy is received." <u>Id.</u> at 23–24. "{F}or a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity." <u>Ventura Coastal, LLC v. United States</u>, __ CIT __, __, 736 F. Supp. 3d 1342, 1357 (2024) (citing <u>Loper Bright</u>, 603 U.S. at 395). Here, Commerce wrongfully relied on the absence of any provision preventing it from investigating international subsidies as affirmative authority allowing it to investigate these subsidies. See Final I&D Mem. at 27 ("The use of the indefinite article in 'a country' indicates that the country of the authority providing a countervailable subsidy <u>may</u> be distinct and separate from the country where the countervailable subsidy is received." (emphasis added)) (P.R. 858). Commerce simply did not identify any affirmative authority beyond the possibility that the statute could be interpreted to include multiple countries.

Commerce's interpretation of the statutory phrase "a country" is no longer entitled to deference. See Loper Bright, 603 U.S. at 396.  Even considered in a vacuum, the plain language of this phrase does not suggest that Congress intended "a country" to include multiple countries.  See Arista Networks, Inc. v. Cisco Sys., 908 F.3d 792, 803 (Fed. Cir. 2018) ("{w}here 'the statutory language is plain, we must enforce it according to its terms.'") (quoting King v. Burwell, 576 U.S. 473, 486 (2015)).[4]

Further, Commerce's interpretation of its statutory mandate was not in accordance with law because it renders a later provision in 19 U.S.C. § 1671 superfluous.  See Final I&D Mem. at 26 (P.R. 858).  It is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute."  Williams v. Taylor, 529 U.S. 362, 367 (2000). 19 U.S.C. § 1671(d) provides that Commerce can countervail a subsidy from multiple countries if they are part of an international consortia.  See 19 U.S.C. § 1671(d).  The statute similarly allows Commerce to apply duties where upstream subsidies are cumulated by "an association of two or more foreign countries . . . organized into a customs union."  Id. § 1677-1(a).  In other words, Congress specifically limited a multi-country subsidy to instances when those countries were part of a consortia or provided upstream subsidies as part of a customs union.  These provisions would be superfluous if Commerce could countervail a subsidy provided by one country to a producer in another country even if the two countries were not a part of a consortia or customs union.

---

[4] Commerce also suggested that use of the indefinite article "a" opens the door to investigation of multiple countries.  See Final I&D Mem. at 23–24 (P.R. 858).  However, using the definite article "the" in its place would either indicate an internal reference to one specific country, or else be grammatically incorrect.  The presence of an indefinite article simply means that the identity of the subsidizing country is not specified.  See A, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/a (last visited Feb. 24, 2025) ("used as a function word before singular nouns when the referent is unspecified").  It does not connote multiples, as Commerce suggests.

Commerce's conclusion that permitting the countervailability of transnational subsidies would not render the portions of the statute pertaining to international consortia and upstream subsidies superfluous arbitrarily conflicts with its own prior interpretation of the statute. See Final I&D Mem. at 27 (P.R. 858). In initially promulgating its regulation prohibiting transnational subsidies, Commerce found that transnational subsidies are not countervailable "to the extent that funds for the program are not provided by <u>government of the country in question</u>." <u>Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments</u>, 54 Fed. Reg. 23,366, 23,374 (Dep't of Commerce May 31, 1989) (emphasis added). Further, in its decision in <u>Utility Scale Wind Towers from Maylasia</u>, Commerce found that "to allow Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies participation in an international consortium engaged in the production of subject merchandise – would render the international consortium provision superfluous." <u>See Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination</u>, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) and accompanying Issues and Dec. Mem. at Cmt. 6. Commerce further explained that because the statute "identifies a narrow set of circumstances under which benefits from an authority operating outside of the country in question, or in the form of a supranational entity, may be countervailed, <u>suggests that the general rule is that countervailable subsidies are limited to those provided by the country under investigation</u>." <u>Id.</u> (emphasis added). Commerce provides no explanation (nor could it) for its change in statutory interpretation. See Final I&D Mem. at 19-28 (P.R. 858). By rendering a later provision in 19 U.S.C. § 1671 superfluous, Commerce's interpretation of the authority delegated to it under 19 U.S.C. § 1671(a) to countervail a transnational subsidy is manifestly contrary to the statute.

For these reasons, Commerce determination that the investigation of transnational subsidies was allowed under 19 U.S.C. § 1671(a), and subsequent finding that JA Solar benefitted from transnational subsidies was unsupported by substantial evidence and otherwise not in accordance with law.  The plain language of 19 U.S.C. § 1671(a) prohibited Commerce from initiating, let alone countervailing, these transnational subsidies.

### B.  The Legislative History of 19 U.S.C. § 1677 Demonstrates that Congress Did Not Intend for Transnational Subsidies To Be Countervailable

This Court need not proceed with its analysis beyond the plain language of the statute, which contains no affirmative authority supporting transnational subsidy investigations.  See Arista, 908 F.3d at 803.  Nevertheless, the legislative history behind the definition of subsidy and Congress' recent attempt to amend the statute to remove the prohibition against countervailing transnational subsidies further demonstrates that Congress intended subsidy investigations to be restricted to a single country

The Tariff Act originally provided that a duty shall be imposed "{w}henever any country . . . shall pay or bestow . . . any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country . . . ."  Tariff Act of 1930, § 303, 46 Stat. 687 (emphasis added).  The Tariff Act therefore inherently linked the country providing the bounty or grant to the country manufacturing or producing the subsidized merchandise.  This definition was substantially retained through the amendments of the Trade Act of 1974, § 331(a), Pub. L. 93-618, 88 Stat. 2049, and was subsequently codified in 19 U.S.C. § 1303(a)(1).  See Ceramica Regiomontana, S.A. v. United States, __ CIT __, __, 64 F.3d 1579, 1580 (1995) (discussing evolution of CVD law).

The passage of the Uruguay Round Agreements Act ("URAA") resulted in the codification of the definition of "subsidy" aligning with the WTO's Agreement on Subsidies and

Countervailing Measures, see URAA, Pub. L. No. 103-465, § 251, 108 Stat. 4908, which was ultimately codified under 19 U.S.C. § 1677(5).  Speaking to the meaning of "subsidy" the Statement of Administrative Action stated that "{i}n general, the Administration intends that the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute, unless that practice or interpretation is inconsistent with the definition contained in the bill."  URAA, Statement of Administrative Action, H.R. Doc. No. 103-316, 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 (emphasis added) ("SAA").  The SAA is the "authoritative expression by the United States concerning the interpretation and application of the {URAA} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).  Therefore, pursuant to the SAA, the definition of "subsidy" as used in 19 U.S.C. §§ 1671 and 1677 retains its original meaning – namely that the singular language "the government" of "a country" ultimately adopted in the statute refers to a singular country and does not authorize countervailing subsidies provided by third countries.

