UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED ET AL., <br>            Plaintiffs, <br>    and <br><br> BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR(VIETNAM) INDUSTRIES COMPANY LIMITED <br>            Consolidated Plaintiffs, <br>    and <br><br> TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED, <br>            Plaintiff-Intervenor, <br><br>    v. <br><br> UNITED STATES, <br>            Defendant, <br>    and <br><br> AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, <br>            Defendant-Intervenor. | Consol. Court No. 25-0157 |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT R."), Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet"), respectfully moves this Court for an order granting movants judgment on the agency record against Defendant, the United States (representing the U.S. Department of Commerce), including, but not limited to the following relief:

- Declaring the Department's decision to countervail alleged subsidies from China in this investigation against Vietnam is inconsistent with the Tariff Act, arbitrary and

1

capricious, and contrary to law; and

- Declaring the Department's withdrawal of the transnational subsidy regulation was arbitrary and capricious and contrary to law; and

- Declaring that the Department's selection of the silicon wafer benchmark is not supported by substantial evidence, is not in accordance with the law, and is arbitrary and capricious; and

- Declaring that the Department's selection of the glass benchmark is not supported by substantial evidence, is not in accordance with the law, and is arbitrary and capricious; and

- Declaring the Department's inclusion of VAT and import duties in the benchmark calculation for an EPE is not supported by substantial evidence;

- Declaring the Department's finding of use of Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises program and the application of AFA to the program is unsupported by substantial evidence and is not in accordance with the law; and

- Remanding to the Department to recalculate Plaintiff's margin in accordance with the law.

WHEREFORE, for the reasons described in this Motion, Plaintiff respectfully requests that this Court enter judgment in their favor.  A proposed order is attached for the Court's consideration.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Date: February 24, 2026

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED ET AL., ) | |
| Plaintiffs, ) | |
| and ) | |
| ) | |
| BOVIET SOLAR TECHNOLOGY CO., LTD., ) | Consol. Court No. 25-0157 |
| JINKO SOLAR(VIETNAM) INDUSTRIES ) | |
| COMPANY LIMITED ) | |
| Consolidated Plaintiffs, ) | |
| and ) | |
| ) | |
| TRINA SOLAR ENERGY DEVELOPMENT ) | |
| COMPANY LIMITED, ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| AMERICAN ALLIANCE FOR SOLAR ) | |
| MANUFACTURING TRADE COMMITTEE, ) | |
| Defendant-Intervenor. ) | |

**ORDER**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT R."), Plaintiff Boviet Solar Technology Co., Ltd.'s Memorandum in support of its Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings had herein, it is hereby

ORDERED that said motion is GRANTED, and it is further

1

ORDERED that this case is remanded to Department of Commerce with instructions that the Department redetermine aspects of its investigation as instructed by this Court in its accompanying slip opinion.

DATED: _____            _____
           New York, New York                          Claire R. Kelly, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED ET AL., ) | |
| Plaintiffs, ) | |
| and ) | |
| ) | |
| BOVIET SOLAR TECHNOLOGY CO., LTD., ) | Consol. Court No. 25-0157 |
| JINKO SOLAR(VIETNAM) INDUSTRIES ) | |
| COMPANY LIMITED ) | |
| Consolidated Plaintiffs, ) | |
| and ) | |
| ) | |
| TRINA SOLAR ENERGY DEVELOPMENT ) | |
| COMPANY LIMITED, ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| AMERICAN ALLIANCE FOR SOLAR ) | |
| MANUFACTURING TRADE COMMITTEE, ) | |
| Defendant-Intervenor. ) | |

**CONSOLIDATED PLAINTIFF'S BOVIET SOLAR TECHNOLOGY CO., LTD.'S
RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION
FOR JUDGMENT UPON THE AGENCY RECORD**

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar
Technology Co., Ltd.*

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

Dated: February 24, 2026

# TABLE OF CONTENTS

I.    Rule 56.2 Statement ......................................................................................... 1

    A.    Administrative Determination Subject to Appeal ......................................... 1

    B.    Issues Presented .......................................................................................... 1

II.   Standards of Review ....................................................................................... 2

III.  Commerce Cannot Countervail Subsidies from China in an Investigation Against Vietnam ......................................................................................................... 3

    A.    The Tariff Act Does Not Authorize the Countervailing of Transnational Subsidies, as Its Text, Context, and Structure Show ..................................... 4

    B.    Statutory History Behind the Definition of "Subsidy" Confirms That Transnational Subsidies Are Not Countervailable ....................................... 13

    C.    The Major-Questions Doctrine Confirms That Transnational Subsidies Are Not Countervailable ............................................................................. 16

    D.    Commerce's Reasoning Was Arbitrary and Capricious............................. 19

IV.   Commerce's Benchmark Selection and Calculations for Certain Programs are Arbitrary and Capricious and Unsupported by Substantial Evidence ................ 21

    A.    Solar Wafer.............................................................................................. 22

        1.    History of Relying on Bloomberg ...................................................... 22

        2.    Bloomberg Best Fulfills the Statutory and Regulatory Requirements for Benchmarks ....................................................... 27

    B.    The Only Appropriate Benchmark Price for Solar Glass Is PVinsights ... 31

    C.    Commerce Incorrectly Added VAT and Import Duties to the LTAR Benchmarks ............................................................................................. 32

V.    Commerce's Finding Regarding the Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises ("EPEs") Program is Unsupported by the Record and Unlawful ........................................................................... 34

    A.    Commerce's Finding that the Program Exists is Not Supported by Substantial Evidence................................................................................. 34

**B.**    **The GOV Accounts for Resalable Scrap** ........................................................ **35**

**C.**    **Commerce's Decision to Apply AFA to this Program is Unlawful** ............ **40**

**VI.**    **Conclusion and Prayer for Relief** ............................................................ **45**

# TABLE OF AUTHORITIES

## CASES

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) ...................................................6, 17

*Ameren Servs. Co. v. FERC*, 893 F.3d 786 (D.C. Cir. 2018) .......................................19

*Anderson v. U.S. Sec'y of Agric.*, 30 C.I.T. 1742, 462 F. Supp. 2d 1333 (2006)............................3

*Arizona v. Navajo Nation*, 599 U.S. 555(2023)..........................................................20

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)..........................................2

*ATC Tires Private Ltd. v. United States*, 322 F. Supp. 3d 1365 ........................................... 34-35

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023). ...............................................................5

*Biden v. Nebraska*, 600 U.S. 477 (2023) ....................................................................17

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ..................................................................................30

*Changzhou Trina Solar Energy Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 179 .........28, 32

*Changzhou Trina Solar Energy Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 113 .........28, 32

*Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016).................................................................................................40

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ...................20

*Corley v. United States*, 556 U.S. 303 (2009)..............................................................7

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983)..................2

*Dubin v. United States*, 599 U.S. 110 (2023)..............................................................10

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002) .......................................... 4-5

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ........................................17

*Former Emps. of Champion Aviation Prods. v. Herman*, 23 C.I.T. 349 (1999)...........................13

*Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265 (Ct. Int'l Trade 2016)..................................................................................26

*Learning Res., Inc. v. Trump*, 2026 WL 477534 (U.S. Feb. 20, 2026)................................... 18-19

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) .................................................5, 20

*Lucey v. Chesapeake Appalachia, LLC*, 786 F. App'x 394 (4th Cir. 2019) ..................................10

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).................... 2-3

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003).................................... 40-42

*NFIB v. OSHA*, 595 U.S. 109 (2022)............................................................................................17

*Peer Bearing Co. v. United States*, 766 F.3d 1396 (Fed. Cir. 2014) ...........................................42

*Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) ...........................................................................................................................................2

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989)............................................................ 4-5

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)............................................3, 27

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) .......................................................10

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .....................................................5

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ..............................................................2

*United States v. Hansen*, 599 U.S. 762 (2023) .............................................................................13

*United States v. Rutherford*, 442 U.S. 544 (1979) .......................................................................16

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)...................................................... 5, 17-18, 20

*West Virginia v. EPA*, 597 U.S. 697 (2022)............................................................................ 17-18

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457 (2001) ................................................6

## STATUTES & REGULATIONS

5 U.S.C. § 706(2) ........................................................................................................................19

19 U.S.C. § 3511 .........................................................................................................................15

19 U.S.C. § 3512 .........................................................................................................................15

19 U.S.C. § 1516a .................................................................................................................. 2, 12

19 U.S.C. § 1671(a) ............................................................................................................ *passim*

19 U.S.C. § 1671(c) ................................................................................................................6, 12

19 U.S.C. § 1671(d) ..................................................................................................7, 12

19 U.S.C. § 1671(e) ..................................................................................................7, 12

19 U.S.C. § 1671(f) ..................................................................................................8-9, 12

19 U.S.C. § 1671(k) ..................................................................................................18

19 U.S.C. § 1677(9) ..................................................................................................11-12

19 U.S.C. § 1677(5A). ..............................................................................................4, 9-10

19 U.S.C. § 1677(5) ..................................................................................................*passim*

19 U.S.C. § 1677e(a) ................................................................................................40

19 C.F.R. 315.408(c) ................................................................................................26

19 C.F.R. 351.519 ....................................................................................................*passim*

19 C.F.R. § 351.307(b) .............................................................................................39

19 C.F.R. § 351.527 ..................................................................................................3

19 C.F.R. §351.511(a) ..............................................................................................22, 26-33, 39

**ADMINISTRATIVE DECISIONS**

*Circular Welded Carbon-Quality Steel Pipe from Vietnam: Final Negative Countervailing Duty Determination*, 77 FR 64,471, and accompanying IDM at 14 (Dep't Commerce Oct. 22, 2012) ..................................................................................................................35

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission, and Rescission, in Part; 2021,* 88 Fed. Reg. 88575 (December 22, 2024) ......................................................................................................... 23-25, 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review, Rescission and Intent To Rescind, in Part; 2020,* 88 Fed. Reg. 1,355 (January 10, 2023) ......................................................................................................... 23-25, 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Intent To Rescind, in Part; 2019,* 87 Fed. Reg. 748 (January 6, 2022).......... 23-25, 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Partial Rescission of Countervailing Duty*

*Administrative Review; 2018*, 86 Fed. Reg 48393 (August 30, 2021) ................................... 23-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2017*, 85 Fed. Reg. 7727 (February 11, 2020) .. 23-25, 31