Further, Congress' recent attempts to amend the statute establish that Congress considers Commerce to be prohibited from investigating transnational subsidies.  In 2021, Congress introduced legislation entitled the Eliminating Global Market Distortions to Protect American Jobs Act, which proposed the following changes to the definition of "Countervailable Subsidy" in 19 U.S.C. § 1677:

> Proposal:  SEC.  201.  ADDRESSING  CROSS-BORDER  SUBSIDIES  IN COUNTERVAILING DUTY INVESTIGATIONS.
> (a) Definitions.—
> (1) Countervailable Subsidy.—Section 771 of the Tariff Act of 1930 (19 U.S.C. 1677) is amended—
> (A) in paragraph (5)(B)—
> . . .

18

(ii) in the flush text after clause (iii), by striking "the country" and inserting "a country"; and

(B) in paragraph (9)—

(i) in subparagraph (B), by inserting after "is exported" the following: "or the authority (as defined in paragraph (5)(B)) alleged to have provided subsidies to a producer of an input of such merchandise";

. . .

(iv) by adding at the end the following:

"(H) in any investigation or administrative review under this title involving an allegation that a subsidy is provided by an authority (as defined in paragraph (5)(B)) within the territory of a country other than the country in which the subject merchandise is produced, a foreign manufacturer, producer, or exporter of an input used in the production of the merchandise."

S.1187—117th Congress at Sec. 201, "Addressing Cross-Border Subsidies In Countervailing Duty Investigations" (2021–2022) (emphasis added).  This statutory change was never enacted; however, if Commerce were already free to investigate transnational subsidies subject to its own discretion, there would hardly have been any need for such specific legislative amendments to allow for exactly this course of action.  There can be no clearer expression of Congressional intent than a specific amendment aimed at permitting a statutorily prohibited course of action.

Commerce did not find that the existence of these legislative proposals presupposed a prohibition on transnational investigations, instead noting that "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change."  Final I&D Mem. at 27 (quoting United States v. Wise, 370 U.S. 405, 411 (1962)) (P.R. 858).  In the present case, the extremely detailed Eliminating Global Market Distortions to Protect American Jobs Act proposed a modification to the use of the simple phrase "a country," which appears in the very first sentence of 19 U.S.C. § 1671(a).  It tests credulity to imagine that the Act was simply mistaken about the real meaning of the statute.

In sum, legislative history of the statute further demonstrates that Commerce is prohibited by statute from assessing CVDs on subsidies provided by third countries.

### C. Commerce's Finding that the Transnational Subsidies Conferred a Benefit and Were Specific Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

"A 'countervailable subsidy' is a 'financial contribution,' 'income or price support,' or 'funding mechanism' provided by 'an authority,' such as a government, 'to a person' with 'a benefit . . . thereby conferred.'" Trina, 975 F.3d at 1326. In addition to the statutory and regulatory issues addressed above, Commerce lacks the authority under 19 U.S.C. § 1677 to impose CVDs on transnational subsidies for the purchase of inputs for LTAR because such subsidies do not provide a benefit and inherently lack specificity.

#### i. Transnational Subsidies Cannot Confirm a Benefit for LTAR Inputs Under the Statute

Commerce has failed to identify what benefit, if any, was conferred by the alleged transnational subsidies, and has accordingly failed to support its benefit analysis with substantial evidence. See NMB, 557 F.3d at 1319 (the reasoning behind Commerce's determination must be "reasonably discernable" to be upheld). The statute specifically provides that in determining whether a benefit is conferred "in the case where goods or services are provided . . . the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). The plain language of the statute makes clear that it is the conditions in Vietnam, not China, which are relevant to the benefit conferred. See Arista Networks, at 803. Instead of confronting this statutory limitation, Commerce merely concluded that the "Act does not affect Commerce's ability under the Act to investigate and countervail transnational subsidies." Final I&D Mem. at 28 (P.R. 858).

Commerce's finding was not "reasonably discernable" given that Commerce failed to address clear language in the statute that limits the conferral of a benefit to the country under investigation. See NMB, 557 F.3d at 1319.

### ii. Transnational Subsidies Cannot be Specific Under the Statute

In addition to providing a benefit, to be countervailable, a subsidy must be "specific" as defined under 19 U.S.C. § 1677(5A). See Trina, 975 F.3d at 1329. "To be 'specific' a subsidy must be 'an export subsidy,' 'an import substitution subsidy,' or one of certain "domestic subsid{ies}." Id. (quoting 19 U.S.C. § 1677(5A)). In particular, with respect to domestic subsidies, the statute provides:

> In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an <u>enterprise or industry within the jurisdiction of the authority</u> providing the subsidy, the following guidelines shall apply. {Listing factors}. In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities <u>within the jurisdiction of the authority providing the subsidy</u>, and the length of time during which the subsidy program has been in operation.

19 U.S.C. § 1677(5A)(D) (emphasis added). The statute further defines an "authority" as "a government of <u>a country or any public entity within the territory of that country</u>." Id. § 1677(5)(B)(iii) (emphasized added).

Commerce unlawfully found that the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR programs were all <u>de facto</u> specific. See Final I&D Mem. at 44 (relying on as a matter of fact under 19 U.S.C. § 1677(5A)(D)(iii)(I)) (P.R. 858). Specifically, relying on facts otherwise available, Commerce determined that "these inputs are provided to a limited number of industries, including the solar cells industry." Final I&D Mem. at 44 (P.R. 858). Commerce found that JA Solar was "within the jurisdiction of the granting authority," and identified the "authority" as the GOC. Id. Commerce did not find that the GOC provided inputs

directly for LTAR, but that "state-invested enterprises" controlled by the GOC provided these inputs. <u>Id.</u>  Citing to the GOC's State-Owned Assets Law, Commerce reasoned that a "'state-invested enterprise' is defined as a 'wholly state-owned enterprise or company with the state being the sole investor, or a company in which the state has a stake, whether controlling or non-controlling,'" and therefore a state-invested enterprise would be subject to GOC jurisdiction, even if it were located in a separate country.  <u>Id.</u>  Concerning the specific producers of silicon wafers, silver paste, and solar glass alleged to be providing inputs at LTAR, Commerce found that these entities were "authorities" based on facts otherwise available.  <u>Id.</u> at 36.