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:* Final Results of Countervailing Duty Administrative Review; 2016; 84 Fed. Reg 45125 (August 28, 2019) ....................................................................... 23-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:* Final Results of Countervailing Duty Administrative Review; 2015, 83 Fed. Reg 34828 (July 3, 2018) ............................................................................. 23-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg 32678 (July 17, 2017) ........................................................................................ 23-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013*, 81 Fed. Reg. 46904 (July 19, 2016) ........................................................... 23-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 80 Fed. Reg 41003 (July 14, 2015) .......................................... 23-25

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 87 Fed. Reg. 75221 (Dec. 8, 2022) .................................................. 24-25

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 7531 (February 10, 2020) ...................................................................................................... 24-26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assemble, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments, 2016-2017*,  83 Fed. Reg. 248 (December 28, 2018) ............................................................................................................... 25-26, 30

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2015–2016*, 83 Fed. Reg. 1018 (January 9, 2018) ........................................................................................................ 25-26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the*

*People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2014–2015*, 81 Fed. Reg. 93888 (December 22, 2016) .......................................................................................... 25-26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2020–2021*, 88 Fed. Reg. 1,046 (January 6, 2023) ............ 25-26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021–2022*, 89 Fed. Reg. 457 (January 4, 2024) .............. 25-26

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 Fed. Reg. 72,923 (December 23, 2021) .... 25-26

*Final Determination in the Countervailing Duty Investigation of Utility Scale Wind Towers from Malaysia*, 86 ITADOC 30593 (June 9, 2021) .................................................................. 5-6

*High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 26,738 (Dep't Comm. 2012) ........................33

## OTHER AUTHORITIES

Pub. L. 93-618 (1975), § 331(a), 88 Stat. 2049 ....................................................................... 13-14

Pub. L. No. 96-39, § 103, 93 Stat. 190 ........................................................................................14

Pub. L. No. 96-39, § 101, 93 Stat. 151 ........................................................................................14

Pub. L. No. 100-418, Pt. 2, § 1312, 102 Stat. 1184 ....................................................................14

Pub. L. No. 103-465, § 261, 108 Stat. 4908 ................................................................................15

Pub. L. No. 112-99, § 1, 126 Stat. 265 ........................................................................................16

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 FR 20,766 (Mar. 25, 2024) .............................................................................................................................................3

S. 691 (119th Cong.), § 201 .........................................................................................................18

S. 1856 (118th Cong.) § 201 ........................................................................................................18

S. 1187 (117th Cong.), § 201 .......................................................................................................18

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ................................................................15

49 FR 32,639 (Aug. 15, 1984) ........................................................................................................14

45 FR 1,468 (Jan. 7, 1980).......................................................................................................... 14-15

58 FR 37,217 (July 9, 1993) ...........................................................................................................14

## I.    Rule 56.2 Statement

Pursuant to Rule 56.2 (c)(1), Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

The U.S. Department of Commerce published the contested final results in the Federal Register on April 25, 2025. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part of Vietnam*, 90 FR 17,399 (Apr. 25, 2025) *incorporating* Issues and Decision Memorandum ("IDM")*,* **PR860**. Boviet also supports and incorporates by reference the arguments raised by JA Solar in their R56.2 brief.

### B.    Issues Presented

1.    Whether Commerce's decision to countervail alleged subsidies from China in this investigation against Vietnam is consistent with the Tariff Act, arbitrary and capricious, and contrary to law?

2.    Whether Commerce's silicon wafer and glass benchmark was supported by substantial evidence or in accordance with the law?

3.    Whether Commerce's inclusion of import duties in the benchmark prices was supported by substantial evidence or in accordance with the law?

4.    Whether Commerce's finding of use of Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises program and the application of AFA to the program is supported by substantial evidence or in accordance with the law?

## II.     Standards of Review

The Court will only sustain Commerce's factual determination if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Furthermore, "substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (CIT 1983). Moreover, "Commerce's determination cannot be based on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249, 1252 (CIT 2016) (internal citation omitted).

Further, the Court will also hold as unlawful any administrative decision that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for

2

the change in practice." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003). It is well-established that "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (alteration, quotation marks and citation omitted). An agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted). A "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'" *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (CIT 2006) (citation omitted).

## III. Commerce Cannot Countervail Subsidies from China in an Investigation Against Vietnam.

For over a quarter century, Commerce's regulations recognized that the Tariff Act does not reach "transnational subsidies," that is, subsidies from governments outside the country under investigation. *See* 19 C.F.R. § 351.527 (2023); 63 FR 65,348, 65,417 (Nov. 25, 1998). And that followed the unbroken understanding from the Tariff Act's enactment in 1930. Yet in 2024, Commerce rescinded this longstanding rule and concluded, for the first time, that it *can* countervail transnational subsidies. *See* 89 FR 20,766, 20,826-27 (Mar. 25, 2024). Commerce flexed its new powers in the underlying investigation here by imposing countervailing duties ("CVDs") on subsidies from the Government of *China* to producers in *Vietnam*.

The Court should hold that Commerce lacks statutory authority to countervail such transnational subsidies. As Part I.A explains, the Tariff Act's text and structure, particularly in Sections 701 and 771, presuppose that the subsidizing authority is the same as the country under investigation—not the government of a third country. Two statutory provisions would be reduced to surplusage if transnational subsidies were countervailable, and several others contain textual indicators or rely on economic assumptions that do not square with the cross-border context. Nor

can these problems be avoided by pretending transnational subsidies are actually "domestic," as Commerce did here, because "specific" domestic subsidies must be made "to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*." 19 U.S.C. § 1677(5A)(D) (emphasis added). Vietnamese firms are obviously not within the jurisdiction of China, and Commerce's atextual workaround—that a foreign firm could "be subject to Chinese law despite being physically located in a different country"—reveals the weakness of its position.

As Part I.B shows, the statutory history confirms this understanding of the Tariff Act. Earlier versions of the Act authorized Commerce to countervail a "bounty or grant" and expressly tied the bounty or grant to the country under investigation—excluding transnational scenarios. Although Congress later adopted the phrase "subsidy" in place of "bounty or grant," it at the same time approved a rule of interpretation confirming that the two definitions are substantively aligned. Part I.C. shows that, at minimum, the major-questions doctrine requires "clear congressional authorization" to countervail transnational subsidies, which is absent here notwithstanding that the issue has been continuously before Congress in recent years. Finally, Part I.D. shows that, even setting aside statutory defects, Commerce's determination does not reflect reasoned decision making and therefore should be set aside as arbitrary and capricious.

### A. The Tariff Act Does Not Authorize the Countervailing of Transnational Subsidies, as Its Text, Context, and Structure Show.

In its decision here, Commerce determined that "{n}othing" in the Tariff Act requires that the authority "providing a countervailable subsidy must be the *same* {authority} as the government of the country within which that subsidy is received." IDM at 26-27. But that framing—which asks whether the Tariff Act expressly *prohibits* countervailing transnational subsidies—is upside down. Tariffs are taxes, and "Congress must indicate clearly its intention to delegate to the Executive the discretionary authority to" impose "'fees' or 'taxes.'" *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S.

212, 224 (1989). It is "indeed well established that the absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 815-16 (Fed. Cir. 2002) (rejecting Commerce's argument that it "has authority to conduct two and four year reviews of transition orders because both the statute and legislative history are silent as to" that issue).

Thus, the proper question is whether the Tariff Act *authorizes* the agency to countervail transnational subsidies. That is a question of statutory interpretation, which "always" begins with "the text of the statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023). Moreover, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014). Thus, an agency interpretation that is "inconsisten{t} with the design and structure of the statute as a whole" is impermissible. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). Any ambiguities in a statute are to be resolved with "legal interpretation," not by agency "policymaking." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 403 (2024). Applying these tools, the Tariff Act does not authorize Commerce to countervail transnational subsidies.

*1. Section 701(a)'s Singular Language.* The starting point is Section 701(a)(1), which authorizes CVDs where Commerce "determines that *the* government of *a* country or any public entity within the territory of *a* country is providing … a countervailable subsidy." 19 U.S.C. § 1671(a)(1) (emphasis added). As Commerce itself once recognized, the Act's singular language (*the* government of *a* country) "indicates that the general rule is that Commerce's CVD analysis is focused on a particular (*i.e.*, 'the') government of a country," not the governments of third countries. *See* IDM, *Final Determination in the Countervailing Duty Investigation of Utility Scale*

5

*Wind Towers from Malaysia*, 86 ITADOC 30593 (June 9, 2021); *see* 86 FR 30,593 (adopting the IDM).

In the investigation here, however, Commerce emphasized "{t}he use of the indefinite article in '*a* country,'" which supposedly "indicates that the country of the authority providing a countervailable subsidy may be distinct and separate from the country where the countervailable subsidy is received." IDM at 24; *see also id.* (noting that Section 771(5)(B) also uses an indefinite article). But context shows that Congress is referring to "a country" *from which subject merchandise is imported*, not any country that happens to provide a subsidy. The back half of Section 701(a)(1), for instance, refers to "a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise *imported, or sold (or likely to be sold) for importation*, into the United States." 19 U.S.C. § 1671(a)(1) (emphasis added). The next paragraph specifies rules for "merchandise *imported from a Subsidies Agreement* country," *id.* § 1671(a)(2) (emphasis added), and a later subsection specifies other rules for "merchandise *imported from a country* which is not a Subsidies Agreement country," *id.* § 1671(c) (emphasis added). The focus throughout is on the country from which merchandise is imported. *See also id.* § 1671a(b)(4)(A) (requiring notification and an opportunity for consultations to "the government of any exporting country named in the petition"). Reading a one-letter word to expand CVD investigations to third-country conduct is implausible. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

In all events, the word "a" was the only textual hook Commerce cited in favor of its position. That is a "wafer-thin reed" for countervailing transnational subsidies, and it collapses under the weight of additional statutory context and structure, as explained next. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam).

*2. Surplusage (§ 701(d) & (e)).* Looking further down the page of Section 701, two of its other subsections reinforce that transnational subsidies are not countervailable here. Section 701(d) concerns "members (or other participating entities) of an *international consortium* that is engaged in the production of subject merchandise." 19 U.S.C. § 1671(d) (emphasis added). If they "receive countervailable subsidies from their respective home countries," then Commerce "shall cumulate all such countervailable subsidies, as well as countervailable subsidies provided directly to the international consortium, in determining any countervailing duty upon such merchandise." *Id*. And then Section 701(e) addresses an "upstream subsidy"—that is, a subsidy paid "by an authority … with respect to" an "input product" that "is used in the same country as the authority in the manufacture or production of {subject} merchandise" and "has a significant effect on the cost of manufacturing or producing the merchandise." *Id.* §§ 1671(e), 1677-1(a). Commerce is authorized to countervail an upstream subsidy by cumulating subsidies paid by "*an association of two or more foreign countries … organized into a customs union*." *Id.* § 1677-1(a) (emphasis added).