Plainly, the statute required Commerce to limit its analysis of specificity to "<u>within the jurisdiction of the authority</u> providing the subsidy."  19 U.S.C. § 1677(5A)(D) (emphasis added).  Further, the statute defines an "authority" as "a government of <u>a country or any public entity within the territory of that country</u>."  <u>Id.</u> § 1677(5)(B)(iii) (emphasized added).  Commerce exceeded its authority by ignoring that the statute provided a limited definition of authority that does not cover public entities located <u>outside</u> of the subject country.   In this case, JA Solar is clearly located outside the jurisdiction of the GOC, the government alleged to be providing subsidies.  The statute does not contemplate any basis for specificity regarding the provision of materials from the jurisdiction of one authority to the jurisdiction of a separate authority. Commerce's finding that the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR programs were all <u>de facto</u> specific was unsupported by substantial evidence and otherwise not in accordance with law because Commerce's findings clearly conflicted with the plain language of the statute that limited a specific domestic subsidy to the country under investigation.

Commerce's decision to countervail transnational subsidies allegedly provided to JA Solar was unsupported by substantial evidence and otherwise not in accordance with law because

Commerce is prohibited by statute from assessing CVDs on subsidies provided by third countries. JA Solar respectfully requests that this Court remand Commerce's transnational subsidy determinations with instructions to remove any subsidies calculated with these programs consistent with Commerce's statutory obligations.

**II.    COMMERCE'S DETERMINATION TO COUNTERVAIL JA SOLAR'S PURCHASES OF SILICON WAFERS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce's determination to countervail JA Solar's purchase of silicon wafers was further unsupported by substantial evidence and otherwise not in accordance with law because Commerce either unlawfully ignored or failed to reach the only reasonable conclusion on the record that: (1) JA Solar's suppliers of silicon wafers were non-GOC authorities and (2) the silicon wafers purchased by JA Solar can be tied to the production of non-subject merchandise.  See Final I&D Mem. at 60-61 (P.R. 858)

### A. Commerce Unlawfully Countervailed JA Solar's Purchase of Silicon Wafers Given that JA Solar Purchased its Wafers from Non-GOC Authorities

Commerce's determination to countervail JA Solar's purchase of silicon wafers was unsupported by substantial evidence and otherwise not in accordance with law because the only reasonable reading of the record was that JA Solar's purchase of silicon wafers from China were from non-GOC authorities, more specifically, its [                    ].

When an interested party has failed to submit necessary information, Commerce may make its determination based on facts otherwise available, and in certain circumstances may apply an adverse inference to those facts.  See 19 U.S.C. § 1677e(a)-(b).  Even when relying on AFA, let alone facts otherwise available as Commerce did here, Commerce cannot simply ignore evidence that undermines its determination and that would otherwise fill an alleged gap on the record.  See, e.g.,  Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011)

("{B}ecause Commerce is empowered to use adverse inferences only in 'selecting from among the facts otherwise available,' it may not do so in disregard of information of record that is not missing or otherwise deficient.").

Commerce failed to consider substantive evidence on the record, and once properly considered, the only reasonable reading of the record was that JA Solar's input suppliers of silicon wafers were non-GOC authorities.  Specifically, JA Solar detailed that "JAPV sourced silicon wafers from [

]. Wafer NSA QR at 1-2 (Confidential Version) (C.R. 481); see also id. at Ex. NSA1-1 (showing that JAPV only purchased silicon wafers from [                          ]) (C.R. 481).  At verification, Commerce confirmed that JAPV's purchases of silicon wafers reconciled with its financial statements, i.e., that JAPV reported all of its purchases of silicon wafers from China.  See Mem. from Frank Schmitt to the File Re: Report on Verification of JA Solar Vietnam Company Limited and Its Affiliates at 19-20 (Feb. 20, 2025) (Public Version) ("Verif. Rep.") (P.R. 801).  Commerce then reviewed certain preselect packages to "confirm that certain purchases were properly reported in the silicon wafer template provided in the {JA Solar} Wafter QR" and "noted no discrepancies." Id. at 20.  Commerce, thus, confirmed that JA Solar only purchased [

].

Commerce's separate rate analysis in the companion AD investigation on solar cells and modules from China establishes that [                          ] were not government authorities.  Commerce's separate rate analysis is analogous to the factors that Commerce examines when determining whether an entity is a government authority.  In determining whether to grant a company a separate rate, Commerce examines the ownership of the company.  Compare

19 C.F.R. § 351.108 (laying out the factors that Commerce examines in its separate rate analysis),

with Guangdong Wireking Housewares & Hardware Co. v. United States, 37 CIT 319, 332, 900 F.

Supp. 2d 1362, 1376 (2013), aff'd, Guangdong Wireking Housewares & Hardware Co. v. United

States, 745 F.3d 1194 (Fed. Cir. 2014) ("Commerce treats entities that are owned by a government

as authorities").  To the extent that the company has ownership by a government entity, Commerce

will examine whether that government entity has control of its subsidiary's export activities.

Compare 19 C.F.R. § 351.108, with Guangdong, 37 CIT at 332, 900 F. Supp. 2d at 1376 (noting

that "where it is unclear whether a firm is an authority based on ownership information alone,"

Commerce may then consider other factors including: 1) government ownership, 2) the

government's presence on the entity's board of directors, 3) the government's control over the

entity's activities, 4) the entity's pursuit of governmental policies or interests and 5) whether entity

is created by statute).  Commerce's separate rate analysis, thus, is nearly identical to the factors

that Commerce analyzes in determining whether an entity is a government "authority."