If Commerce were *generally* empowered to countervail transnational subsidies, then these *targeted* provisions authorizing Commerce to address subsidies from third countries under particular circumstances would be superfluous. Commerce could *always* characterize international-consortium subsidies or upstream subsidies as "transnational" and countervail them on that ground alone, leaving Sections 701(d) and 701(e) with no work to do. That would violate "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (brackets and internal quotation marks omitted).

Indeed, Commerce itself has recognized this surplusage problem, as to both of these sections. In 2021, it explained: "To interpret the Act in a different manner – *i.e.*, to allow

Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies{'} participation in an international consortium engaged in the production of subject merchandise – would render the international consortium provision superfluous." 86 ITADOC 30593. Commerce went on: "The fact that {the upstream-subsidies section} of the Act identifies a *narrow* set of circumstances under which benefits from an authority operating outside of the country in question, or in the form of a supranational entity, may be countervailed, suggests that the *general* rule is that countervailable subsidies are limited to those provided by the country under investigation." *Id.* (emphases added).

Today, however, Commerce grievously misunderstands the implications of these provisions. In rescinding the transnational-subsidy regulation, it noted that "the Act allows Commerce to countervail a subsidy from multiple countries if those countries are part of an international consortia" and invoked this point in *favor* of countervailing transnational subsidies *generally*, regardless of whether there is an international consortium. 89 FR at 20,827. That reasoning turns the presumption against surplusage on its head and for that reason should be rejected. *See FAG Italia*, 291 F.3d at 817 ("The fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances."). And Commerce's cursory response below—that the "transnational subsidies … at issue here" do not present "the circumstances applicable to sections 701(d) or 701(e)" (IDM at 27)—underscores the point: Because the Act specifies the narrow circumstances in which third-country subsidies may be countervailed, scenarios outside those constraints fall beyond the statute's authorization.

*3. Nonmarket Economy Country Rules (§ 701(f)).* Section 701(f)—which provides rules for nonmarket economy ("NME") countries—further underscores the absence of authority to countervail transnational subsidies generally. Commerce may decline to impose under Section

701(a) CVDs on merchandise imported "into the United States *from a {NME} country* if {Commerce} is unable to identify and measure *subsidies provided by the government of the {NME} country* or a public entity within the territory of the {NME} country because the economy of that country is essentially comprised of a single entity." 19 U.S.C. § 1671(f)(2) (emphases added). This exception to Section 701(a) takes for granted that the country of export is the same as the country providing the otherwise-countervailable subsidy, as the language expressly equates the two. This further undermines Commerce's claimed authority to generally countervail transnational subsidies.

**4. "Specific" Subsidy (§ 771(5)(A)).** Provisions beyond Section 701, particularly in the Tariff Act's definitions, provide further contextual clues that transnational subsidies are outside Commerce's authority. To be a countervailable subsidy, a financial contribution must be "specific." 19 U.S.C. § 1677(5)(A); *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1329 (Fed. Cir. 2020) ("Before imposing a countervailing duty, Commerce must necessarily determine that a subsidy is 'specific'…. Otherwise, Commerce cannot impose a countervailing duty to offset that subsidy."). Here, Commerce found that the Government of China's subsidies to Vietnamese firms were "specific" under Section 771(5A)(D). IDM at 32-33, 44. That provision, however, says a subsidy is "specific" only if granted "to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*." 19 U.S.C. § 1677(5A)(D) (emphasis added). That cannot be squared with transnational subsidies, which are granted to an enterprise or industry within the jurisdiction of *another country*.

To escape this difficulty, Commerce determined that Boviet and JAVN—Vietnamese firms—are "within the jurisdiction of the {Government of China}" because "a company with state-owned or state-controlled investors may … be subject to Chinese law despite being physically

located in a different country." IDM at 44. But for at least three reasons, the word "jurisdiction" must be understood in a geographic sense. *First*, the title of paragraph (D) is "Domestic subsidy," which demonstrates a territorial focus. *Dubin v. United States*, 599 U.S. 110, 120-21 (2023) ("This Court has long considered that the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." (citation modified)). *Second*, Congress chose to use the phrase "within the jurisdiction" of the granting authority, rather than "subject to" its jurisdiction. The word "within" connotes a territorial limitation. *Lucey v. Chesapeake Appalachia, LLC*, 786 F. App'x 394, 397 (4th Cir. 2019) ("The primary definition of the word 'within' is 'inside, enclosed by.'"). *Third*, subparagraph (iv) states: "Where a subsidy is limited to an enterprise or industry *located within a designated geographical region within the jurisdiction of the authority providing the subsidy*, the subsidy is specific." 19 U.S.C. § 1677(5A)(D)(iv) (emphasis added). That use of the word "jurisdiction" inescapably has a geographic meaning, and it is unnatural to infer that Congress used the word in a different sense within the same paragraph. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 571 (2012) ("{I}t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (citation modified)).

In short, a subsidy is specific within the meaning of Section 771(5A)(D) only if the recipient is territorially "within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D). That cannot encompass transnational subsidies. Commerce's contrary determination must be vacated.

**5. "Benefit Conferred" (§ 771(5)(B) & (E)).** Another definitional clue demonstrates that cross-border subsidies are not countervailable. The definition of "subsidy" requires that "a benefit is … conferred" by the government's assistance. 19 U.S.C. § 1677(5)(B). A benefit is conferred

where, as alleged here, "goods or services are provided {to the recipient} for less than adequate remuneration." *Id.* § 1677(5)(E)(iv). And "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided … *in the country which is subject to the investigation or review*." *Id.* § 1677(5)(E) (emphasis added).

This framework presupposes that the subsidizing authority and the recipient are in the same country. For instance, if an input costs $10 under "prevailing market conditions" in Vietnam, but a company obtained that input from the Vietnamese government for $6, then it may be fair to infer that the government conferred a subsidy on the company. But that inference does not stand in the transnational-subsidies context. The difference between (1) the "prevailing" price in one's *own country* and (2) the price charged by a *foreign* entity does not necessarily reflect a subsidy by the foreign government, because pricing may differ across countries for reasons unrelated to subsidies. For instance, if an Italian firm bought a barrel of oil from a Saudi Arabian oil company for $50, no one would say it received a "subsidy" simply because an Italian oil company would charge $80 for the barrel; the price difference simply reflects Saudi Arabia's natural comparative advantage in oil production. So too here, even if a Chinese producer sells a good for $6 when its prevailing price in Vietnam is $10, that does not inevitably reflect a subsidy.

In short, if transnational subsidies are countervailable, then the Tariff Act's "less than adequate remuneration" formula embeds an economic fallacy. The better inference is that the Act is simply not engineered for the cross-border context.

*6. "Interested Party" (§ 771(9) etc.).* Yet another prominent clue against Commerce's reasoning comes from the Tariff Act's definition of "interested party." The Act affords that status to a wide range of persons whose interests would be affected by a CVD order, including "a foreign manufacturer, producer, or exporter … of subject merchandise" and "the government of a country

11

in which such merchandise is produced or manufactured or from which such merchandise is exported." 19 U.S.C. § 1677(9)(A)–(B). Conspicuously absent from the list, however, are third-country producers and governments.

That absence is telling in itself, and related provisions confirm the significance of that absence. The Act guarantees "interested parties" a range of important procedural rights, which indicate the parties' stake in the outcome of a CVD proceeding. For instance, only interested parties:

- can submit comments before initiation, *id.* § 1671a(c)(4)(E);

- can submit comments and information for the record before the suspension of an investigation, *id.* § 1671c(e)(3);

- can seek review of a CVD order based on changed circumstances, *id.* § 1675(b)(1);

- are entitled to service of "written information, including business proprietary information … if the information is covered by a protective order," *id.* § 1677f(d);

- are entitled to have their relevant arguments addressed by Commerce in making final determinations, *id.* § 1677f(i)(3);

- and can seek judicial review, *id.* § 1516a(a).

On the flip side, the Tariff Act imposes *burdens* on interested parties that do not cooperate with an investigation. For instance:

- An "interested party or any other person" may fail to provide information requested by Commerce, but when an "interested party" fails to do so, the agency can draw adverse inferences from the facts available. *Id.* § 1677e(a), (b)(1).

- And when an interested party does not cooperate, Commerce need not "estimate what the countervailable subsidy rate … would have been if the interested party …

had cooperated" or "demonstrate that the countervailable subsidy rate … reflects an alleged commercial reality of the interested party." *Id.* § 1677e(d)(3). If subsidies from third-country producers and governments are subject to CVD orders, then their interests are equally at stake in these proceedings. It would be most odd for Congress to have excluded them from these benefits and burdens of participating as full-fledged "interested parties."

Commerce ignored this argument, which reinforces the unreasonableness of its action here. *Former Emps. of Champion Aviation Prods. v. Herman*, 23 C.I.T. 349 (1999) ("One indication of the unreasonableness of the agency's action is that the agency has entirely failed to consider an important aspect of the problem.").

Petitioner did at least respond, contending that "a host of parties impacted directly by the Act … are not granted interested party status, including input providers and tollers." IDM at 22. But that generality fails to explain the conspicuous anomaly of granting interested-party status to *exporting countries* that provide a subsidy, but not *third countries* that provide a subsidy—even though the two may have equivalent stakes in the outcome of the investigation.

### B.    Statutory History Behind the Definition of "Subsidy" Confirms That Transnational Subsidies Are Not Countervailable.

"Statutory history is an important part of th{e} context" that informs a statute's meaning. *United States v. Hansen*, 599 U.S. 762, 775 (2023). Here, the history of enacted changes culminating in the Tariff Act's definition of "subsidy" confirms that transnational subsidies are not countervailable. The starting point is Section 303 of the original Act, which provided: "Whenever any country … shall pay or bestow … any *bounty or grant* upon the manufacture or production or export of any article or merchandise *manufactured or produced in such country* … then upon the importation of any such article or merchandise into the United States," a duty shall be imposed. Act of June 17, 1930, § 303, 46 Stat. 687 (emphasis added); *see also* Pub. L. 93-618

(1975), § 331(a), 88 Stat. 2049 (substantially retaining this definition). That definition expressly equated the country providing the "bounty or grant" with the country that manufactured or produced the subject merchandise. A transnational "bounty or grant" was thus not countervailable. So things stood for nearly 50 years.