Despite acknowledging that JA Solar argued that its "suppliers were not government

authorities based on Commerce granting separate rate status to other {JA Solar} affiliates with the

same ownership structure as {JA Solar's} wafer suppliers" in its agency case brief, Commerce

nonsensically determined that the record lacked information regarding the producers that supplied

JA Solar's silicon wafers.  See Final I&D Mem. at 58-59 (P.R. 858).  Commerce's separate rate

analysis in the recently completed administrative review of the AD order on solar cells and

modules from China shows that both [                                    ] were non-Chinese authorities

as Commerce granted separate rates to companies with the same ultimate ownership as [

                              ].  See JA Solar Case Brief at 30 (Confidential Version) (C.R. 768).  In

that review, Commerce determined that both JA Solar Technology Yangzhou Co., Ltd. ("JA

Yangzhou") and Shanghai JA Solar Technology Co., Ltd. ("JA Shanghai") qualified for separate rates. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020 87 Fed. Reg. 38,379, 38,380 (June 28, 2022). JA Donghai is ultimately [                                                    ]. See JA Solar Affiliation QR at Ex. 1 (July 22, 2024) (Confidential Version) (C.R. 63).   [

                                                    ]. See id. [

                  ]. See id.  JA Yangzhou, like [                              ], is [

        ]. See id.  JA Shanghai is owned by [                          ]. See id.  In short, as JA Solar clearly provided in its case brief, Commerce determined that the exact same ownership structure as [                              ] was free from government control in assigning JA Yangzhou and JA Shanghai separate rates. See JA Solar Case Brief at 30-31 (Confidential Version) (C.R. 768).  Commerce's failure to address these facts in the Final Determination alone warrants a remand because Commerce failed to consider information that "fairly detract{ed}" from the weight of its conclusion.  See generally Trina, 975 F.3d at 1326.

    Instead of confronting JA Solar's arguments, Commerce unlawfully hid behind inferences based solely on facts otherwise available due to the GOC's alleged failure to provide a complete response to the Input Producer Appendix.  See Final I&D Mem. at 58 (P.R. 858).  Even if the GOC withheld information, which JA Solar disputes, when relying on AFA let alone facts otherwise available, Commerce must consider all information and arguments made on the record.  See Zhejiang Dunan, 652 F.3d at 1348.  Further, although Commerce can apply an adverse inference to a cooperating respondent, it should "seek to avoid such impact if relevant information exists elsewhere on the record." Archer Daniels Midland Co. v. United States, 37 CIT 760, 769, 917 F.

Supp. 2d 1331, 1342 (2013). [5]  The only reasonable reading of the record was that a fully cooperative JA Solar purchased its silicon wafers from non-GOC authorities because [

          ] share the same ownership structure with other JA Solar affiliates that have been granted separate rates by Commerce. See generally Huayin, 322 F.3d at 1374.  Commerce's determination to countervail JA Solar's purchases of silicon wafers, therefore, was unsupported by substantial evidence and otherwise in accordance with law given that JA Solar's purchased its silicon wafers from non-GOC authorities.

**B.  Commerce Unlawfully Countervailed JA Solar's Purchase of Silicon Wafers Given that JA Solar Used Its Silicon Wafers to Produce Non-Subject Merchandise**

Commerce's determination to countervail JA Solar's purchase of silicon wafers was also unsupported by substantial evidence and otherwise not in accordance with law because the only reasonable reading of the record is that JA Solar's silicon wafers can be tied to the production of non-subject merchandise.

In calculating the subsidy rate under 19 C.F.R. § 351.525 "{i}f a countervailable benefit is tied to a product other than the {subject} merchandise, {Commerce} will not find a countervailable subsidy on the merchandise. This practice of tying benefits to specific products is an established tenet of the {Commerce}'s administration of the countervailing duty law." Kajaria Iron Castings Pvt. Ltd. v. United States, 156 F.3d 1163, 1168-69 (Fed. Cir. 1998); see also id. (explaining that "Commerce reiterated that 'grants that are tied to the production or export of only non-subject merchandise do not provide a countervailable benefit to the subject merchandise.'" (internal

---

[5] Although not binding on this Court, this Court should not "ignore the informed opinion of {past holdings} from the Court of International Trade." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994); see also Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

citation omitted)).  In determining whether a subsidy can be tied to a particular product, Commerce examines whether "the intended use is known to the subsidy giver and so acknowledged prior to, or concurrent with, the bestowal of the subsidy."  Changzhou Trina Solar Energy Co. v. United States, __ CIT __, __, 195 F. Supp. 3d 1334, 1353-54 (2016) (Trina I); see also Taizhou United Imp. & Exp. Co. v. United States, __ CIT __, __, 560 F. Supp. 3d 1316, 1322 (2022) ("Commerce explained that it generally countervails all or most goods provided at LTAR, unless a respondent can show that the good was 'tied' to non-subject merchandise, meaning that the subsidized good was purchased with an intent for its dedicated use in the production of non-subject merchandise." (citation omitted)).  Commerce did not disagree that it cannot countervail an input that is intended for use in non-subject merchandise at the time of bestowal but instead unreasonably found that that JA Solar's "relevant documentation for {its} Chinese silicon wafer purchases did not indicate that the purchases are for inputs for the exclusive production of non-subject merchandise."  Final I&D Mem. at 60 (P.R. 858).

    Commerce's conclusion was not supported by the record.  JA Solar repeatedly explained in its questionnaire responses that it purchased a [          ] of silicon wafers from its [

          ] for use in non-subject merchandise.  See Wafer NSA QR at 1, Ex. NSA 1-1 (Confidential Version) (showing a [      ] number of purchases of Chinese wafers by JAPV) (C.R. 481); see also JA Solar First SQR at 7 (Confidential Version) (confirming that [


] and that [

]) (C.R. 286).

    Commerce's finding that "verification report does not indicate that Commerce reviewed documentation that would demonstrate that certain purchases of Chinese silicon wafers were to be

used specifically to produce non-subject merchandise" was not supported by the record. Final I&D Mem. at 60 (P.R. 858). Commerce examined a [

]. See Letter on Behalf to JAVN to Dep't of Commerce re: Verification Exhibits of JAVN and Affiliates at Ex. VE-4 (Dec. 30, 2024) (Confidential Version) ("Verif. Exhibits") (C.R. 655-687). Indeed, in its verification report Commerce noted that it a reviewed "a reconciliation of all raw materials during the POI{,}" specifically both the purchased Chinese silicon wafer in relation to the inventory report and silicon wafer production where Commerce found no discrepancies with JA Solar's reported figures in response to Commerce's questionnaires. Verif. Rep. at 19-26 (P.R. 801). Further, contrary to Commerce's conclusion that the record lacked "any purchase transaction document which ties the purchase of inputs to non-subject merchandise," Final I&D Mem. at 61 (P.R. 858), [

] supporting JA Solar's statements that it purchased Chinese silicon wafers with the intention for use in non-subject merchandise. See Verif. Exhibits at Ex. VE-9 (C.R. 729-731). Commerce, therefore, successfully verified JA Solar's statements [

]. Verif. Rep. at 19-20 (Confidential Version) (C.R. 759); Verif. Exhibits at Ex. VE-9 (C.R. 729-731). JA Solar then went a step further to support its statements that it purchased its Chinese wafers for use in non-subject merchandise by demonstrating that its Chinese wafers were indeed [

]. See Wafer NSA QR at 1, Ex. NSA 1-1 (C.R. 481); Verif. Exhibits at Ex. VE-4 (C.R. 655-687). Commerce's determination to countervail JA Solar's purchases of silicon wafers, therefore, was unsupported by substantial evidence and otherwise not in accordance with law given that the only reasonable reading of the record was that

JA Solar's purchases of Chinese wafers could be tied to its production of non-subject merchandise. See generally DuPont, 407 F.3d at 1215.