After the Tokyo Round in 1979, Congress created a two-track system: one for subsidies provided by countries "under the Agreement" and another for subsidies provided by countries not "under the Agreement." Section 303 continued in the same form, except that it applied only to merchandise from non-Agreement countries. Pub. L. No. 96-39, § 103, 93 Stat. 190; *see also* Pub. L. No. 100-418, Pt. 2, § 1312, 102 Stat. 1184 (substantially retaining this definition). Section 701 was added for Agreement countries, and it authorized CVDs on "subsidies." Pub. L. No. 96-39, § 101, 93 Stat. 151. The Act then linked this new provision to Section 303, explaining that "{t}he term 'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 303 of this Act." *Id.* at 177. And because a transnational "bounty or grant" continued to be not countervailable, the same was necessarily true of "subsidies" in Section 701.

Commerce recognized this statutory logic. In the early 1990s, for example, it explained: "*section 303(a)(1)* makes clear that a subsidy from the government of a particular country is countervailable only if it is given to a company manufacturing or producing the merchandise in, or exporting the merchandise from, that country," and, "*therefore*, {under} *section 701*, a subsidy is not countervailable if it is given by the government of one country to a company manufacturing or producing the merchandise in another country." 58 FR 37,217, 37,233 (July 9, 1993) (emphases added). This "transnational subsidies rule," it elaborated, "is not merely a rule of administrative convenience devised by the Department. Rather, that rule *essentially re-states the statute.*" *Id.* (emphasis added); *see also* 49 FR 32,639, 32,640 (Aug. 15, 1984) ("Since the merchandise under

14

investigation is produced in Turkey, a loan provided by the World Bank is not countervailable."); 45 FR 1,468, 1,469 (Jan. 7, 1980) (a "payment or bestowal … from the U.S. Government" to "Austrian manufacturers …, with no contribution from the Austrian government" was determined "as a matter of law, not to constitute a bounty or grant").

That was the setting for the last key development, after the 1994 Uruguay Round, when Congress replaced the "bounty or grant" formulation with a single statutory definition of "subsidy," reflecting the Agreement on Subsidies and Countervailing Measures ("SCM"). Pub. L. No. 103-465, § 261, 108 Stat. 4908; *see* 19 U.S.C. § 1677(5). At the same time, Congress approved a Statement of Administrative Action ("SAA") explaining how the statutory language was to be interpreted. *See* 19 U.S.C. § 3511(a)(2) ("Congress approves … the statement of administrative action proposed to implement the agreements that was submitted to the Congress on September 27, 1994."); *id.* § 3512(d) ("The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."). The SAA states as follows: "In general, the Administration intends that the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute, unless that practice or interpretation is inconsistent with the definition contained in the bill." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 (hereinafter "SAA").

Per the congressionally-approved SAA, then, the definition of "subsidy" continues to mirror the original definition of "bounty or grant" as continuously understood from the Tariff Act's

inception, meaning that a "subsidy" must be provided by the subject country. Indeed, Commerce recognized as much four years later. *See* 63 FR at 65,405 (concluding in 1998 that "the repeal of section 303 by the {1994 Act}" did not "eliminate{} the transnational subsidies rule, and there is no other indication that Congress intended to eliminate this rule"). And Congress itself has continued to operate under the assumption that transnational subsidies are not countervailable. For instance, it enacted Section 701(f) (*i.e.*, the rules for NME countries, *supra* § I.A.3) in 2012 against the backdrop of Commerce's then-extant prohibition on countervailing transnational subsidies. *See* Pub. L. No. 112-99, § 1, 126 Stat. 265. Not only did Congress acquiesce to the transnational-subsidy rule by choosing not to disturb it. *See United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979). Congress affirmatively signaled its agreement with that rule by crafting a provision that presupposes its validity. *Cf. Lorillard v. Pons*, 434 U.S. 575, 581 (1978) ("{W}here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law.").

In sum, from 1930 to the modern day, Congress has signaled over and over again that countervailable subsidies must be bestowed by the country where the merchandise is produced or exported—not third countries. Subsidies provided by China to firms in Vietnam are therefore not encompassed by the Tariff Act.

## C.    The Major-Questions Doctrine Confirms That Transnational Subsidies Are Not Countervailable.

Even if the statutory question were close (it is not), the major-questions doctrine would foreclose Commerce's newfound assertion of power. Under that interpretive principle, when an agency 'claim{s} to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in {its} regulatory authority,'" the agency must identify "clear congressional authorization" supporting that authority, not just "a merely plausible textual basis."

*West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022). Apart from their novelty, agency assertions of authority that carry great "economic and political significance," *id.* at 721, and "intrude{} into an area that is" not the "particular domain" of the agency, *Ala. Ass'n of Realtors*, 594 U.S. at 764, raise major questions.

Commerce's assertion of authority to countervail transnational subsidies bears all the hallmarks of a major-questions case. To begin, Commerce's current view is inconsistent with its decades-long position that the Tariff Act does not apply to cross-border subsidies, as described above. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 158-159 (2000) (noting that for decades the FDA had said it lacked statutory power to regulate cigarettes). That alone is "reason to 'hesitate before concluding that Congress' meant to confer on {Commerce} the authority it claims." *West Virginia*, 597 U.S. at 725; *see also NFIB v. OSHA*, 595 U.S. 109, 119 (2022) ("This 'lack of historical precedent,' coupled with the breadth of authority that the Secretary now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach.").

Commerce's claimed authority also has "vast 'economic … significance.'" *Utility Air*, 573 U.S. at 324. In Commerce's own words, "in today's subsidization landscape, governments provide cross-border equity infusions, fundings, loans, etc., and they are no longer limited to foreign aid." IDM at 24 (quoting 89 FR at 20,826). As an example, Commerce flagged China's Belt and Road Initiative, *id.*, which involves billions of dollars in foreign investment by the Chinese government. Commerce itself has thus confirmed the economic significance of its newfound assertion of authority, as it has claimed for itself the power to countervail substantial sums without any clear textual hook. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (finding economic significance "where the Secretary of Education claims the authority, on his own, to release 43 million borrowers from their obligations to repay $430 billion in student loans").

The issue also has great "political significance," *Utility Air*, 573 U.S. at 324, because "'Congress considered and rejected' multiple times" bills that would have given Commerce the authority to countervail transnational subsidies, *West Virginia*, 597 U.S. at 731; *see* S. 691 (119th Cong.), § 201; H.R. 1548 (119th Cong.), § 201; S. 1856 (118th Cong.), § 201; H.R. 3882 (118th Cong.), § 201; S. 1187 (117th Cong.), § 201; H.R. 6121 (117th Cong.), § 201. Indeed, these bills would expressly address many of the contextual and structural issues noted above—for instance, by amending the international-consortium and upstream-subsidy provisions to account for cross-border scenarios, *e.g.*, S. 691 (119th Cong.), § 201(a)(4), (c), and by adding third-country governments to the list of interested parties in Section 771(9), *e.g.*, *id.* § 201(b)(2) . But Congress has not seen fit to enact these proposals into law, and the agency cannot "work around the legislative process to resolve {the issue} for itself." *West Virginia*, 597 U.S. at 743 (Gorsuch, J, concurring) (citation modified).

Finally, transnational subsidies are outside Commerce's wheelhouse. *Biden*, 600 U.S. at 504 (explaining that the Department of Education's student-loan cancellation plan was more accurately in the "'wheelhouse' of the House and Senate Committees on Appropriations"). Tariffs, being taxes, are a core congressional power, *Learning Res., Inc. v. Trump*, 607 U.S. __, 2026 WL 477534, at *7 (U.S. Feb. 20, 2026), and so the policy decision of whether to authorize duties on transnational subsidies is "one{} that Congress would likely have intended for itself." *Biden*, 600 U.S. at 506. Though Congress has empowered Commerce to address some subsidies, Congress has not authorized it to countervail third-country subsidies. This is significant because, when Congress wants to address unfair trade activity in third countries, it knows how. *See* 19 U.S.C. § 1677k (authorizing the U.S. Trade Representative to address third-country dumping).

In short, Commerce's newfound willingness to countervail transnational subsidies implicates a major question. And as the foregoing sections demonstrated, there is no "clear congressional authorization" in the Tariff Act to support this authority. *Supra* § I.A–B; *see Learning Resources*, 2026 WL 477534, at *10 (opinion of Roberts, C.J.) ("[W]e would not expect Congress to relinquish its tariff power through vague language, or without careful limits."). Commerce's interpretation is thus not the best reading of the statute. *Utility Air*, 573 U.S. at 324.

### D.    Commerce's Reasoning Was Arbitrary and Capricious.

Apart from the absence of statutory authority, Commerce's determination must be set aside because the agency failed to engage in reasoned decision making. *See* 5 U.S.C. § 706(2); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("agency action {must} be reasonable and reasonably explained"). This is for three main reasons.

*First*, "{a}n agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious," *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 794 (D.C. Cir. 2018), and in this case, Commerce ignored or breezed past many of Boviet's arguments recounted above. The agency said nothing about the major-questions doctrine, and it acknowledged but brusquely dismissed Boviet's other statutory arguments. *See* IDM at 28 (noting Boviet's arguments about "(1) The benefit conferred; (2) Nonmarket Economy Country Rules; (3) Subsidies Agreement Country; and (4) Third-Country Dumping Rules" but dismissing them because "as indicated above, the Act does not affect Commerce's ability under the Act to investigate and countervail transnational subsidies"). Boviet also argued that Commerce's rescission of the transnational-subsidy regulation misunderstood the statutory history linking the word "subsidy" to the pre-1994 definition of "bounty or grant"—to which Commerce responded with a block quotation regurgitating the rulemaking's erroneous reasoning. IDM at 46-47.

*Second*, Commerce primarily relied on policy reasons rather than interpretive ones to justify the countervailing of transnational subsidies. Parroting from the rulemaking, Commerce explained that "instances in which a government provides a subsidy that benefits foreign production are far more prevalent," and, "{c}onsequently, the assumptions underlying our interpretation of section 701 of the Act have changed." IDM at 24 (quoting 88 FR at 29,870). Such reasoning has no place when the meaning of a statute is at stake. While *Chevron* deference once allowed agencies to engage in "the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress," *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 (1984), that mode of analysis has been invalidated. As the Supreme Court affirmed in overruling *Chevron*, "the traditional tools of statutory construction" must be used to resolve the meaning of a statute and the scope of the agency's own power. *Loper Bright*, 603 U.S. at 401. But Commerce in its analysis failed to use those tools. *Supra* §§ I.A–I.C. And if Commerce is right that the Tariff Act could benefit from updating due to changed geopolitical realities, that is Congress's job. *See Arizona v. Navajo Nation*, 599 U.S. 555, 566 (2023) ("Under the Constitution's separation of powers, Congress and the President may update the law to meet modern policy priorities and needs."); *Utility Air*, 573 U.S. at 328 (2014) (noting the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"). The statutory language has not changed, and that controls until Congress chooses to change it.