For either of the reasons detailed above, this Court should remand Commerce's Final Determination with instructions for Commerce to find that JA Solar did not receive a countervailable benefit for its purchases of silicon wafers.

### III. COMMERCE'S DETERMINATION TO USE THE COMTRADE DATA INSTEAD OF BLOOMBERG DATA FOR ITS BENCHMARK TO VALUE SILICON WAFERS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce's determination to value JA Solar's purchases of silicon wafers using Comtrade data instead of the Bloomberg data was unsupported by substantial evidence and otherwise not in accordance with law because (1) the Comtrade data, as compared to the Bloomberg data, were not specific to the silicon wafers used by JA Solar to produce subject merchandise and (2) Commerce failed to provide sufficient reasoning for departing from its past practice to rely on the Bloomberg data. See Final I&D Mem. at 52-59 (P.R. 858)

In selecting the Comtrade data as its benchmark to value JA Solar's purchases of silicon wafers, Commerce unlawfully found that "a lack of specific data points is not sufficient grounds to exclude the entire dataset as a benchmark source." Final I&D Mem. at 57 (P.R. 858). To measure the adequacy of remuneration, Commerce must "compare{} the respondent's reported costs for the input in question { . . . } with the calculated benchmark price, which is representative of the market price for the good at issue." Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 52 F. Supp. 3d 1351, at 1356, n.9 (2015). In making this comparison, Commerce is directed under 19 C.F.R. § 351.511(a)(2) to account for "factors affecting comparability" when using a world market price to calculate the tier-two benchmark. See 19 C.F.R. § 351.511(a)(2); see also Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __ 352 F. Supp. 3d 1316, 1332

(2018) (finding that product specificity of benchmarks is a "vital comparability concern") ("Trina II"). The Court has repeatedly rejected Commerce's benchmark selections where the dataset is not specific to the input used by the respondents. See, e.g., Changzhou Trina Solar Energy Co. v. United States, 44 CIT __, __, 466 F. Supp. 3d 1287, 1294-5 (2020) ("Trina III") (holding that Commerce correctly determined to use only IHS data as a benchmark for aluminum extrusions because it was the most specific to the solar frames input used by the respondents); Trina II, 352 F. Supp. 3d at 1332 (remanding Commerce's selection of a benchmark where Commerce did not address specificity concerns).

The only reasonable reading of the record was that the Comtrade data for HTS 3818.00 included merchandise beyond silicon solar wafers. See Letter on Behalf of JA Solar to Dep't of Commerce re: Surrebuttal on JA Solar's Response to Commerce's NSA Questionnaire on Wafers at Ex. 1-4 (Oct. 30, 2024) (Public Version) ("JA Solar Wafer NSA Surrebuttal") (P.R. 698-699). Wafers used in the production of solar cells are composed of pure-grade polysilicon. See id.; see also JA Solar Case Brief at 36-37 (P.R. 837). HTS subheading 3818.00, however, includes "chemical elements" and "chemical compounds" beyond silicon. See JA Solar Wafer NSA Surrebuttal at 4, Ex. 1-4 (P.R. 698-699). Further, HTS subheading 3818.00 includes shapes beyond wafers including "discs" or "similar forms." See id. By contrast, as Commerce itself recognized, the Bloomberg data were specific to silicon wafers. See Final I&D Mem. at 55 (P.R. 858).

In Trina II, the Court remanded Commerce's determination to average non-product specific Comtrade data with a separate product-specific data set. See Trina II, 42 CIT at __, 352 F. Supp. 3d at 1332-33. Commerce maintained that averaging of the datasets was necessary because the product-specific dataset did not contain monthly data. See id. at 1322. The Court reasoned that "not all flaws in data are equally problematic" and Commerce "made little effort to

counter claims that Comtrade data was based on too broad a product category to provide an accurate world market price." Id. at 1332. This Court should find the holding in Trina II to be persuasive because here too Commerce "made little effort" to address the fact that the Bloomberg data were more specific than the UN Comtrade data to JA Solar's purchases of silicon wafers. See Final I&D Mem. at 57 (P.R. 858) (addressing respondents' arguments at the agency that the Comtrade data were not specific by merely finding that it adjusted the Comtrade data to address concerns of specificity). Commerce's determination to rely on the Comtrade data to value JA Solar's purchases of solar silicon wafers, therefore, was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to consider evidence that detracted from the weight of its conclusion, and once properly considered, the only reasonable reading of the record was that the Comtrade data were not specific to the silicon wafers used by JA Solar to produce subject merchandise. See Trina, 875 F.3d at 1326.

Instead of addressing the inherent lack of specificity in the Comtrade data, Commerce relied on its conclusion that the Bloomberg data were unusable as a benchmark source. See Final I&D Mem. at 53-55 (P.R. 858). Commerce "action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002). Commerce correctly acknowledged that it has previously relied on Bloomberg data as a tier-two benchmark price in the tenth administrative review of the CVD order on solar cells and modules from China. See Final I&D Mem. at 55 (P.R. 858) (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, and Rescission in Part; 2021, 88 Fed. Reg. 88,575 (Dec. 22, 2023), and accompanying Prelim. Dec. Mem. at 23); see also Letter on Behalf of Boviet to Commerce re: Case Brief at 25-33 (Mar. 24, 2025) (Public

Version) (P.R. 839) (laying out other past proceedings where Commerce relied on the Bloomberg data to value silicon wafers). In its Final Determination, Commerce failed to sufficiently explain its departure from its past practice to rely on Bloomberg data to calculate its benchmark for silicon wafers. See Final I&D Mem. at 53-55 (P.R. 858).