*Third*, as explained above, Commerce found the subsidies at issue here to be "specific" under Section 771(5A)(D) on the theory that firms in *Vietnam* are "enterprise{s} … within the jurisdiction of the authority providing the subsidy," that is, *China*. 19 U.S.C. § 1677(5A)(D); IDM at 44. That contortion is an error of law: Firms within Vietnam are within Vietnam's territorial

jurisdiction, not China's. *Supra* § I.A.5. On this ground alone, Commerce's determination should be vacated as arbitrary and capricious and contrary to law. 5 U.S.C. § 706(2)(A).

IV.    **Commerce's Benchmark Selection and Calculations for Certain Programs are Arbitrary and Capricious and Unsupported by Substantial Evidence.**

In the Final Determination, Commerce relied upon UN Comtrade data under HTS 3818 as a benchmark to value solar polysilicon wafers, and UN Comtrade data under HTS 7007.19 as a benchmark for solar glass—even though that data includes dissimilar products. In doing so, Commerce rejected Bloomberg prices specific to solar polysilicon wafer and PVinsights prices specific to solar glass. Commerce's benchmark selection for solar wafer and solar glass in this investigation is inapposite to its established practice of relying on the most specific benchmarks. Indeed, Commerce has a history of relying on the very same sources for benchmarks for these programs in the reviews of *Solar Cells from China* that it rejected in this investigation. The decision is therefore arbitrary and further, the selection of these benchmarks is not supported by substantial evidence. Boviet addresses specifically the benchmarks for solar wafer and solar glass further below, but there is a common thread running through Commerce's unreasonable decisions in both instances.

First, Commerce rejected these solarspecific sources (Bloomberg and PVinsights) because they are purportedly not disaggregated by country and thus would not allow Commerce to remove prices from China and Vietnam. IDM at 54 (wafer) and 69 (glass), **PR860**. However, it has not been Commerce's practice to require the removal of any price from these countries in calculating a benchmark. As cited below, Commerce has relied upon these sources for years without finding the fact that it could not disaggregate the data to be a reliability issue—indeed, Commerce has actually *preferred* these sources to the very ones Commerce now relies upon. The sources have not changed, nor has Commerce's knowledge that the sources are not disaggregated. Commerce

has changed its practice and policy, without acknowledging that it has and without explaining its justification for this change. This alone is grounds for remand.

Second, Commerce's determination that the prices from Bloomberg and PVinsights are distorted is not supported by substantial evidence. Critically, the benchmark sources argued for by Respondents are aggregated in such a way that Commerce can exclude prices available *in China*. Bloomberg data has "shipped to non-China" prices and PVInsights has "Non-China" prices. Boviet NSA Benchmarks (November 12, 2024) at NSAW-1 **PR733-734**; JA Solar Benchmark (November 12, 2024) at Exhibit NSA2-16 **PR731**. Commerce found China controlled the wafer and glass market in China—not on the entire world market. IDM at 54. It is not established that the inclusion of some prices from China and Vietnam available in other regions and market economies would render the overall benchmark distorted or unreliable. Commerce also failed to consider that relying on a benchmark (the export data) that is very broad and overly inclusive of non-comparable products is distortive and contrary to the statutory and regulatory requirements to rely on a comparable benchmark representative of prices available to the Respondents. 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.511(a)(2)(ii).

### A.  Solar Wafer

#### 1.  History of Relying on Bloomberg

Commerce has a long history of relying upon Bloomberg data in antidumping and countervailing reviews and investigations, with the same information on the data aggregation and regions. In every countervailing review where Commerce benchmarked solar wafer, Commerce relied upon Bloomberg data. In the review of *Solar Cells from China* completed almost simultaneously with this investigation, Commerce found:

> Consistent with our practice of seeking to maintain product comparability between the benchmark prices and the products purchased… and relying on data that reflect

> the narrowest category of products encompassing the input products, we are using
> the world market prices (tier two) published by Bloomberg Prices to derive the
> world market silicon wafer benchmark prices because they are specific to silicon
> wafers.

*Solar from China Prelim. CVD 2021,* 88 FR 88575 (December 22, 2024) and accompanying

Prelim IDM at 23 (unchanged in final). Commerce relied upon the same source and methods in

the prior review. *Solar from China CVD Prelim. 2020*, 88 FR 1,355 (January 10, 2023) and

accompanying Prelim IDM at 26 (unchanged in final). In each instance, Commerce relied upon a

world average, namely the "Average all" also on this record, not finding it needed to remove China.

Prior to the 2020 review, Petitioner had not alleged a program on silicon wafers for LTAR.

However, since the investigation, Commerce has initiated upon a polysilicon LTAR program. In

every single review that Bloomberg data was provided, Commerce relied upon this data as the

most specific benchmark for polysilicon. Commerce relied upon Bloomberg, or other world

benchmark sources specific to solar polysilicon, and critically, these were <u>world</u> benchmarks—

inclusive of Chinese and Vietnamese prices. *Solar from China Prelim. CVD 2019*, 87 FR 748

(January 6, 2022) and accompanying Prelim IDM (relying on Bloomberg) (unchanged in final);

*Solar from China Final CVD 2018*, 86 FR 48393 (August 30, 2021) (program not used by

mandatory respondent); *Solar from China Prelim. CVD 2017*, 85 FR 7727 (February 11, 2020)

and accompanying Prelim IDM (relying on Bloomberg) (unchanged in final); *Solar from China

Final CVD 2016*; 84 FR 45125 (August 28, 2019) and accompanying IDM at Comment 4 (Relying

on world benchmarks including Bloomberg); *Solar from China Final CVD 2015*, 83 FR 34828

(July 3, 2018) and accompanying IDM at Comment 5 (Relying on world benchmarks including

Bloomberg); *Solar from China Final CVD 2014*, 82 FR 32678 (July 17, 2017) and accompanying

IDM at Comment 6 (relying on world market prices from Bloomberg); *Solar from China Final

CVD 2013*, 81 FR 46904 (July 19, 2016); and accompanying IDM at Comment 5 (the record did

not contain Bloomberg data, instead Commerce relied upon other world benchmarks for polysilicon); *Solar from China Final CVD 2012*, 80 FR 41003 (July 14, 2015) and accompanying IDM at Comment 4 (the record did not contain Bloomberg data, instead Commerce relied upon other world benchmarks for polysilicon); *Solar from China Final CVD Investigation,* 77 FR 73018 (December 7, 2012) (the record did not contain Bloomberg data, instead Commerce relied upon other world benchmarks for polysilicon).

In all of these instances, Commerce relied upon a world benchmark. Here, Commerce determined that it needs to remove China and Vietnam data from the dataset. However, in all of the China solar countervailing reviews, Commerce relied upon a world benchmark that included China prices. Thus, it is arbitrary for Commerce to find now that it cannot rely upon a world benchmark that includes China or Vietnam prices on the world market.

Commerce also has an established practice of relying upon Bloomberg to value silicon wafer and polysilicon in antidumping cases. In the solar circumvention case on Vietnam, Commerce relied upon Bloomberg to value silicon wafers. *Solar from China Circumvention Vietnam Prelim*, 87 FR 75221 (Dec. 8, 2022) and accompanying Vietnam Preliminary IDM (unchanged in final). In all prior reviews of the China Order, Commerce has relied upon Bloomberg, for wafers, cells, and/or polysilicon (depending on the production of the company). For example, Commerce explained why it would rely upon Bloomberg instead of HTS 3818:

> we valued wafers using international prices from Bloomberg New Energy Finance. The HTS category covering silicon wafers – HTS 3818...**covers a wide range of products that may not specifically reflect the cost of solar-grade wafers**. Also, wafers for solar cells are primarily made of polysilicon. In the investigation and first five administrative reviews of this proceeding, we found that differences in silicon purity levels can result in significant price differences. Therefore, in each of these segments of the proceeding, we relied on international prices in valuing either polysilicon or wafers, or both. **Given the wide range of products covered by the Malaysian HTS number for wafers,** it is more likely that the Malaysian imports include products with a silicon purity level that significantly differs from the silicon

purity level required for wafers used to manufacture solar cells. **By contrast, the international prices [from Bloomberg] are specific to wafers used in solar products because they are from a publication that covers the solar industry**.

*Solar from China Prelim. AD 2017-18*, 85 FR 7531 (February 10, 2020) and accompanying Prelim. IDM at 25 (emphasis added) (unchanged in final); *Solar from China Prelim. AD 2016-17*, 83 FR 248 (December 28, 2018) and accompanying Prelim. IDM at 25-26 (unchanged in final); *Solar from China Prelim. AD 2015–16*, 83 FR 1018 (January 9, 2018) and accompanying Prelim. IDM at 23-24; *Solar from China Prelim. AD 2014–15*, 81 FR 93888 (December 22, 2016) and accompanying Prelim. IDM at 24; *Solar from China Prelim. AD 2020-21*, 88 FR 1,046 (January 6, 2023) and Prelim. IDM at 26 ("Consistent with each of the prior segments of this proceeding, we valued solar cells and wafers using international prices from *Bloomberg New Energy Finance*."); *Solar from China Prelim. AD 2021-22*, 89 FR 457 (January 4, 2024) and Prelim. IDM at 27 (relying on BNEF to value solar cells) (unchanged in final); *Solar from China Prelim. AD 2019-20*, 86 FR 72,923 (December 23, 2021) and Prelim. IDM at 25 (unchanged in final).

Notably, in response to comments on subsidization and distortion in the data, Commerce found:

> While Commerce will disregard subsidized and distorted prices that do not reflect market prices when calculating SVs, **the prices that we used to value wafers are the average prices set by the entire international market. We did not base the SV on a subset of prices that may differ from, and be atypical when compared to, market prices; rather, we based the SV on the average wafer price for the entire international market**. Because our SV is the market price for the entire international market, we find no basis for concluding that it does not represent a market price.

*Solar from China Prelim. AD 2019-20* IDM at Comment 5.