In selecting a tier-two benchmark source, Commerce's regulations instruct it "to measure the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii) (emphasis added). A world market price would include prices for silicon wafers produced in both China and Vietnam. Further, these silicon wafers would be available to purchasers in Vietnam. Commerce's conclusion in this case to exclude Chinese and Vietnamese prices, if taken to its conclusion, would result in the rejection of any price that would be reasonably available in China and Vietnam such that Commerce could not comply with its regulatory mandate to select a "world market price." See Glycine & More, Inc. v. United States, 880 F.3d 1335, 1344 (Fed. Cir. 2018) (providing that a court should "examine the regulation's language to ascertain its plain meaning"). Commerce, thus, failed to provide sufficient reasoning from departing from its prior reliance on the Bloomberg data given that Commerce's reasoning for its departure conflicted with its own regulations.

For these reasons, Commerce's determination to rely on the Comtrade data to measure the price for silicon wafers was unsupported by substantial evidence and otherwise not in accordance with law and this Court should remand the Final Determination with instructions for Commerce to rely on the Bloomberg data to calculate its benchmark price for silicon wafers.

IV.   **COMMERCE'S DETERMINATION TO USE THE COMTRADE DATA INSTEAD OF THE PVINSIGHTS DATA FOR ITS BENCHMARK TO VALUE SOLAR GLASS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce's determination to use the Comtrade data to value JA Solar's purchases of solar glass was unsupported by substantial evidence and otherwise not in accordance in law because: (1) no reasonable mind could find that Commerce supported with substantial evidence its conclusion to reject the PVInsights data and (2) Commerce failed to give sufficient weight to the fact that the PVInsights data was the only benchmark source that was specific to the solar glass used by JA Solar to produce subject merchandise. See Final I&D Mem. at 68-71 (P.R. 858).

Commerce rejected the PVInsights data based on its unlawful determination that it "could not remove solar glass prices from the subsidy provider, China, or prices of solar glass in specific markets that Commerce is finding to be distorted (i.e., solar glass markets in Thailand, Cambodia, Vietnam, and Malaysia)." Final I&D Mem. at 69 (P.R. 858). No reasonable reading of the record can support Commerce's finding that the Chinese prices could not be removed from the PVInsights data when Commerce itself initially "found it appropriate to select non-China solar glass prices reported within this dataset." Id. at 68. Further, as explained below in Section VII, Commerce failed to support its conclusion that prices in Thailand, Cambodia, Vietnam and Malaysia were distorted such that their inclusion disqualified the PVInsights data.

In relying on its conclusion that the PVInsights data were unusable, Commerce unlawfully failed to give sufficient weight to the fact that HTS subheading 7007.19 is overinclusive and does not represent the solar glass used by JA Solar in the production of subject merchandise. See Final I&D Mem. at 68-71 (P.R. 858). "Commerce acknowledge{d} that PV Insights data has been preferred in previous Solar Cells China cases." Id. at 69. Here too, in the Post-Preliminary Decision Memorandum, Commerce relied on the PVInsights data because Commerce found that

34

"the PV Insights data are more specific to the solar glass input than the UN Comtrade data because the UN Comtrade for HS subheading 7007.19 covers solar glass but also other kinds of glass such as safety glass that is not used in the manufacture of solar cells." Post-Prelim. Dec. Mem. at 16 (P.R. 806). The Court has similarly held that Comtrade data covering HTS subheading 7007.19 are overinclusive and cannot be used to calculate a solar glass benchmark. See Trina II, 42 CIT at __, 352 F. Supp. 3d at 1334 ("Comtrade data . . . under the six-digit HTS heading{} 7007.19 . . . are {not} specific to solar glass, but rather includes many types of safety glass (often a type of flat glass) unrelated to solar glass."). The Court in the Trina II litigation subsequently held that Commerce's reliance on PVInsights data over Comtrade data in its remand redetermination was supported by substantial evidence and otherwise in accordance with the law. See Trina III, 44 CIT at __, 466 F. Supp. 3d at 1299. Both Commerce and the Court agree that the PVInsights data are more specific than the Comtrade data for solar glass.

Instead of grappling with these comparability concerns, Commerce merely concluded that "Commerce's selection of benchmarks do not require perfection." Final I&D Mem. at 70 (P.R. 858). While Commerce's benchmarks need not be perfect, at a minimum, Commerce needed to address these comparability concerns as they detracted from the weight of its conclusion that the UN Comtrade data were the best benchmark to value JA Solar's purchases of solar glass. See Trina, 975 F.3d at 1326; Trina II, 42 CIT at __, 352 F. Supp. 3d at 1332-33; Trina III, 44 CIT at __, 466 F. Supp. 3d at 1294-5. Even if Commerce had attempted to address these comparability concerns, however, no reasonable reading of the record could continue to support the use of the Comtrade data where Commerce's reasoning for rejecting the PVInsights data was flawed in the first instance and the PVInsights were more specific to the solar glass used by JA Solar than the Comtrade data. Commerce's determination to rely on the Comtrade data to value solar glass,

therefore, was unsupported by substantial evidence and otherwise not in accordance with law.  This Court should remand this issue back to Commerce with instructions to rely on the PVInsights data to value JA Solar's purchases of solar glass.

**V.    COMMERCE'S DETERMINATION TO COUNTERVAIL JA SOLAR'S LOANS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce's determination to countervail JA Solar's loans as the alleged "Policy Lending from Chinese Banks for {BRI} Capacity Cooperation Projects" was unsupported by substantial evidence and otherwise not in accordance with law because the only reasonable reading of the record was that JA Solar's loans were not associated with any BRI projects and thus do not meet the description of the alleged program.  See Final I&D Mem. at 48 (P.R. 858).

Petitioner defined the alleged program, "Policy Lending from Chinese Banks for BRI Capacity Cooperation Projects," as only covering instances where "policy lending in support of BRI capacity cooperation projects in Vietnam confers a benefit to the extent that any interest paid on such loans is lower than the interest that would have been paid on a comparable commercial loan that the firm could actually obtain on the market" and "limited to firms investing in BRI industrial ones or industrial zones within 'Two Corridors and One Circle' initiative."  Letter on Behalf of Petitioner to Commerce re: Petitions at Vol. IX, p. 77-78 (Apr. 24, 2024) ("Petition") (P.R. 5).  Accordingly, Commerce initiated its investigations on the basis that in instances where "Chinese banks provide policy lending at below-market rates to solar cell producers in Vietnam in support of BRI capacity cooperation projects" and "the program is limited to BRI investment zones and { . . . } contingent upon export", such loans may be identified as a financial contribution that confers a benefit with specificity under the Act.  See Initiation Checklist at 14-16 (May 16, 2024) ("Initiation Checklist") (P.R. 106).  Thus, for Commerce to find that a loan meets the description

of the alleged program, the loan must meet two criteria: (1) policy lending at below-market rates in support of BRI capacity cooperation projects and (2) limited to BRI investment zones and contingent upon export.