That Commerce found Bloomberg was the best information in the *antidumping reviews* is particularly relevant to Commerce's concern in this *countervailing review* that Bloomberg included China and Vietnam pricing data. In antidumping reviews, Commerce is normally

restricted to rely solely on one single primary surrogate country and excludes all non-market economy and export-subsidy country data. Yet, Commerce still found for the last thirteen years in antidumping reviews that Bloomberg data was the best information to value solar wafer and polysilicon. In other words, for surrogate values in antidumping cases, Commerce is far more restricted in its sourcing. 19 C.F.R. § 315.408(c). Yet, Commerce still always found that the reliability and specificity of the Bloomberg data trumped its practice to rely on a single surrogate country that was economically comparable to China and not an NME/ES country. This has also been upheld by the Court. *Canadian Solar Int'l Ltd. v. United States,* 378 F. Supp. 3d 1292, 1313 (CIT 2019) (affirming Commerce's determination "that the world market price for raw polysilicon constituted the best available information for valuing respondents' semi-finished polysilicon ingots and blocks").

In countervailing reviews, Commerce is actually directed to rely upon a world tier two benchmark. 19 C.F.R. § 351.511(a)(2)(ii) directs Commerce to make a comparison to a "world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." The tier-two regulation assumes that the benchmark price should include prices that would be available in Vietnam. Thus, based on 19 C.F.R. § 351.511(a)(2)(ii) and its requirements, there is no better benchmark than a price that is shown to be actually available in Vietnam from around the world. If Commerce's reasoning in this investigation is taken to its logical end, any price that is shown to be reasonably available in Vietnam or China should be rejected because it might be distorted by the government's involvement. But under this premise, Commerce's tier-two regulation is meaningless. *Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States*, 181 F. Supp. 3d 1265, 1278 (CIT 2016) ("An agency is bound by the unambiguous, plain meaning of its own regulations.").

In conclusion, Commerce's countervailing and antidumping reviews for thirteen years reflect that Bloomberg is a reliable source to benchmark solar wafers. Commerce's decision in this case is contrary to a significant amount of precedent and is arbitrary. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001). The Court should find that Commerce's decision is arbitrary because it runs contrary to established practice and well-reasoned Court-upheld preferences and practice. The resulting benchmark, which is actually not based on prevailing market prices available in Vietnam is also unsupported by substantial evidence, as explained more fully below.

## 2. Bloomberg Best Fulfills the Statutory and Regulatory Requirements for Benchmarks.

Commerce's benchmark selection not only is arbitrary, but also is not supported by the record and is contrary to law. As Commerce itself explained, "Commerce normally looks for product comparability between the benchmark and the products purchased by the mandatory respondents and relies on data that reflect the narrowest category of products encompassing the input products." Post-Prelim IDM at 12. Indeed, the statute directs Commerce to measure the adequacy of remuneration in relation to prevailing market conditions, which includes "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E). And Commerce's regulations direct it to compare the "government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii). Underlying all of these provisions is comparability. Specificity is the key component of comparability.

While considering different LTAR programs, in an earlier review of *Solar Cells from China*, the Court remanded twice Commerce's decision to rely upon UN Comtrade export data instead of a benchmark that was specific to the input in question. For solar glass and aluminum

frames, Commerce relied upon UN Comtrade data at the 6-digit level. The Court found that, despite both of these HTS including the subject input, Commerce had not explained how these datasets were not "fatally overinclusive" of non-solar glass and "overinclusive such that its inclusion produces a fatally inaccurate aluminum benchmark rate." *Changzhou Trina Solar Energy Co. v. United States*, 2018 Ct. Intl. Trade LEXIS 179, *16-19. In the third remand, Commerce changed its benchmarks to rely solely on the solar specific world benchmarks, and the Court upheld this as supported by record evidence and consistent with the regulation. *Changzhou Trina Solar Energy Co. v. United States*, 2020 Ct. Intl. Trade LEXIS 113, *9-11.

Following the regulation and precedent, the UN Comtrade data in this investigation is fatally overinclusive and results in a fatally inaccurate benchmark. Bloomberg is the only reliable, specific benchmark for solar wafer. Bloomberg is indisputably specific to the precise input. Bloomberg is a well-established solar wafer benchmarking source for the solar industry. Bloomberg specifically tracks the price of Monocrystalline silicon wafers on a daily basis. Boviet NSA Benchmarks at Exhibit NSAW-1, **PR733**. In fact, Bloomberg has prices for the precise size of wafer that Boviet purchased: "Monocrystalline silicon wafers -182mm." *Id*. The source is also fully contemporaneous with the POI and requires no conversions to compare to Respondents' purchases.[1] In contrast, the UN Comtrade data is a large basket category of products, including those not related to the solar industry at all. HTS 3818, a mere four-digit HTS, covers "Chemical elements doped for use in electronics, in the form of discs, wafers or similar forms; chemical compounds doped for use in electronics." Dep't Post-Prelim Benchmarks at Excel file for "3818" **PR808-809**; *see also* JA Solar Rebuttal Benchmarks (October 30, 2024) at Exhibit 1 (Chapter 38 tariff schedule) **PR698**. This is not specific to the solar industry and not specific to silicon wafers.

---

[1] Further, Bloomberg is reported in the same unit of measurement as Respondents' purchases.

HTS 3818 includes "chemical elements" and "chemical compounds" beyond silicon and also includes shapes beyond wafers including "discs" or "similar forms." *Id*. The record also contains CBP rulings demonstrating that entirely different products are included under HTS 3818, such as "Unmounted LED Chips" and "indium phosphide gallium arsenide semiconductor wafers" *Id*. at Exhibit 2. And for two of the larger exporting countries in the UN Comtrade data, India and Korea, trading during the POI under HTS 3818 included many other products with vastly different AUVs than solar silicon wafers. *See* JA Rebuttal Information, **PR820**.

The fact that HTS 3818 encompasses a large basket-category of non-comparable inputs is also evident from the dataset itself. Even after removing the China and Vietnam exports/imports from the dataset, the underlying AUV varies dramatically. Prices range from $0.20/kg to over $160,000/kg. Boviet Case Brief at Attachment 1 **PR840**. The varying values are also not explained by the quantity alone, even among the top quantity exports, values range from $1/kg to over $700/kg. In contrast, the Bloomberg data and the Respondents' own purchases demonstrate that the value of actual solar silicon wafers changed very little during the POI. Boviet NSA Benchmark at NSAW-1; Boviet Post-Prelim Calc Memo (March 13, 2024) at "Chinese Wafer Purchases" **CR765 PR815**; JA Solar Post-Prelim Calc Memo (March 13, 2024) at "Input-Purchases Wafer" **CR764 PR814**. The record supports a conclusion that a silicon wafer is a highly uniform mature product in the market produced from highly sophisticated automated machinery that results in the stable AUV data. What is being imported under HTS 3818 is not specific or comparable in pricing to solar silicon wafers.

The statute's mandate to consider the price, quality, availability, and marketability conditions of solar silicon wafers is not fulfilled by benchmarking it with "Chemical elements doped for use in electronics, in the form of discs, wafers or similar forms." 19 U.S.C. § 1677(5);

19 C.F.R. § 351.511(a)(2)(ii). It is not reasonable to conclude that world price availability of such "chemical elements doped for electronics" would have any relevance to a purchaser of solar silicon wafers in Vietnam. Indeed, this is precisely why Commerce has relied upon Bloomberg to benchmark solar wafers, polysilicon, and cells for an uninterrupted string of many CVD reviews. Indeed, Commerce has compared this precise choice of sources for surrogate values for solar wafers, and found it must rely upon Bloomberg *instead* of HTS 3818 due to the specificity of the Bloomberg data. *Solar from China Prelim. AD 2016-17* Prelim. IDM at 25-26 (unchanged in final). These facts have not changed, thus neither can the consistent determinations of the best most appropriate benchmark in the past reviews. Commerce has already consistently found in the past that HTS 3818 "covers a wide range of products." This is further demonstrated on this record, as discussed above. Commerce has likewise already consistently found that "wafers for solar cells are primarily made of polysilicon and that the "differences in silicon purity levels can result in significant price differences." This is also supported by facts on this record. JA Solar Rebuttal Benchmarks at Exhibit 4 **PR593**. Thus, Commerce's conclusion in all past reviews from these facts must also apply here—*i.e.*, HTS 3818 covers different products with significantly different important characteristics, making it more appropriate to rely *solely* upon Bloomberg.

Commerce has relied upon a benchmark that does not fulfill the statutory and regulatory requirements or well-established practice in the solar cases. HTS 3818 is not specific to solar silicon wafers, but rather is a broad basket of products that cannot be used to benchmark solar silicon wafers. The resulting margin is not accurate. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1337 (CIT 2015) (holding that Commerce's benchmark selections must ensure that the benchmark would . . . result in a margin calculated "as accurately as possible"). In contrast, the Bloomberg data is specific to solar silicon wafers and accounts for

all required aspects of comparability for benchmarking. *Canadian Solar, Inc. v. United States*, 2020 Ct. Intl. Trade LEXIS 157, *13 (Oct. 19, 2020) (faulting Commerce for failing to account for "'factors affecting comparability' as required by regulation). Commerce's decision is not supported by substantial evidence on the record of this case.

### B.  The Only Appropriate Benchmark Price for Solar Glass Is PVinsights.

Commerce similarly has a longstanding history of relying upon PVinsights and other similar sources for a solar-specific glass benchmark. Following 19 C.F.R. § 351.511(a)(2)(ii), even when acknowledging that PVinsights is a world benchmark that would include China-prices, Commerce has consistently preferred this precise benchmark source over HTS 7007.19 in multiple reviews of *Solar Cells from China* reviews because PVinsights is specific to solar glass instead of the overly generic glass HTS category:

> Consistent with our practices of seeking to maintain product comparability between the benchmark prices and the products purchased… that reflect the narrowest category of products encompassing the input products, we are using the world market prices (tier two) published by PVinsights… to construct the world market solar glass benchmark prices because they are specific to solar glass.

*Solar from China Prelim. CVD 2019* Prelim. IDM at 27 (unchanged in final); *Solar from China Prelim. CVD 2020* Prelim. IDM at 27 (relying on PV Insights); *Solar from China Prelim. CVD 2021* Prelim. IDM at 22 (unchanged in final); *Solar from China Prelim. CVD 2017* Final IDM, 85 FR 79163 (December 9, 2020) and accompanying IDM at Comment 5 (relying on Greentech Media and PVinsights for glass).

This Court has already rejected Commerce's attempts to rely upon UN Comtrade export data for HTS 7007.19 instead of a benchmark that was specific to the glass input in question. In that case, Commerce had relied upon 6-digit level UN Comtrade export data for HTS 7007.19, the same dataset that Petitioner *now* advocates that Commerce rely upon, instead of PVinsights. The

Court found that, despite the fact that this HTS includes the subject input, Commerce had not explained how the dataset was not "fatally overinclusive of non-solar glass in Commerce's calculation of the solar glass benchmark." *Changzhou Trina*, 2018 Ct. Intl. Trade LEXIS at *18-19. In the third remand, having thoroughly exhausted its meritless reasons for preferring the HTS over PVinsights, Commerce changed its benchmarks to rely solely on the PVinsights and the Court upheld this as supported by record evidence and consistent with the regulation. *Changzhou Trina*, 2020 Ct. Intl. Trade LEXIS at *9-11.