In the Final Determination, Commerce unlawfully relied on the GOC's alleged lack of response to the program to apply adverse facts as available and find that JA Solar's loans were related to BRI capacity cooperation projects. See Final I&D Mem. at 49 ("Without a full response from the GOC, we cannot determine if any loans received by {JA Solar} are related to the BRI Capacity Cooperation Projects.") (P.R. 858). Again, even when relying on AFA, Commerce cannot simply ignore evidence that undermines its determination. See, e.g., Zhejiang Dunan, 652 F.3d at 1348. Further, where Commerce finds that the GOC failed to provide information, it nonetheless must avoid applying AFA against a cooperating party that otherwise submits information that can fill any alleged gap on the record. See GPX Int'l Tire Corp. v. United States, 37 C.I.T. 19, 58-59, 893 F. Supp. 2d 1296, 1331-1332 (2013) ("When Commerce has access to information on the record to fill in the gaps created by the lack of cooperation by the government, as opposed to the exporter/producer, however, it is expected to consider such evidence."), aff'd GPX Int'l Tire Corp. v. United States, 780 F.3d 1136 (Fed. Cir. 2015). Here, the only reasonable reading of the record, as described below, was that JA Solar fully cooperated with Commerce's investigation and submitted sufficient information that could have filled in any alleged gap caused by the GOC's responses.

A fully cooperative JA Solar submitted information demonstrating that its loans were (1) ordinary commercial loans that were not associated with the GOC's BRI capacity cooperation projects with no "preferential rates"; and (2) not contingent, or in any way conditional, upon JA Solar's investment in a "BRI industrial zone" or physical location in specific areas "such as

industrial parks, special economic zones, other areas designated by {the Vietnamese} government and/or designated in cooperation with the GOC or the GOC-owned entities." See JA Solar Sec. III QR at Vol. I, p. 59-63; Ex. I-27 (Confidential Version) (C.R. 192; C.R. 211).  In particular, JA Solar's underlying loan contracts from [

],

clearly showed that they were ordinary commercial loans that [

].  See id. at Vol. I, Ex. I-27 (C.R. 211).  The [

].  See id. at Vol. I, Ex. I-27 (Article 6.3 of [          ] Agreement referring to [                    ] and Article 9.1 of [       ] Agreement referring to [                    ]).   (C.R. 211).  As the [

] of these loans were based on [

], these loans were ordinary commercial loans, unrelated to any policy lending at below-market rates in support of BRI projects.  See id.  at Vol. I, Ex. I-27.

Further, as Commerce acknowledged, it "review{ed} and confirm{ed} {JA Solar}'s reporting of loans with respect to this program." See Final I&D Mem. at 49 (P.R. 858).  Commerce conducted an extensive review of all of JA Solar's loans during the verification, reconciling all reported expenses and financial documents as well as examining all loan applications, agreements and proof of payment statements, ultimately finding no discrepancies with JA Solar's reporting.

See Verif. Rep. (Confidential Version) (C.R. 759).  In other words, Commerce did not find any information that would suggest that JA Solar's loans were not ordinary commercial loans.

Commerce did not address any of JA Solar's loan documents as described above.  In GPX International, Commerce applied AFA against a respondent due to the GOC's failure to provide information relating to a debt forgiveness program.  See 37 CIT at 57, 893 F. Supp. 3d at 1331. The Court remanded Commerce's application of AFA because Commerce failed to consider information submitted by the respondent that Commerce requested from the GOC.  See 37 CIT at 60, 893 F. Supp. 3d at 1333.  The Court reasoned that "Commerce was . . . required to consider the record evidence put forward by {the respondent}, as the party directly affected by duties . . ."  Id. Like in GPX International, this Court should similarly find that Commerce's determination to countervail JA Solar's loans was unsupported by substantial evidence and otherwise not in accordance with law because Commerce unlawfully hid behind AFA to disregard information submitted by a cooperating JA Solar.  Once properly considered, this information demonstrated that JA Solar's loans were not countervailable as ordinary commercial loans not associated with the BRI.  This Court, therefore, should remand this issue back to Commerce with instructions to find that JA Solar's loans are not countervailable.

**VI.    COMMERCE'S DETERMINATION TO APPLY AFA AGAINST JA SOLAR WITH RESPECT TO THE IMPORT DUTY EXEMPTIONS ON IMPORTED EQUIPMENT WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS OTHERWISE NOT IN ACCORDANCE WITH LAW**

Commerce's application of AFA is a two-step inquiry.  First, before Commerce can apply facts otherwise available it must determine if "necessary information is not available on the record" or a respondent "withholds information . . . fails to provide such information by the deadlines for submission . . . significantly impedes a proceeding . . . provides . . . information {that} cannot be verified." 19 U.S.C. § 1677e(a).  Second, if Commerce makes an overt finding of non-cooperation,

it may use an adverse inference against that non-cooperative party.  See 19 U.S.C. § 1677e(b).

Commerce's application of AFA against JA Solar with respect to the Import Duty Exemptions on

Imported Equipment program was unsupported by substantial evidence and otherwise not

accordance with law because JA Solar did not withhold or fail to provide information or otherwise

impede Commerce's investigation and instead fully cooperated with Commerce's investigation.

See Final I&D Mem. at 88 (P.R. 858).

        The only reasonable reading of the record was that JA Solar properly disclosed that it had

imports of machinery as requested by Commerce.  Specifically, JA Solar explained that "as an

export processing enterprise . . . {a}ll machinery, equipment, parts are not subject to duty so long

as they are used in the production of exported products" under the "Import Duty Exemptions on

Imported Raw Materials for Export Processing Enterprises and Export Processing Zones."  JA

Solar Sec. III QR at Vol. I, p.29 (P.R. 457).  Further, JA Solar explained that "{a}ll machinery,

equipment exported products, as an eligible export processing enterprise under applicable legal

statutes, are not subject to import duties under Vietnamese domestic law and various free trade

agreements."  Id.  Contrary to Commerce's findings leading to its application of AFA, see Final

I&D Mem. at 87 (P.R. 858), Commerce did not ask JA Solar to report its imports of machinery

during the fully extended AUL period in any of its questionnaires, but rather specifically asked JA

Solar to "{i}ndicate each of the items of equipment and machinery for which your company

received import duty exemptions during the POI."  JA Solar Sec. III QR at Vol. I, p. 28 (P.R. 457).