Likewise here, the UN Comtrade data is fatally overinclusive and results in a fatally inaccurate benchmark. HTS 7007.19 covers "safety glass, consisting of toughened (tempered) or laminated glass: Toughened (tempered) safety glass; Other." This is not specific to solar glass or the size of glass used by Respondents. In contrast, PVinsights is specific to <u>solar</u> glass only. Further, it is even specific to the thickness of the glass that Boviet purchased, 2mm and 3.2mm solar glass. JA Solar Benchmark at Exhibit NSA2-16 **PR731**. The statute's mandate to consider the price, quality, availability, and marketability conditions of the input, solar glass at 2mm and 3.2mm, is not fulfilled by benchmarking it with value merely for "toughened safety glass." 19 U.S.C. § 1677(5); 19 C.F.R. § 351.511(a)(2)(ii). It is not reasonable to conclude that a world price of such "toughened safety glass" would have any relevance to a purchaser of solar glass at 2mm and 3.2mm in Vietnam. Accordingly, HTS 7007.19 does not fulfill Commerce's requirements as a benchmark. The Court should find that Commerce's solar glass benchmark selection is not supported by the record and is arbitrary compared to past practice that was already litigated.

### C. Commerce Incorrectly Added VAT and Import Duties to the LTAR Benchmarks.

In the Final Determination, Commerce added 10% VAT and import duties to the LTAR benchmarks. IDM at Comment 11. Commerce explained this was required because pursuant to 19

CFR 351.511(a)(2)(iv), Commerce will adjust the benchmark price to reflect the price that a firm actually paid or would pay if it imported the product, which includes delivery charges and import duties. *Id*. However, Commerce failed to properly consider that because Boviet is an export processing enterprise ("EPE"), the prices Boviet actually paid do not include VAT or import duties. Therefore, the regulation provides no basis for including VAT and import duties.

In finding otherwise, Commerce thought it appropriate to include VAT in a benchmark if "the inclusion of VAT is reflective of what a firm located in Vietnam—and not necessarily the specific respondent—would have ordinarily paid." IDM at 73. Commerce argues that the statute is for a hypothetical firm in Vietnam generally, rather than the actual Respondents. IDM at Comment 11. But the regulation provides no support for that theory: it looks to what "a firm *actually paid* or would pay if it imported the product," 19 C.F.R. § 351.511(a)(2)(iv) (emphasis added), so hypothetical musings about whether some firms would pay VAT are inappropriate. Further, both mandatory respondents are EPEs, and the record supports that solar-producing firms are typically EPEs. Thus, there is even more reason under the regulation to consider that what a Vietnam solar producing company would pay if it imported the product would be zero VAT or import duties because they are EPEs.

The addition of VAT to the LTAR benchmark means that Commerce did not perform an apples-to-apples comparison. *See High Pressure Steel Cylinders From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 FR 26,738 (Dep't Comm. 2012) and accompanying IDM at Comment 9 (discussing Commerce's need to ensure an "apples-to-apples" comparison between these domestic input purchases and the benchmark).

V.    **Commerce's Finding Regarding the Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises ("EPEs") Program is Unsupported by the Record and Unlawful.**

A.    **Commerce's Finding that the Program Exists is Not Supported by Substantial Evidence.**

Commerce countervailed import duty exemptions into EPEs. However, as Boviet and the Government of Vietnam (GOV) explained in their questionnaire responses, there is no such program. Boviet is and was an EPE during the POI. As an EPE by the law of Vietnam, Boviet is entitled to tax policies applied to free trade zones. *See* Boviet Sec III at 18 **CR251 PR459**; *see also* GOV IQR at Exhibit C-6.1, **PR347, 420**. Therefore, Boviet as an EPE is outside of the customs territory of Vietnam. The purchases of items by Boviet, not only from overseas but also from the Vietnamese domestic market, are treated as imports and must go through import procedures. Accordingly, its imports of raw materials are not subject to import duty or import duty liability in the first place, and therefore there could not be any exemption for the import duty that Boviet has no obligation to pay in the first place. Thus, in this case, there is no foregone revenue by the government that would otherwise be due and thus no countervailable benefit conferred. 19 U.S.C. § 1677(5)(B), (D)(i)-(ii).

Commerce dismissed this argument, relying on *ATC Tires*, to support its contention that a respondent in a special economic zone could still be considered inside the customs territory of a country. IDM at 81-82 (citing *ATC Tires Priv. Ltd. v. United States*, 322 F. Supp. 3d 1365 (CIT 2018)). However, the Court and Commerce drew a distinction between the Indian Special Economic Zone ("SEZ") program in that case and the precise program at issue in this investigation in Vietnam. In the Indian SEZ, the company remained contingently liable for the import duties until it demonstrated it had met the requirement to export all goods produced and achieved a net foreign exchange goal. Thus, the Court and Commerce found this constituted foregone revenue by

the government, which is a countervailable benefit. *ATC Tires*, 322 F. Supp. 3d at 1372. In contrast, for EPEs in Vietnam, they have already met the requirements and are an established EPE; there are no contingent duties and thus no foregone revenue by the government. *Id.* (*citing Circular Welded Carbon-Quality Steel Pipe from Vietnam: Final Negative Countervailing Duty Determination*, 77 FR 64,471, and accompanying IDM at 14 (Dep't Commerce Oct. 22, 2012)).

Thus, Commerce's dismissal of this argument is not supported on this particular record. 19 C.F.R. § 351.519(a), relied upon by Commerce for this program, addresses remission or drawback of import duties. But inherent in this regulation is that the goods entered the country's customs territory. The Court should remand to Commerce to explain how this program is countervailable in the first instance because it does not apply on its face.

### B. The GOV Accounts for Resalable Scrap

Even if the program were countervailable, it still must satisfy the requirements of 19 C.F.R. § 351.519(a)(4)(i). Under this regulation, no benefit for an import duty exemption will be found to have been conferred if the government has a reasonable, effective system to confirm which inputs and what amount are consumed in the production of the exported products and in what amounts, and if the system or procedure is reasonable.

Commerce found Vietnam failed to meet this standard because the "GOV does not track the amount of waste exiting the EPE." IDM at 79. This is factually incorrect on this record. Commerce reached that conclusion based on Article 71 of Circular 38/2015/TT-BTC (Circular 38), which "states that waste or scrap within the norm that is the by-product of producing goods intended for export can be sold in the domestic market without paying import duty, but waste or scrap beyond the norm is subject to import duty when sold domestically." IDM at 80. This not a correct reading of the Circular, which defeats Commerce's determination.

Boviet, and critically the GOV itself, explained the correct meaning of this Circular in their responses. Article 71 does address the sale of waste, but this is not specific to EPEs. Section 5 of the Circular is specific to EPEs and in Article 75.5 on EPE procedures for exports/imports, it clearly states that "With regard to waste and rejects that may be sold domestically: Customs procedures shall comply with Chapter II of this Circular, according to which the EPE shall follow export procedures and the domestic enterprise shall open a corresponding declaration of imports." GOV IQR at Exhibit C-2.1.6, **PR410-415**.

The GOV also clearly explained that when an export processing enterprise sells scrap or discarded products into the domestic market, it is required to perform export procedures, and its buyer is required to perform import procedures which triggers the obligation of tax and duty payments on the buyer. GOV IQR at 36, **PR347**. The GOV also provided sample documents for sales of scrap into the domestic market. GOV First Supp Qre at 23-24, **PR609**. The documents included export declarations by both Respondents, import declarations of the buyer, and payment proof of import duties by the buyers. *Id*. at Exhibit 17.1, **PR611**.

An EPE could not exit anything resalable at all from its facility without undergoing an export procedure. The EPE is not part of the customs territory of Vietnam, such that a sale to Vietnam is an export sale and a sale to any other country is also an export sale. Thus, all sales are export sales. Commerce has not suggested that somehow the GOV does not require companies to track its exports. The GOV's extensive questionnaire responses recorded all of the detailed requirements to export, whether to Vietnam or other countries. GOV First Supp Qre at 18-24 (citing to various Circulars overseeing export procedures), **PR609**. According to Article 16.1 of Circular 38/2015/TT-BTC, amended by Article 1.5 of Circular 39/2018/TT-BTC, upon the sale of scraps or any other product, the EPE is required to prepare a custom dossier of exports including

an export declaration (which includes information of the exporter, date of export, information of the importer, invoice number, invoice amount, quantity, taxable amount, taxpayer, tax payable, product code (HS code of product), tax rate, product description, country of origin) and commercial invoices or equivalent documents. According to Article 16.2 of Circular 38/2015/TT-BTC, amended by Article 1.5 of Circular 39/2018/TT-BTC, if the buyer is in Vietnam, then buyer must prepare a customs dossier of import (which includes information of the importer, date of export, information of the exporter, invoice number, invoice amount, quantity, taxable amount, taxpayer, tax payable, product code (HS code of product), tax rate, product description, country of origin, etc.), Commercial invoices or equivalent documents; and a Value declaration. The customs documentation is inspected by the Customs Authorities as stipulated in Article 19.1 of Circular 38/2015/TT-BTC, with the potential for physical inspection.

Indeed, Commerce spent two days at the Vietnam Customs authority reviewing their detailed systems, including computers that monitored EPEs imports, EPEs' exports, EPEs' physical surveillance, and their risk management system and found no discrepancies. *See* GOV Ver. Report at 9-12 **CR761 PR803**. Therefore, since all resalable goods exiting an EPE must be declared as exports, the amount of resalable waste is certainly tracked via such export documentation. The basic premise of an EPE does not allow for untrackable saleable material to be exported into Vietnam. Commerce cannot reasonably conclude on this enormously substantiated record that the GOV does not track waste exiting the EPE.