Commerce's questionnaire, thus, was clear that it limited its investigation of this program to the

POI.

        Commerce dismissed the language limiting its investigation of this program to POI as only

applying to JA Solar's reporting of its purchases of raw materials, as opposed to machinery,

whereas Commerce's initial questionnaire stated: "Commerce is also investi{gati}ng alleged allocable, non-recurring subsidies that your company may have received during the AUL period." Final I&D Mem. at 87 (P.R. 858).  This language, however, is in reference to the reporting of affiliates where a company may have received the assets of another company during the AUL and is unrelated to Commerce's investigation of JA Solar's purchases of machinery.  See id. at 87, n. 357; see also JA Solar Affiliation QR at 6 (P.R. 301).  Further, contrary to Commerce's reasoning that JA Solar had an obligation to report "Other Subsidies" section{,}" the exemptions that JA Solar received for its imported equipment during the AUL, as verified by Commerce, were  under the "Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises and Export Processing Zones" program and not under a "different program" related to importation of equipment.  Final I&D Mem. at 87 (P.R. 858).  Commerce initiated the program under "Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises and Export Processing Zones" and limited that reporting to the POI.  See Initiation Checklist at 11 (P.R. 106). Where the reporting of a program is limited to a set time-period, Commerce cannot reasonably then conclude that a respondent is required to report an alleged benefit beyond the parameters of its instructions.  Commerce's application of AFA against JA Solar, thus, was unsupported by substantial evidence and otherwise not in accordance with law because JA fully cooperated with Commerce's investigation by reporting its purchases of machinery during the POI as required by Commerce's questionnaire.  See 19 U.S.C. § 1677e(a) – (b).

Finally, contrary to Commerce's determination, the fact that Boviet reported its purchases of machinery in its initial questionnaire for the entire AUL period did not provide JA Solar with sufficient notice that it was similarly required to report its own purchases of machinery.  See Final I&D Mem. at 86 (P.R. 858).  19 U.S.C. § 1677m(d) requires that, if Commerce determines that "a

request for information . . . does not comply with the request," Commerce must inform a respondent of "the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C. § 1677m(d). Commerce cannot meet its obligations 19 U.S.C. § 1677m(d) merely by finding that a respondent should have been on notice based on information either requested from or submitted by a different party. See Shelter Forest Int'l Acquisition, Inc. v. United States, __ CIT __, __, 497 F. Supp. 3d 1388, 1401 (2021) (holding that a respondent's "access to supplemental questionnaires seeking additional information from the mandatory respondents did not provide adequate notice that its {response} was deficient" as required under 19 U.S.C. § 1677m(d)), aff'd Shelter Forest Int'l Acquisition, Inc. v. United States, 2022 U.S. App. LEXIS 16491, *13 (Fed. Cir. 2022). Here, JA Solar informed Commerce that its imports of machinery were not subject to duties and properly reported its purchases from the POI. Regardless of Boviet's reporting, Commerce had an obligation to inform JA Solar of any alleged deficiencies in its responses and provide an opportunity to cure any deficiencies. Commerce's failure to do so rendered its application of AFA against JA Solar as unsupported by substantial evidence and otherwise not in accordance with law.

For these reasons, this Court should remand Commerce's application of AFA against JA Solar with respect to the Import Duty Exemptions on Imported Equipment program back to Commerce with instructions to calculate a subsidy rate for JA Solar under this program.

## VII.    COMMERCE'S DETERMINATION TO EXCLUDE VIETNAMESE EXPORT PRICES FROM ITS BENCHMARKS FOR LTAR INPUTS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce unlawfully removed Vietnamese export prices from its benchmarks for silicon wafers, solar glass, silver paste and polysilicon based on determination pursuant to facts otherwise

available that Vietnamese prices for silicon wafers were distorted.  See, e.g., Final I&D Mem. at 68 (P.R. 858).  Commerce's reliance on AFA, or facts otherwise available in this instance, does not "obviate Commerce's obligation to support any such determinations '{with} substantial evidence.'" Trina, 975 F.3d at 1329.   Commerce relied on the fact that "GOC authorities account for at least 71 percent of silicon wafer and solar glass production in China; and 70 percent of silver paste production in China."  See Final I&D Mem. at 41 (P.R. 858).  Commerce noted that it had previously found prices for these inputs in China to be distorted and "excluded exports from Vietnam {from its benchmark prices}, because the goods from the government provider (China) constitute a majority of the Vietnamese market."  Post-Prelim. Dec. Mem. at 13 (P.R. 806); see also id. at 15-16 (finding that silver paste and solar glass markets in China and Vietnam were distorted).   Commerce failed to provide a "reasonably discernable" explanation for this finding given that Commerce provides no justification for its determination that a 70 or 71 percent threshold is sufficient to distort an external market.  NMB, 557 F.3d at 1319.  Determining market "distortion" must be supported by more facts and reasoning than simply citing to a high percentage of import share. Nor does Commerce provide an explanation for arbitrarily excluding Vietnamese pricing without conducting a similar of analysis of whether Chinese prices distort import pricing in other countries included in the Comtrade data.  See Post-Prelim. Dec. Mem. at 13 (P.R. 806); see also id. at 15-16.  By Commerce's logic, no data could be used as benchmark because GOC authorities control the world-wide market for production of these LTAR inputs.  For these reasons, this Court should remand Commerce's determination to exclude Vietnamese pricing data from its LTAR input benchmarks as Commerce failed to support its determination with substantial evidence.

**CONCLUSION AND RELIEF REQUESTED**

For the forgoing reasons, JA Solar requests that the Court grant its Rule 56.2 Motion for Judgment Upon the Agency Record because Commerce's actions as described above were unsupported by substantial record evidence and otherwise not in accordance with law.

Respectfully submitted,

Dated: February 24, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Bryan P. Cenko
Clemence D. Kim
**Mowry & Grimson, PLLC**
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
jsg@mowrygrimson.com
*Counsel to JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chamber Procedures and the Scheduling Order to this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 13,855 words.

<u>Dated</u>: February 24, 2026

<u>/s/ Jeffrey S. Grimson</u>
Jeffrey S. Grimson
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, D.C. 20015
202-688-3610
jsg@mowrygrimson.com
*Counsel to JA Solar Vietnam Company*
*Limited, JA Solar PV Vietnam Company*
*Limited, JA Solar NE Vietnam Company*
*Limited and JA Solar USA Inc*