Further, in order to monitor waste allowances, including waste that might be sold in the domestic market (which would be regarded as an export sale), companies receiving import duty exemptions are required to prepare reports on production norms that detail their consumption of raw materials, including the rate of loss for each product code. GOV IQR at 35, **PR347**. At the

end of each calendar year, companies are required to prepare and submit the report on receipt, withdrawal, leftover inventory, and use, of which must be reconciled to their accounting documentation. GOV IQR at Exhibit C-6.1 (Article 1.39 of Circular 39/2018/TT-BTC). These reports require very detailed information by material code traced through production. Customs can check the materials reported in the consumption norm against the EPE's import records and similarly can check the exported goods reported in the consumption norm against the EPE's export records. GOV IQR at 32. The consumption norm and the year-end report of receipt, withdrawal, leftover inventory of imported raw materials as well as the EPE's import and export records serve the basis for the customs authority to confirm which inputs are consumed in the production of exported products and in what amounts. The requirement of export-import procedures between an EPE and its importers into the domestic market allows the customs authority to track each transaction. Combining this requirement with the requirements of surveillance cameras set in the EPE, as well as Customs' inspection of the fiscal year report on the receipt, withdrawal, leftover inventory, and use of imported goods, it effectively monitors goods entering and leaving the facility of the EPE. *Id.* at 36-37.

These reports are subject to inspection by Vietnamese Customs, which can examine the reports submitted by producers based on the customs authority's risk management criteria. To the extent that Commerce criticized the GOV's lack of a POI inspection of either Respondent, a full view of the record and the verification of the GOV has clarified that in fact, the GOV has a reasonable and rigorous verification system for EPEs that is consistent with the Vietnamese accounting standard. EPEs are required to report annual customs settlement reports, in addition to the live system checks on their imports and security systems available to the GOV, as observed by Commerce at verification.

There are three types of inspections conducted by the GOV. There is a physical inspection performed upon the establishment of an EPE. GOV Ver Report at 10. Next, there is a customs settlement report inspection to verify the accuracy of the customs settlement report, which includes the customs declaration forms and the company data on imported and exported goods. *Id*. Lastly, the post-customs clearance inspection is broader than the customs settlement report inspection, covering five years of data, and is meant to verify compliance on all the business regulations and policies outlined in Article 77 of Law on Customs. This type of inspection includes tracking the volume of goods that companies import and verifying inventory withdrawal reports and current inventory reports, the merchandise they consumed in the production process, and the merchandise exported from the EPE zone. *Id*. at 11. While these inspections are not conducted annually for every EPE, that is also not required under Vietnam accounting standards. Rather, as verified, these different inspections are scheduled based on the assessment of the CRMS risk management system. *Id*. Commerce viewed the CRMS risk management system live, observing how the system determines what companies should be inspected at a particular time and flagging any risks and inconsistencies in reporting. *Id*. This is a reasonable and effective manner of verifying the accuracy of the information consistent with Vietnamese accounting standards. 19 C.F.R. § 351.519(a)(4)(i). After all, even Commerce is only required to verify Respondents every three review cycles; that does not make the intervening final results of the reviews not verified unreliable. 19 C.F.R. § 351.307(b)(1)(v)(B).

In sum, the evidence above demonstrates that the GOV maintains a reasonable and effective system and set of procedures consistent with Vietnamese accounting standards, and thus Commerce has no basis to find that the exception contained in 19 C.F.R. § 351.519(a)(4)(i) does not apply.

### C.  Commerce's Decision to Apply AFA to this Program is Unlawful.

In the Final Determination, Commerce applied AFA to this program, finding that Boviet failed to provide requested information and did not cooperate to the best of their ability by not reporting that imports of aluminum frame were exempt from AD duties. IDM at 16. Commerce may only resort to "facts available" ("FA") if the criteria of 19 U.S.C. § 1677e(a) are met, which provide that necessary information is missing from the record or a party withheld information, failed to provide information, or impeded the proceeding. And Commerce may apply an adverse inference in selecting among facts otherwise available only if a "party failed to cooperate to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). This "best of its ability" standard "does not require perfection," but rather Commerce is required to "examine respondents' actions and assess the extent of respondents' abilities, efforts, and cooperation in responding to Commerce's requests for information." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1376 (Fed. Cir. 2003). "{M}istakes sometimes occur," and that alone does not warrant AFA (or even FA). *Id*. This Court has likewise held that the statute "does not support the use of AFA on the basis of an inadvertent failure to cooperate." *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334, 1346 (CIT 2016); *see also* 19 U.S.C. § 1677m(d) (requiring Commerce to provide an opportunity to remedy or explain submissions deemed to be deficient).

Here, there was no basis for Commerce to determine that Boviet did not act to the best of its ability. In the initial questionnaire, Boviet was requested to report their raw material purchases during the POI and "indicate the duties and other import fees that would have been charged on these items absent the import duty exemption." Boviet IQR at 20, **CR251 PR459**. Boviet reported their raw material purchases, which were verified by Commerce without discrepancy. Boviet also explained that it is an EPE, and thus is never charged import duties, as EPEs are treated legally as

if they are outside the territory of Vietnam. Nonetheless, Boviet, in response to Commerce's request, reported to the best of its knowledge the standard import rates for Vietnam, MFN or ASEAN, for its imports, but again reiterated "these are not duty rates that Boviet's imports were actually subject to." *Id*. at 20-21. At verification, Commerce observed that Vietnam has an antidumping duty order on aluminum frames from China. Thus, in theory, if Boviet was not an EPE, it would have had to pay such antidumping duties. Boviet Ver. Report at 2, **CR760 PR802**. Yet as Boviet explained at verification (consistent with its written submissions), it is not subject to any AD duties as an EPE. *Id*. at 10. Boviet provided information on the AD order to Commerce at verification upon request. *Id*.; *see also* Boviet Ver. Exhibits at Exhibit VE-8, pg 27, **CR627 PR784**.

Despite this full cooperation, Commerce found that Boviet did not act to the best of its ability. That determination is wrong. Boviet answered Commerce's initial questionnaire accurately and to the best of its ability, and it thus did not withhold or otherwise fail to provide information by the deadline. As Boviet explained in that questionnaire and at verification, Boviet does not pay any import duties because Boviet is an EPE. Thus, the entire notion of an import duty exemption is a misnomer and not the actual situation applicable to Boviet. Boviet Initial Qre at 20.

In Boviet's normal course of business, it does not consider duties or deal with duties, because it is not considered within the customs territory of Vietnam. When Commerce requested that Boviet report the duties it "*would have been charged* on these items *absent the import duty exemption*," Boviet accurately reported that it had no import duty exemption and thus there are no duties it would have been charged. Nonetheless, in Boviet's best attempt to provide information beyond what Commerce's question called for, it explained to the best of its ability the tariffs a company in the customs territory of Vietnam would pay--which again, is not what Boviet would

41

actually pay since it is not such a company. Boviet Initial Qre at 20-21; *see also* Boviet Case Brief at 44-49, **PR839**. Further, it is not even clear that Commerce's request for information on "duties and other import fees" would call for a response about antidumping duties since antidumping duties are not a normal duty and not a fee. And again, Boviet would not be subject to these special tariffs anyway.

Commerce also faulted Boviet for not reporting "information regarding AD duties that would have been charged absent the import duty exemption granted to them as EPEs." IDM at 92. But this is not information Boviet has occasion to be aware of in its normal business. As an EPE, Boviet need not pay AD duties; there is no reason to expect it to be apprised of the hypothetical duties it would pay if it lacked EPE status. At verification, when Commerce noticed the normal non-payment of antidumping duties, Boviet had to check a public source to discover that there was an antidumping duty order and confirm for Commerce that Vietnam had AD duties on aluminum extrusions from China. This was not information that Boviet was aware of in its normal business. Indeed, Boviet imported inputs or machinery under *nearly 400 different HTS* during the AUL. For none of these inputs/machinery does Boviet pay any import duty, fee, or AD/CVD duty, or any other possible type of duty or fees in the first place and thus has no knowledge of potentially applicable antidumping duties in its normal business. Boviet's best effort in responding to Commerce's request for "duties and other import fees" should not reasonably require Boviet to check public sources one by one for almost 400 different HTS to determine if there were any AD, CVD, or other unusual, special duties applicable during the AUL in Vietnam that Boviet is not aware of in its normal business. *Cf. Peer Bearing Co. v. United States*, 766 F.3d 1396, 1400 (Fed. Cir. 2014) (discussing that under the best of its ability provision, a company should keep records that it should anticipate being called upon to produce); *Nippon Steel*, 337 F.3d at 1382 (holding

that the best of its ability standard expects respondents to maintain complete records and have familiarity with the records under its control).

If anything, Boviet went above and beyond by looking up import duties for these products by providing the tariff schedule and indicating the MFN or an FTA rate that would apply to importers who, unlike Boviet, are in the customs territory of Vietnam. This was already well beyond the scope of information that Boviet maintains in its normal business, since under Boviet's business, it has no knowledge or need to have knowledge of such import duties. Boviet nonetheless in a spirit of cooperation provided this additional information about import duties in Vietnam. Thus, we submit that no adverse facts could reasonably be applied to this situation. At the worst, which again we submit is not even supported by the record, Boviet not reporting the antidumping duties on aluminum frames is an inadvertent mistake or misunderstanding of Commerce's request. This does not rise to the level of warranting adverse facts available.

Further, when Commerce asked about the antidumping duties, Boviet provided the information requested at verification. Boviet never withheld information that was directly requested and always cooperated fully. Commerce has information on Boviet's purchases and the import duties, thus there is also no actual missing information on the record. Under 19 U.S.C. § 1677m(e), Commerce is required to accept information from respondents that have acted to the best of their ability so long as the information is verifiable, "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination," and "can be used without undue difficulties." It is common for minor corrections or additional information to be requested by Commerce or come to light at verification; this alone is not grounds for an adverse inference. Rather, any such corrections or additions at verification are considered in light of the factors above, the scope of the additional information at verification, and whether the respondent acted to the best

of its ability in providing answers to the questionnaires, including Boviet's full cooperation with the verification.

In sum, Boviet answered Commerce's questionnaire to the best of its ability according to its understanding of the request and its business experience as an EPE. When Commerce specifically asked for further information on antidumping duties at verification, Boviet provided all information requested. The information was easily publicly verified and assimilated by Commerce decision makers. The record does not lack any information, so an FA inference is not permissible. And there is certainly no basis for an AFA inference: Boviet acted to the best of its ability, and even if information was lacking at some point, it was subsequently provided in response to a request by Commerce at verification. There is no gap in the record and certainly no justification for the application of adverse facts available to Boviet's EPE program, if countervailable at all.

## VI.    Conclusion and Prayer for Relief

In light of the foregoing, Commerce's *Final Results* were not supported by substantial evidence or in accordance with the law. Plaintiff respectfully requests that the Court remand this case for redetermination of the issues presented in this brief.

Respectfully submitted,

 /s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W. 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*

C. Kevin Marshall
Henry J. Dickman
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com
*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Date: February 24, 2026

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **13,980** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**Inter-Global Trade Law Group**

46