# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., *et al.*,       ) <br>      ) <br>          Plaintiffs,     ) <br>      ) <br>   and      ) <br>      ) <br> BOVIET SOLAR TECHNOLOGY CO., LTD.,   ) <br> JINKO SOLAR (VIETNAM) INDUSTRIES    ) <br> CO. LTD,      ) <br>      ) <br>      Consolidated Plaintiffs,   ) <br>      ) <br>   and      ) <br>      ) <br> TRINA SOLAR ENERGY DEVELOPMENT   ) <br> CO. LTD.,      ) <br>      ) <br>      Plaintiff-Intervenor,   ) <br>      ) <br>   v.      ) <br>      ) <br> UNITED STATES,      ) <br>      ) <br>      Defendant,   ) <br>      ) <br> AMERICAN ALLIANCE FOR SOLAR   ) <br> MANUFACTURING TRADE COMMITTEE,   ) <br>      ) <br>      Defendant-Intervenor.   ) | Consol. Court No. 25-00157 <br><br> ██████████████ |

---

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

---

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
SAMUEL CHILDERSON
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (240) 956-8573
Email: Justin.Merhar@trade.gov

SOSUN BAE
Senior Trial Counsel
United States Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-7568
Fax: (202) 514-8624
Email: Sosun.Bae@usdoj.gov


August 13, 2026                          Attorneys for Defendant

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ..................................................................................2

   I.     The Administrative Determination Under Review ..........................................2

   II.    Issues Presented ..............................................................................................2

STATEMENT OF FACTS .........................................................................................3

SUMMARY OF THE ARGUMENT ........................................................................10

ARGUMENT ............................................................................................................12

   I.     Standard of Review ........................................................................................12

   II.    Commerce Can Countervail Transnational Subsidies ...................................13

       A.   Relevant Background Relating to the Revocation of the Regulation
           Prohibiting the Countervailing of Transnational Subsidies .................13

       B.   The Statutory Framework for Countervailing Duties Allows Commerce to
           Countervail Transnational Subsidies ....................................................15

          1.   The Plain Text and Context of 19 U.S.C. § 1671 Permits Commerce to
             Assess Duties on Transnational Subsidies .................................16

          2.   Allowing Commerce to Countervail Transnational Subsidies Would Not
             Render 19 U.S.C. § 1671(d)-(e) Superfluous ...........................20

          3.   The Provisions Regarding Nonmarket Economy Countries and
             Interested Parties Do Not Undermine Commerce's Authority to
             Countervail Transnational Subsidies ..........................................23

       C.   Legislative History Does Not Show That Congress Intended to Preclude
           Commerce from Countervailing Transnational Subsidies ...................25

       D.   Commerce Is Not Foreclosed by Statute from Finding that Transnational
           Subsidies Can Confer a Benefit and Be Specific..................................28

          1.   Transnational Subsidies Can Confer a Benefit under the Statute ...............28

          2.   Commerce Is Not Statutorily Prohibited from Finding That a
             Transnational Subsidy Is Specific..............................................29

E.  Commerce Did Not Act Arbitrarily or Capriciously in Withdrawing the Regulation and Confirming Its Authority to Countervail Transnational Subsidies ...................................................................................................32

F.  The Major Questions Doctrine Does Not Apply................................................40

III.  Commerce Reasonably Relied on Facts Available in Finding that JA Solar's Loans Were Associated with the BRI Program.........................................................42

A.  Framework for Applying Facts Available ...........................................................42

B.  The GOC Did Not Provide Information Necessary for Commerce to Make Its Determination ..................................................................................................43

IV.  Commerce's Countervailing of the Provision of Inputs for LTAR Was Lawful and Supported by Substantial Evidence....................................................................47

A.  Because the GOC Failed to Provide Necessary Information, Commerce Reasonably Found Chinese Input Suppliers to Be Authorities ..........................47

1.  Framework for Determining Government Authorities ..............................47

2.  Commerce Properly Applied Facts Available to Find Chinese Input Suppliers to Be Authorities ...............................................................49

B.  Commerce Properly Found that the Record Did Not Demonstrate that JA Solar's Purchases of Silicon Wafers Were Tied to Non-Subject Merchandise.........................................................................................................54

V.  Commerce's Benchmark Selections for Calculating the Benefit for the Provision of Silicon Wafers and Solar Glass For LTAR Were Lawful and Supported by Substantial Evidence .................................................................................................56

A.  Legal Framework for the Selection of Benchmarks ..........................................57

B.  Commerce Reasonably Relied on Comtrade Data for the Silicon Wafers Benchmark ..........................................................................................................58

1.  Commerce's Selection of Comtrade Data over Bloomberg Data ..............58

2.  Plaintiffs' Arguments Do Not Undermine Commerce's Selection ............60

C.  Commerce Reasonably Relied on Comtrade Data for the Solar Glass Benchmark ..........................................................................................................63

D.    Commerce Properly Excluded Vietnamese Export Prices from Its Benchmark Calculations ................................................................................65

E.    Commerce Properly Included VAT and Import Duties in Its Benchmark Calculations.........................................................................................66

VI.    Commerce's Determination to Countervail Subsidies Under the Import Duty Exemption on Imported Raw Materials for EPEs is Supported by Substantial Evidence and Otherwise in Accordance with Law ..................................................67

A.    The Import Duty Exemptions Program Exists and Provides Countervailable Subsidies ......................................................................................67

B.    Boviet has Failed to Show That an Exception Is Warranted.............................70

C.    Commerce Lawfully Applied AFA for the Failure to Report Exemption from Vietnam's Antidumping Duty Order .................................................73

VII.    Commerce's Determination to Apply AFA to JA Solar for Import Duty Exemptions on Imported Equipment Was Lawful and Supported by Substantial Evidence.........................................................................................77

CONCLUSION...................................................................................................80

# TABLE OF AUTHORITIES

**Page(s)**                                                                                                                            **Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) ...................................................................... 43, 50

*Archer Daniels Midland Co. v. United States*,
  779 F. Supp. 3d 1349 (Ct. Int'l Trade 2025) ........................................................................... 53

*Archroma U.S., Inc. v. Dep't of Commerce*,
  --- F.4th ---- No. 2024-2159, 2026 WL 2275132 (Fed. Cir. Aug. 7, 2026) ........................ *passim*

*Arista Networks, Inc. v. Cisco Sys., Inc.*,
  908 F.3d 792 (Fed. Cir. 2018) ................................................................................................ 25

*ATC Tires Priv. Ltd. v. United States*,
  322 F. Supp. 3d 1365 (Ct. Int'l Trade 2018) ...................................................................... 69, 70

*Beasley v. Shinseki*,
  709 F.3d 1154 (Fed. Cir. 2013) .............................................................................................. 31

*Bio-Lab, Inc. v. United States*,
  776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ............................................................................ 36

*Boomerang Tube LLC v. United States*,
  856 F.3d 908 (Fed. Cir. 2017) ................................................................................................ 72

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
  5 F.4th 1367 (Fed. Cir. 2021) ................................................................................................ 36

*Bridgestone Americas Tire Operations, LLC v. United States*,
  No. 24-000263, 2026 WL 2114514 (Ct. Int'l Trade July 22, 2026) ........................................ 79

*Burrus v. Vegliante*,
  336 F.3d 82 (2nd Cir. 2003) ................................................................................................... 17

*Butterbaugh v. Dep't of Just.*,
  336 F.3d 1332 (Fed. Cir. 2003) .............................................................................................. 27

*BYD (H.K.) Co. v. United States*,
  785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1937 (Fed. Cir. July 16,
  2025) .................................................................................................................................... 33

*Carter v. United States*,
  530 U.S. 255 (2000) ............................................................................................................... 30

*Changhou Trina Solar Energy Co., Ltd. v. United States*,
No. 17-00246, 2018 WL 6271653) (Ct. Int'l Trade Nov. 30, 2018) ........................................ 65

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ........................................................................................................ 12

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ........................................................................................................ 12

*Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, AFL–CIO*,
6 F.3d 1511 (Fed. Cir. 1993) ............................................................................................ 63

*Dalian Meisen Woodworking Co., Ltd. v. United States*,
No. 20-00109, 2023 WL 3058783 (Ct. Int'l Trade Apr. 24, 2023) ........................................ 79

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ........................................................................................ 56

*Essar Steel Ltd. v. United States,*,
721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012) ............................................................................... *passim*

*Fine Furniture (Shanghai) Ltd. v. United States*,
748 F.3d 1365 (Fed. Cir. 2014) ........................................................................................ 43

*Former Emp. of Drive Sol Glob. Steering, Inc. v. U.S. Sec'y of Lab.*,
181 F. Supp. 3d 1369 (Ct. Int'l Trade 2016) ...................................................................... 31

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996) .......................................................................................... 36

*Goldlink Indus. Co. v. United States*,
431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...................................................................... 12

*Goodluck India Ltd. v. United States*,
11 F.4th 1335 (Fed. Cir. 2021) ........................................................................................ 76

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ...................................................................... 66

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025) ...................................................................................... 41

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ...................................................................... 79

v

*Husteel Co., Ltd. v. United States,*
　98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ................................................................ 40

*In re Forest,*
　134 F.4th 1198 (Fed. Cir. 2025) ................................................................................ 30

*Itochu Bldg. Prods. v. United States,*
　733 F.3d 1140 (Fed. Cir. 2013) ................................................................................ 72

*KCJ Corp. v. Kinetic Concepts, Inc.,*
　223 F.3d 1351 (Fed. Cir. 2000) ................................................................................ 18

*Kumho Tire (Vietnam) Co., Ltd. v. United States,*
　741 F. Supp. 3d 1277 (2024) .................................................................................... 27

*Learning Resources, Inc. v. Trump,*
　607 U.S. 229 (2026) .................................................................................................. 40

*Lesko v. United States,*
　161 F.4th 1352 (Fed. Cir. 2025) ........................................................................ *passim*

*Loper Bright Enterprises v. Raimondo,*
　603 U.S. 369 (2024) .............................................................................................. *passim*

*Luoyang Bearing Factory v. United States,*
　240 F. Supp. 3d 1268 (Ct. Int'l Trade 2002) ............................................................ 19

*Mitsubishi Polyester Film, Inc. v. United States,*
　228 F. Supp. 3d 1359 (Ct. Int'l Trade 2017) ............................................................ 19

*Mosaic Co. v. United States,*
　160 F.4th 1340 (2025) .................................................................................... 35, 37, 66

*Muscogee (Creek) Nation v. Hodel,*
　851 F.2d 1439 (D.C. Cir. 1988) ................................................................................ 17

*Nexteel Co. v. United States,*
　28 F.4th 1226 (Fed. Cir. 2022) ................................................................................ 36

*Nippon Steel Corp. v. United States,*
　458 F.3d 1345 (Fed. Cir. 2006) ................................................................................ 12

*Niz-Chavez v. Garland,*
　593 U.S. 155, 164 (2021) .......................................................................................... 18

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)................................................................................................... 27

*Pirelli Tyre Co., Ltd. v. United States*,
    128 F.4th 1265 (Fed. Cir. 2025) ............................................................................... 40

*Pt. Kenertec Power Sys. v. United States*,
    No. 20-03687, 2021 WL 6123546 (Ct. Int'l Trade Dec. 28, 2021), *aff'd*, No. 2022-1408, 2023
    WL 234179 (Fed. Cir. Jan. 18, 2023)................................................................. 47, 48

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ........................................................................... 53, 63

*QVD Food Co., Ltd. v. United States*,
    658 F.3d 1318 (Fed. Cir. 2011) ................................................................................. 54

*Risen Energy Co. v. United States*,
    658 F. Supp. 3d 1364 (Ct. Int'l Trade 2023) ............................................................. 63

*Seven County Infrastructure Coalition v. Eagle County, CO*,
    605 U.S. 168 (2025)............................................................................................. 33, 36

*Smith-Corona Grp. v. United States*,
    713 F.2d 1568 (Fed. Cir. 1983) ................................................................................. 36

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)................................................................................................... 27

*Taizhou United Imp. & Exp. Co. v. United States*,
    560 F. Supp. 3d 1316 (Ct. Int'l Trade 2022) ....................................................... 54, 55

*Thai Pineapple Pub. Co. v. United States*,
    187 F.3d 1362 (Fed. Cir. 1999) ................................................................................. 42

*Timken Co. v. United States*,
    699 F. Supp. 300 (Ct. Int'l Trade 1988) .................................................................... 12

*United States v. Maverick Mktg., LLC*,
    322 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ............................................................. 31

*United States v. Vargas*,
    871 F. Supp. 623 (S.D.N.Y. 1994) ............................................................................ 27

*United States v. Wells*,
    519 U.S. 482 (1997).................................................................................................. 17

vii

*United States v. Wise*,
  370 U.S. 405 (1962) ................................................................................................. 27

*Utility Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ................................................................................................. 40

*Ventura Coastal, LLC v. United States*,
  736 F.Supp.3d 1342 (Ct. Int'l Trade 2024) ............................................................. 35

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................................... 40, 41, 42

*Wheatland Tube Co. v. United States*,
  161 F.3d 1365 (Fed. Cir. 1998) ............................................................................... 12

*Wright v. West*,
  505 U.S. 277 (1992) ................................................................................................. 27

*Yama Ribbons & Bows Co., Ltd. v. United States*,
  606 F. Supp. 3d 1345 (Ct. Int'l Trade 2022) .......................................................... 48

*Yamaha Motor Co., Ltd. v. United States*, 910 F.Supp. 678, 686 (Ct. Int'l Trade November 20,
  1995) ........................................................................................................................ 76

*Zenith Radio Corp.* v. *United States*,
  437 U.S. 443 (1978) ................................................................................................. 69

**Statutes**

1 U.S.C. § 1 .................................................................................................................. 18

5 U.S.C. § 5548(a) ....................................................................................................... 34

19 U.S.C. § 1303(a)(1),
  *repealed by* Pub. L. 103–465, title II, § 261(a), 108 Stat. 4908 (1994) ............. *passim*

19 U.S.C. § 1516a(b) .................................................................................................... 12

19 U.S.C. § 1671 .......................................................................................................... 13

19 U.S.C. § 1671(a) ............................................................................................... *passim*

19 U.S.C. § 1671(d) ......................................................................................... 21, 22, 23

19 U.S.C. § 1671(e) ............................................................................................... *passim*

19 U.S.C. § 1671(f) ............................................................................................................ 23

19 U.S.C. § 1677(5) ...................................................................................................... *passim*

19 U.S.C. § 1677(5A) .................................................................................................... *passim*

19 U.S.C. § 1677(5B) ........................................................................................................ 42

19 U.S.C. § 1677(9) ............................................................................................................ 24

19 U.S.C. § 1677(33) .......................................................................................................... 35

19 U.S.C. § 1677-1(a) ........................................................................................................ 21

19 U.S.C. § 1677e(a) ..................................................................................................... 44, 46

19 U.S.C. §1677e(b) ........................................................................................................... 73

19 U.S.C. § 1677m(c) ...................................................................................................... 7, 76

19 U.S.C. § 1677m(d) ......................................................................................................... 79

19 U.S.C. § 3512(d) ............................................................................................................ 35

19 U.S.C. § 3513(a) ....................................................................................................... 34, 35

19 U.S.C. §§ 1677(A)-(E) .................................................................................................. 22

Pub. L. 103–465, title II, § 261(a), 108 Stat. 4908 (1994) ............................................... 13

Tariff Act of 1930, § 303, 46 Stat. 687 ............................................................................. 13

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979) .......................... 13

**Rules**

Ct. Int'l Trade R. 56.2 ......................................................................................................... 1

**Regulations**

19 C.F.R. § 351.511(a) ........................................................................................... 57, 58, 66

19 C.F.R. § 351.519(a) ..................................................................................................*passim*

19 C.F.R. § 351.527 ......................................................................................................*passim*

19 C.F.R. § 351.527 (1998)............................................................................................... 14

Administrative Determinations

*Carbon and Alloy Steel Threaded Rod from the People's Republic of China*,
   85 Fed. Reg. 8,833 (Dep't of Commerce Feb. 18, 2020) ........................................ 52

*Certain Epoxy Resins from the Republic of Korea,*
   90 Fed. Reg. 14,605 (Dep't of Commerce Apr. 3, 2025).......................................... *22*

*Certain Paper Plates from the People's Republic of China*,
   90 Fed. Reg. 8,281 (Dep't of Commerce Jan. 28, 2025) .......................................... 45

*Certain Steel Wheels from the People's Republic of China*, 77 Fed. Reg. 17,017 (Dep't of
   Commerce Mar. 23, 2012) ....................................................................................... 53

*Certain Van-Type Trailers and Subassemblies Thereof from Mexico*,
   91 Fed. Reg. 34,218 (Dep't of Commerce June 5, 2026) ......................................... 22

*Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam*,
   77 Fed. Reg. 64,471 (Dep't of Commerce Oct. 22, 2012) ....................................... 71

*Citric Acid and Certain Citrate Salts from the People's Republic of China*,
   79 Fed. Reg. 78,799 (Dep't of Commerce Dec. 31, 2014) ....................................... 52

*Common Alloy Aluminum Sheet from the People's Republic of China*,
   83 Fed. Reg. 17,651 (Dep't of Commerce Apr. 23, 2018)........................................ 45

*Countervailing Duties*,
   62 Fed. Reg. 8,818 (Dep't of Commerce Feb. 26, 1997) ......................................... 14

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From
   Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam*,
   89 Fed. Reg. 43816 (Dep't of Commerce May 20, 2024) ......................................... 3

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the
   Socialist Republic of Vietnam*,
   90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025).................................... 2, 19

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam*,
  89 Fed. Reg. 80,866 (Dep't of Commerce Oct. 4, 2024)........................................................ 5, 7

*Modifications of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*,
  85 Fed. Reg. 6,031 (Dep't of Commerce Feb. 4, 2020) ........................................................ 42

*Preamble, Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)................................................. *passim*

*Regulations Improving and Strengthening Enforcement of Trade Remedies Through the Administration of Antidumping and Countervailing Duty Laws*,
  88 Fed. Reg. 29,850 (Dep't of Commerce May 9, 2023) ............................................ 14, 15, 38

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, Final Rule*,
  89 Fed. Reg. 20,766 (Dep't of Commerce Mar. 25, 2024)................................................. *passim*

*Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*,
  89 Fed. Reg, 101,694 (Dep't of Commerce Dec. 16, 2024)..................................................... 69

*Steel Concrete Reinforcing Bar from the Republic of Turkey*;
  84 Fed. Reg, 36,051 (Dep't of Commerce July 26, 2019)....................................................... 58

**Other Authorities**

157 Cong. Rec. 14,998 (2011) ................................................................................................ 27

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) ......................................................................................................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| BOVIET SOLAR TECHNOLOGY CO., LTD., ) | |
| JINKO SOLAR (VIETNAM) INDUSTRIES ) | |
| CO. LTD, ) | Consol. Court No. 25-00157 |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| TRINA SOLAR ENERGY DEVELOPMENT ) | |
| CO. LTD., ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| AMERICAN ALLIANCE FOR SOLAR ) | |
| MANUFACTURING TRADE COMMITTEE, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment on the agency record and

defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative

record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____, 2026                    _____
New York, NY                                                Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| JA SOLAR VIETNAM CO. LTD., *et al.*, | ) |
| Plaintiffs, | ) |
| and | ) |
| BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR (VIETNAM) INDUSTRIES CO. LTD, | ) Consol. Court No. 25-00157 |
| Consolidated Plaintiffs, | ) |
| and | ) |
| TRINA SOLAR ENERGY DEVELOPMENT CO. LTD., | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE, | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response in opposition to the motions for judgment on the agency

record filed by plaintiffs JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company

Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc (collectively, JA Solar),

and consolidated plaintiffs Boviet Solar Technology Co., Ltd. (Boviet),[1] challenging the

Department of Commerce's (Commerce) final determination in the countervailing duty

investigation covering crystalline silicon photovoltaic cells, whether or not assembled into

modules (solar cells) from Vietnam.  *See* JA Solar Br., ECF No. 45; Boviet Br., ECF No. 49.  As

demonstrated below, Commerce's final determination is supported by substantial evidence and in

accordance with law.  Accordingly, we respectfully request that the Court deny plaintiffs'

motions and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      The Administrative Determination Under Review**

Plaintiffs challenge Commerce's final determination in the countervailing duty

investigation of solar cells from Vietnam.  *See* C*rystalline Silicon Photovoltaic Cells, Whether or*

*Not Assembled Into Modules, from the Socialist Republic of Vietnam*, 90 Fed. Reg. 17,399 (Dep't

of Commerce Apr. 25, 2025) (final determination) (P.R. 869), and accompanying Issues and

Decision Memorandum (IDM) (P.R. 860).  The period of investigation was January 1, 2023,

through December 31, 2023.

**II.     Issues Presented**

1.      Whether Commerce has the authority to countervail transnational subsidies.

2.      Whether Commerce's determination to countervail policy loans received by JA

Solar was supported by substantial evidence and in accordance with law.

---

[1]  Consolidated plaintiff Jinko Solar (Vietnam) Industries Company Limited and plaintiff-intervenor Trina Solar Energy Development Company Limited did not file substantive briefs.

2

3.      Whether Commerce's determination finding JA Solar's purchases of silicon wafers for less than adequate remuneration (LTAR) to be countervailable subsidies was supported by substantial evidence and in accordance with law.

4.      Whether Commerce's selection of benchmarks to value silicon wafers and solar glass was supported by substantial evidence and in accordance with law.

5.      Whether Commerce's determination that the Import Duty Exemptions on Imported Raw Materials for Export Processing Enterprises (EPE) Program (Import Duty Exemptions program) is countervailable was supported by substantial evidence and in accordance with law.

6.      Whether Commerce's determination to apply facts available with an adverse inference (AFA) to JA Solar with respect to the Import Duty Exemptions on Imported Equipment Program was supported by substantial evidence and in accordance with law.

### STATEMENT OF FACTS

In May 2024, based on a petition received from the American Alliance for Solar Manufacturing Trade Committee (Alliance), Commerce initiated a countervailing duty investigation of solar cells from Vietnam.  *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam*, 89 Fed. Reg. 43816 (Dep't of Commerce May 20, 2024) (P.R. 107).  Based on the petition, Commerce decided to investigate, among other programs, the Import Duty Exemptions program, the cross-border provision of Chinese-origin polysilicon for LTAR, and the Policy Lending from Chinese Banks for Belt and Road Initiative Capacity Cooperation Projects program (BRI program).  Initiation Checklist at 6-20, dated May 16, 2024 (P.R. 106; C.R. 38).  Commerce selected Boviet and JA Solar as mandatory respondents.  Respondent Selection Memo, dated June 18, 2024 (P.R. 178; C.R. 62).

3

Commerce issued initial questionnaires to the mandatory respondents, the government of Vietnam (GOV), and the government of China (GOC). *See* Countervailing Duty Questionnaire, dated July 3, 2024 (Initial Questionnaire, GOV Questionnaire) (P.R. 288); Transnational Countervailing Duty Questionnaire, dated July 3, 2024 (GOC Questionnaire) (P.R. 290). With respect to the BRI policy loans, Boviet stated that it had not received any loans from commercial banks during the period of investigation. Boviet Section III QR at 41 (P.R. 469, C.R. 251). JA Solar, however, reported that it had "outstanding loans from ███ commercial banks{,}" namely

███████████████████████████████████████████████████

████████████████████████████." JA Solar Section III QR at 59 (P.R. 457; C.R. 191).

For the Import Duty Exemptions program, Commerce requested that Boviet and JA Solar report all raw materials for which they had received import duty exemptions during the period of investigation. *See* Initial Questionnaire at III-11. Both Boviet and JA Solar reported a list of imported raw materials, as well as value-added tax (VAT) and import tariff exemption templates showing the non-payment of import duties for those imported materials. Boviet Section III QR at 20, Exh. 10.2 (P.R. 469; C.R. 251); JA Solar Section III QR at 34, Exh. I-16 (P.R. 457; C.R. 191). Neither company claimed that it was exempted from paying antidumping duties (imposed by the GOV) on aluminum frames from China. IDM at Cmt. 16. Boviet also reported that it had received benefits for imported equipment under the Import Duty Exemptions program. *Id.* at Cmt. 15; Boviet Section III QR at 22-23 (P.R. 469; C.R. 251). JA Solar, however, did not report a receipt of such benefits. JA Solar Section III QR at 56-57 (P.R. 457; C.R. 191).

The GOV and the GOC also responded to Commerce's questionnaires. *See* GOC Transnational Subsidy QR (P.R. 339, C.R. 74); GOV QR (P.R. 347; C.R. 79). In its

4

questionnaire response, the GOC did not provide the information Commerce had requested pertaining to the BRI program, claiming that it found the requests to be "not applicable." GOC Transnational Subsidy QR at 3-7, 19-20; *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the Socialist Republic of Vietnam*, 89 Fed. Reg. 80,866 (Dep't of Commerce Oct. 4, 2024) (P.R. 657), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 646). In its response, the GOV reported the existence of a government decree providing for the exemption of duties on imports of equipment and machinery imported to create fixed assets. GOV QR at 45, Exh. G-2.1; PDM at 43.

On August 12, 2024, and August 26, 2024, the Alliance filed new subsidy allegations, alleging that silicon wafers, silver paste, and solar glass were being provided by the GOC to producers in Vietnam. New Subsidy Allegation at 1-13 (NSA1) (P.R. 327, C.R. 70); 2nd New Subsidy Allegation at 2-20 (NSA2) (P.R. 483). Commerce then began to investigate these additional alleged subsidies. *See* NSA Decision Memorandum (P.R. 605). Commerce asked the mandatory respondents and their affiliates to provide a list of all the producers and suppliers from which they had sourced the inputs at issue. Post-Preliminary Decision Memo at 4 (PPDM) (P.R. 806).

For the Input Producer Appendix to its transnational subsidy questionnaire, Commerce also asked the GOC to provide certain information "to assess the relationship between the GOC" and both majority government-owned and non-majority government-owned enterprises. *Id.* at 4 (citing GOC Questionnaire at II-9 - II-12, II-21 (P.R. 290)). This included information regarding "the basic ownership structure of the Chinese producers, registration information, information tracing the ownership of the input producers back to their ultimate individual or state owners, articles of incorporation, capital verification reports, articles of groupings, company by-laws,

5

annual reports, and articles of association." *Id*. In response, the GOC responded that, "to the best of its knowledge{,}" none of respondents' Chinese suppliers were majority government-owned enterprises. *Id.* (citing GOC NSA QR1 at 5 (P.R. 667), GOC NSA QR2 at 6, 34 (P.R. 740, C.R. 554)). For non-majority government-owned enterprises, Commerce also requested "information regarding the role of the Chinese Communist Party (CCP) officials in the management and operations of the silicon wafer, solar glass, and silver paste producers," including information regarding "the owners, members of the board of directors, or managers of the producers who were also government or CCP officials or representatives during the" period of investigation. *Id.* at 4 (citing GOC NSA Questionnaire at 3 (P.R. 630)). While the GOC provided "basic registration and ownership structure" for some of the producers in question, it did not fully provide the information requested by Commerce, including "company by-laws, annual reports, tax registration documents, and articles of association." *Id.* at 5 (citing GOC NSA QR1 at 6, Exhs. A.1-A.2; GOC NSA QR2 at 7, 34, Exhs. A.1-A.4)). The GOC also claimed that it "fail{ed} to see how any of the items" requested would assist Commerce in making its determination. GOC NSA QR1 at 6-7; GOC NSA QR2 at 7-8.

The GOC also refused to provide information regarding the CCP's role in the management and operations of the suppliers, instead asserting that Commerce's questions "are irrelevant to this proceeding and do not help determine whether the suppliers at issue are 'public bodies' for the purposes of {Commerce's} LTAR analysis." GOC NSA QR1 at 12; GOC NSA QR2 at 40-41. The GOC further flouted Commerce's requests, asserting that, if Commerce "insists on the necessity of this information," it should "collect this information through the respondents, via their suppliers directly." GOC NSA QR1 at 20; GOC NSA QR2 at 21, 48. The GOC did not present any alternative forms in which it could have submitted the requested

information pursuant to 19 U.S.C. § 1677m(c)(1) and did not request an extension for providing the requested information.

On October 4, 2024, Commerce published its preliminary determination. *See* 89 Fed. Reg. at 80,866. Commerce explained that, because the GOC had failed to provide requested information regarding the BRI program, it did not have the necessary record information to conduct its analysis; Commerce thus relied on facts otherwise available to assess financial contribution and specificity with regard to this program, finding that the only other information on the record showed that subsidies under the BRI program provided a financial contribution and were specific. PDM at 11.

Commerce also preliminarily determined that subsidies under the Import Duty Exemptions program could be countervailable, but that Boviet did not receive a measurable benefit. PDM at 42. Commerce did find that JA Solar received a measurable benefit and preliminarily determined a subsidy rate for JA Solar for the program. *Id.* at 42-43. Finally, Commerce determined that Boviet had used the Import Duty Exemptions program for imported equipment, but that the benefits expensed did not give rise to a countervailable subsidy for the period of investigation. *Id.* at 43.

Commerce issued a post-preliminary determination on March 13, 2025, addressing the new subsidy allegations for the cross-border provision of Chinese silicon wafers and solar glass for LTAR. *See generally* PPDM. Commerce found that, because the GOC did not provide requested information, instead claiming its irrelevance, necessary information for its analysis of these programs was not on the record, and the GOC had withheld requested information and significantly impeded the proceeding. *Id.* at 6. As Commerce explained, the requested information was necessary because the CCP exerts significant control over economic activities in

7

China and "the GOC exercises meaningful control over {input producers} and uses them to effectuate its goal of upholding the socialist market economy, allocating resources, and maintaining the predominant role of the state sector."  *Id.* at 6 n.32 (citing Petitioner Transnational Policy Lending Benchmark Submission at Exh. 2 Att. 1 (Public Bodies Memo) (P.R. 534)).  While Commerce found it necessary to rely on facts available due to the GOC's non-responsiveness, it declined to apply an adverse inference.  *Id.* at 6.

Commerce observed that other facts available on the record showed that certain producers of silicon wafers and solar glass were "authorities" within the meaning of the statute, including evidence that "silicon wafer producer LONGi { } established a CCP Party Committee in 2020, in addition to its existing CCP branches" and the Chinese solar products industry was a focus of GOC industrial plans and policy initiatives.  PPDM at 7 (citing NSA1 at 3-4, 8-10, Exhs. NSA2-4 - NSA 2-7, NSA-2 - NSA-6 (P.R. 327-329, C.R. 70-72)).  Commerce thus preliminarily determined that certain Chinese input producers of solar wafers and solar glass were "authorities" providing a financial contribution to Boviet and JA Solar.  PPDM at 7. Regarding the input producers for which there was no producer-specific evidence, Commerce explained that record evidence showed that "GOC authorities account for at least 71 percent of silicon wafer and solar glass production in China{.}"  *Id.* at 7 (citing NSA1 at 6; NSA2 at 8, 13). Accordingly, Commerce preliminarily determined that 71 percent of the purchases of silicon wafers and solar glass from producers lacking specific record information were supplied by GOC authorities.  PPDM at 8.

Commerce conducted verification of Boviet, JA Solar, and the GOV from December 4-20, 2024.  *See* Verification Schedule (P.R. 717).  At verification, Commerce discovered for the first time that the GOV had imposed an antidumping duty order on aluminum frames from China

8

and that Boviet and JA Solar, as EPEs, were exempted from paying those duties. Boviet Verification Report at 2, 20 (P.R. 801, C.R. 760); JA Solar Verification Report at 2, 13 (P.R. 802, C.R. 759). Commerce also discovered that JA Solar, contrary to its reporting, had imported equipment duty free during the average useful life period. JA Solar Verification Report at 12.

On April 25, 2025 Commerce published its final determination. *See* 90 Fed. Reg. at 17,399. Commerce continued to find, as facts available, that certain suppliers of silicon wafers and solar glass were "authorities" within the meaning of 19 U.S.C. § 1677(5)(B). IDM at 36-41. In doing so, Commerce reiterated that the GOC had not provided the requested information regarding the Chinese suppliers. *Id.* at 37. As such, Commerce explained that:

> {i}n analyzing facts available, we continue to find that CCP officials are present in each of the input producers identified in the new subsidy allegations as individual owners, managers, and members of the boards of directors, and that this gives the CCP, as the government, meaningful control over the companies and their resources. As explained in the Public Bodies Memorandum, an entity with significant CCP presence on its board or in management or in party committees may be controlled, such that it possesses, exercises, or is vested with governmental authority. Consistent with this determination, the record also shows that GOC authorities account for at least 71 percent of silicon wafer and solar glass production in China; and 70 percent of silver paste production in China.

*Id.* at 40-41. Commerce disagreed with respondents that it should use data from Bloomberg as a tier-two benchmark for valuing silicon wafers and chose to rely on the UN Comtrade data submitted by the Alliance. *Id.* at 53-59. For its tier-two benchmark to value solar glass, Commerce determined to rely on UN Comtrade data instead of the PVInsights data suggested by respondents, changing course from the preliminary determination, where it had selected the PVInsights data. *Id.* at 68-71.

9

Commerce also continued to find, as facts available, that policy loans under the BRI program provided a financial contribution and were specific. IDM at 30-42. Disagreeing with JA Solar's position to the contrary, Commerce also found, on the basis of facts available, that JA Solar's loans were associated with the BRI program. *Id*. at 48-50.

Regarding the Import Duty Exemptions program, Commerce continued to find that the GOV provided a financial contribution specific to EPEs in the form of import duty exemptions on imported equipment during the average useful life. IDM at 85. Because JA Solar had failed to report the receipt of other assistance under this program, Commerce applied AFA to determine the rate for JA Solar for this program. *Id.* at 8-9, 88.

Finally, Commerce determined that the GOV provides a financial contribution specific to EPEs in the form of import duty exemptions on raw material and that the Import Duty Program for EPEs was countervailable. IDM at 91-93. Because Boviet and JA Solar had failed to report their exemptions from the antidumping duties on aluminum frames from China, Commerce found there was a gap on the record; Commerce also found that both respondents had failed to cooperate to the best of their ability. *Id.* at 93. Accordingly, Commerce applied AFA to both Boviet and JA Solar with regard to this program, finding that they received countervailable subsidies and using a rate from a comparable program. *Id.*

## SUMMARY OF THE ARGUMENT

Commerce is permitted by statute to countervail transnational subsidies and plaintiffs cannot demonstrate otherwise. The plain language of the statute makes evident that the government of the country providing a subsidy does not have to be the same as the country in which the recipient of the subsidy is located, particularly in light of the fact that Congress removed language explicitly prohibiting the countervailing of transnational subsidies when it

10

amended the countervailing duty laws.  And despite plaintiffs' protestations to the contrary, neither statutory context nor legislative history indicate that Congress intended to disallow Commerce from assessing countervailing duties on subsidies provided by third-country governments.  Plaintiffs also fail to show that Commerce can never find the existence of benefit or specificity for transnational subsidies.  Finally, the major questions doctrine does not apply to the issue of whether Commerce can countervail transnational subsidies, and plaintiffs cannot establish that Commerce acted arbitrarily and capriciously in withdrawing the regulation that had barred Commerce from doing so.

Plaintiffs fare no better in protesting Commerce's countervailing of specific programs, and Commerce's determinations were supported by substantial evidence and in accordance with law.  First, Commerce reasonably determined to apply facts available in finding that certain loans JA Solar received from Chinese commercial banks were associated with the BRI lending program and that the program both constituted a financial contribution and was specific.  Second, Commerce reasonably applied facts available in determining that plaintiffs' Chinese input suppliers were authorities and in countervailing JA Solar's purchases of Chinese silicon wafers for LTAR.  Third, Commerce appropriately selected data from U.N. Comtrade as benchmarks for assessing the benefit received as a result of the provision of silicon wafers and solar glass for LTAR and properly excluded Vietnamese export prices from its benchmark calculations.  Fourth, Commerce made a reasoned determination to countervail the Import Duty Exemptions program. Finally, Commerce appropriately applied AFA against JA Solar with respect to import duty exemptions on imported equipment, as JA Solar had failed to properly report the import of relevant machinery during the average useful life period.

11

**ARGUMENT**

## I.    Standard of Review

This Court holds lawful Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b).  "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record").  It is also not required that Commerce to provide an explicit explanation for every finding so long as its decisional path is reasonably discernible.  *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998).  Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

II.    **Commerce Can Countervail Transnational Subsidies**

A.    **Relevant Background Relating to the Revocation of the Regulation Prohibiting the Countervailing of Transnational Subsidies**

The Tariff Act of 1930 authorized the assessment of countervailing duties "{w}henever any country . . . shall pay or bestow . . . any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country{.}"  Tariff Act of 1930, § 303, 46 Stat. 687; *see also* 19 U.S.C. §1303(a)(1), *repealed by* Pub. L. 103–465, title II, § 261(a), 108 Stat. 4908, (1994).  Thus, by explicit statutory mandate, countervailing duties could only be imposed on bounties or grants from the same country in which the manufacturing or production of the merchandise occurred.  But in 1979, Congress—in the Trade Agreements Act of 1979—created 19 U.S.C. § 1671.  *See* Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 (1979).  While the 1979 amendments partially retained section 1303,[2] the new section 1671(a)(1) contained certain key distinctions from the old section 1303.  As relevant here, section 1671(a)(1) adopted the term "subsidy" rather than the "bounty or grant" language used in section 1303(a)(1).  Section 1671(a)(1) also removed section 1303(a)(1)'s requirement that the country providing the subsidy be the same as the country of manufacture or production.  In 1994, Congress fully repealed section 1303 with the passage of the Uruguay Round Agreements Act (URAA).  Pub. L. No. 103-465, §§ 261, 262, 108 Stat. 4908.  The URAA further modified the countervailing duty framework to its current form.

In 1998, Commerce promulgated 19 C.F.R. § 351.527, which was based on the agency's prior interpretation of the repealed section 1303, and stated that, with the limited exceptions of

---

[2]  Countries that were "a country under the {Subsidies} Agreement" became subject to an injury test and investigation under section 1671(a)(1), while countries that were not under the Subsidies Agreement were still subject to section 1303(a)(1) until its repeal.  Pub. L. 96-39, 93 Stat. 144.

13

subsidies provided to international consortia or upstream subsidies, a subsidy did not exist if Commerce determined that the subsidy was supplied "{b}y a government of a country other than the country in which the recipient firm is located{.}"  19 C.F.R. § 351.527 (1998); *see also Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws, Final Rule*, 89 Fed. Reg. 20,766, 20,826 (Dep't of Commerce Mar. 25, 2024) (*RISE Final Rule*).  At that time, Commerce's administrative experience showed that "'the government of a country normally provides subsidies for the general purpose of promoting the economic and social health of *that* country and its people, and for the specific purpose of supporting, assisting, or encouraging domestic manufacturing or production{.}'"  *Regulations Improving and Strengthening Enforcement of Trade Remedies Through the Administration of Antidumping and Countervailing Duty Laws,* 88 Fed. Reg. 29,850, 29,870 (Dep't of Commerce May 9, 2023) (*RISE Proposed Rule*) (quoting *Countervailing Duties*, 62 Fed. Reg. 8,818, 8,847 (Dep't of Commerce Feb. 26, 1997) (*CVD Proposed Rule*) (emphasis added)).  At that time, Commerce also thought that the repeal of section 1303 had not necessarily eliminated the transnational subsidies rule.  *See Preamble, Countervailing Duties*, 63 Fed. Reg. 65,348, 65,405 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).

Over the next two decades, Commerce observed that situations in which a government subsidizes production in another country had become increasingly prevalent.[3]  In 2023, Commerce proposed eliminating 19 C.F.R. § 351.527, explaining that its past interpretation of section 1671 was overly restrictive and that the statute did not prohibit Commerce from

---

[3]  Commerce specifically noted China's initiatives in driving capacity in other countries and propping up other countries' export platforms.  *See RISE Final Rule*, 89 Fed. Reg. at 20,826.

14

countervailing transnational subsidies outside the context of an international consortium or upstream subsidy. *RISE Proposed Rule*, 88 Fed. Reg. at 29,870. After undertaking notice-and-comment rulemaking, Commerce published a final rule withdrawing C.F.R. § 351.527 and stating that, "when appropriate, Commerce will investigate and countervail transnational subsidies." *See RISE Final Rule*, 89 Fed. Reg. at 20,826. In doing so, Commerce observed that section 1671 did not impose geographic limitations on countervailing transnational subsidies and reiterated that its former interpretation of the statute was overly restrictive, as nothing in that statute prohibited countervailing duties on subsidies provided by a government or public entity in one country that benefit producers or exporters in another. *Id.* Indeed, as Commerce stated, restricting the ability to countervail transnational subsidies that injured domestic producers would be inconsistent with the very purpose of the countervailing duty laws. *Id.*

Commerce further explained that, as opposed to 25 years ago when the regulation limiting Commerce's ability to countervail transnational subsidies was issued, the current landscape included "governments provid{ing} cross-border equity infusions, fundings, loans, *etc.*" that "promote the grantor country as well as the recipient's country manufacturing capacities for a particular industry{,}" as well as "direct investments in a third country from state-owned enterprises{.}" *Id.* at 20,826-20,827.

**B.     The Statutory Framework for Countervailing Duties Allows Commerce to Countervail Transnational Subsidies**

As the Court of Appeals for the Federal Circuit has recently confirmed, Commerce has broad delegated authority to fill in the details of a statutory scheme, particularly where Congress is silent on an issue. *See Archroma U.S., Inc. v. Dep't of Commerce*, --- F.4th ----, No. 2024-2159, 2026 WL 2275132, at *5-6 (Fed. Cir. Aug. 7, 2026). Here, the countervailing duty statute explicitly authorizes Commerce to assess duties when the government of a country is providing a

15

subsidy that constitutes a financial contribution, confers a benefit, and is specific.  But Congress did not limit countervailable subsidies to only those provided by the government of the same country as the country where the subject of the investigation is physically located.  As such, Commerce properly exercised its authority to find that transnational subsidies can be countervailable and plaintiffs cannot demonstrate that countervailing transnational subsidies conflicts with the countervailing duty statute.

> **1.**    **The Plain Text and Context of 19 U.S.C. § 1671 Permits Commerce to Assess Duties on Transnational Subsidies**

Nothing in the plain language of 19 U.S.C. § 1671(a) prohibits Commerce from assessing countervailing duties on transnational subsides; as such, Commerce—with its discretion and flexibility to carry out countervailing duty laws—may countervail transnational subsidies so long as the statutory requirements are otherwise met.  Subsection (a) states:

> If . . . {Commerce} determines that the government of *a country* or any public entity within the territory of *a country* is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold, (or likely to be sold) for importation, into the United States . . . there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy.

19 U.S.C. § 1671(a) (emphasis added).  The use of the indefinite article "a" in the phrase "a country" to describe the authority providing a subsidy does not require the country of the authority providing a countervailable subsidy to be the same as the country in which the company receiving the subsidy is located; rather, it allows Commerce to impose countervailing duties on transnational subsidies provided by "a country" so long as the merchandise at issue is imported or sold for importation (or likely to be sold) into the United States.  Put simply, Congress, by deliberately using the phrase "a country" without further restrictions, has permitted

16

Commerce to countervail subsidies even if they originate from the government of a country that is not the country of manufacture or production of the product at issue.

If Congress had meant to restrict Commerce's ability to countervail transnational subsidies, it would have cabined the language to the government of "*the* country" in which the subsidy is received or stated that the government of a country is providing a countervailable subsidy with respect to the manufacture, production, or export of merchandise *in such country*. That it chose not to is telling, particularly given that section 1671 was the direct successor to former section 1303, which stated explicitly that countervailing duties would be levied "whenever any country . . . shall pay or bestow . . . any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced *in such country*{.}" 19 U.S.C. § 1303 (repealed 1994); *see also United States v. Wells*, 519 U.S. 482, 493 (1997) (holding that, when "Congress deliberately dropped the term 'materiality{,}" it did not "intend{ } materiality to be an element of the {statute.}"); *Burrus v. Vegliante*, 336 F.3d 82, 89 (2nd Cir. 2003); *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning."). Former section 1303 demonstrates that Congress knew how to limit countervailing duties to only subsidies from the governments of countries in which the manufacturing and production of the merchandise took place; the Court should not ignore Congress's deliberate decision to remove this restriction when enacting section 1671.

Additionally, in defining "subsidy" and "authority," section 1677(5)(B) similarly employs indefinite articles, defining a subsidy as a situation in which "*an* authority provides a financial contribution" (emphasis added) and an "authority" as "*a* government of *a* country or any public

17

entity within the territory of the country" (emphasis added).  Like section 1671(a), section 1677(5)(B) contains no restriction, or even implication, that the authority providing the subsidy must be from the same country as the merchandise being subsidized.

Despite these clear statutory clues, JA Solar claims that the reference to "a country" in the singular rather than the plural means that the statute only permits Commerce to countervail subsidies from a single country in each proceeding.[4]  JA Solar Br. at 12.  But JA Solar's position rests on an unreasonable reading of the statute.  The Dictionary Act states that "words importing the singular include and apply to several persons, parties, or things{.}"  1 U.S.C. § 1.  The Supreme Court has taken this to mean that, while "{t}he Dictionary Act does not transform every use of the singular 'a' into the plural 'several,'" "a statute using the singular 'a' can apply to multiple persons, parties or things."[5]  *Niz-Chavez v. Garland*, 593 U.S. 155, 164 (2021).  And the Federal Circuit has repeatedly emphasized (albeit in the context of claim construction), that the indefinite article "a" or "an" carries the meaning of "one or more" unless there is a clear intention to limit the article.[6]  *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000).  "{T}he { } limitation 'a,' without more, requires at least one."  *Id.*

---

[4]  Interestingly, JA Solar's reading would not prohibit Commerce from assessing transnational subsidies so long as Commerce only countervailed subsidies from a single country during a proceeding.  Under this scenario, Commerce could presumably countervail subsidies provided by the Chinese government if it chose not to do so for subsidies provided by the Vietnamese government.

[5]  In *Niz-Chavez*, the Court held that "a notice to appear" in an immigration removal proceeding must be constituted of a single document containing all the information required by the relevant statute rather than multiple documents collectively containing the required information.  This holding is, of course, inapposite to the present case.

[6]  There is no good reason not to construe "a" in the context of section 1671(a) any differently than in the claim construction context, particularly in light of the Dictionary Act and the Supreme Court's decision in *Niz-Chavez*.

Moreover, section 1671(a) mandates that Commerce impose a countervailing duty when it determines the existence of "*a countervailable subsidy.*" 19 U.S.C. § 1671(a)(1). This does limit Commerce to only countervailing a single subsidy program in each proceeding; Commerce regularly investigates and assesses countervailing duties on multiple subsidy programs—indeed, it did so in the underlying investigation with regard to subsidies provided by the Vietnamese government. *See* Final Determination, 90 Fed. Reg. at 17,400, 17,401; IDM at 16-20 (countervailing various tax programs, import duty exemptions, and land programs). Commerce separately examines each alleged subsidy program to determine whether it fulfills the statutory criteria for a countervailable subsidy—*i.e.,* that an authority provided a financial contribution conferring a benefit and the subsidy is specific. See 19 U.S.C. §§ 1677(5)(A)-(E), 1677(5A). JA Solar does not appear to contest Commerce's ability to countervail multiple subsidy programs in a single proceeding, nor could it reasonably do so. There is no cause for reading "*a* countervailable subsidy" as one or more countervailable subsidies but limiting "*a* country" to just one country.[7]

For its part, Boviet argues that the surrounding "context" of section 1671(a)(1) supports a reading that Commerce cannot countervail subsidies provided by a third-country government.

---

[7] To the extent plaintiffs claim on reply that any specific arguments we raise relating to Commerce's general authority to countervail transnational subsidies are *post hoc*, the Court should reject such an argument. Whether Commerce is allowed to countervail transnational subsidies under the countervailing duty statutes is a question of law that the Court examines *de novo*. *See, e.g., Mitsubishi Polyester Film, Inc. v. United States*, 228 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2017); *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1289 n.16 (Ct. Int'l Trade 2002) ("Moreover, a legal argument entered by Commerce in its capacity as a defendant to a civil action with respect to the level of discretion offered by the relevant statute and regulation does not amount to a *post hoc* rationalization since Commerce argues its position within the parameters of common law litigation. If {plaintiff's} argument is taken to its logical conclusion, every argument by every party with respect to the legal boundaries of any applicable provision should be deemed a form of *post hoc* rationalization.").

Boviet Br. at 6.  Not so.  Boviet first cites subsection (a)(1), which requires Commerce to impose

countervailing duties when it determines that countervailable subsidies have been provided for

"merchandise imported, or sold (or likely to be sold) for importation, into the United States."  19

U.S.C. § 1671(a)(1).  Boviet misreads this phrase as requiring the country from which the

merchandise is imported to be the same as the country providing the subsidy, Boviet Br. at 6, but

nothing in the statutory provision lends itself to such an interpretation; rather, subsection (a)(1)

requires that the *merchandise itself* is imported or sold into the United States, not that the

government or public entity providing the subsidy must be in the same country as the

merchandise being imported or sold to the United States.

Boviet also cites subsections (a)(2) and (c), which discuss whether merchandise is

imported from a "Subsidies Agreement country," *id.*, but these subsections only contend with

whether the International Trade Commission must find material injury depending upon Subsidies

Agreement Country status.  And, as with subsection (a)(1), whether the importation of

merchandise is from a Subsidies Agreement Country does not bear on whether the government

providing the subsidy must be in the same country as the country from which the merchandise is

imported into the United States.

The plain language of the statute and the surrounding context of 19 U.S.C. § 1671(a)

clearly do not deprive Commerce of the authority to investigate and countervail transnational

subsidies; this alone is sufficient for the Court to sustain Commerce's determination on this

issue.

> **2.    Allowing Commerce to Countervail Transnational Subsidies Would Not Render 19 U.S.C. § 1671(d)-(e) Superfluous**

Plaintiffs assert that allowing Commerce to countervail transnational subsidies outside

the context of an international consortium or upstream subsidy allegation would render 19 U.S.C.

20

§ 1671(d)-(e) superfluous.  Boviet Br. at 7-8; JA Solar Br. at 15.  Again, they are wrong.  While subsections (d) and (e) indeed grant Commerce explicit authority to investigate—respectively— international consortia and upstream subsidies, and provide frameworks for how to do so under those scenarios, they do not restrict Commerce from otherwise investigating transnational subsidies and would not be rendered superfluous if the statute were interpreted as allowing Commerce to do so.

First, an examination of subsections (d) and (e) demonstrates that they are not intended to supplant Commerce's general authority to investigate transnational subsidies.  These subsections create frameworks under which Commerce countervails subsidies either provided indirectly or through membership in a consortium, as opposed to the type of subsidies at issue here.  *See* 19 U.S.C. §§ 1671(d) (directing Commerce to countervail subsidies provided to an entity "to assist, permit, or otherwise enable their participation in that consortium"); (e) (directing Commerce to include the amount of any upstream subsidy, as described in section 1677-1(a), in assessing countervailing duties); 1677-1(a) (defining an upstream subsidy as a subsidy provided to an input product and stating that a customs union of multiple countries will be treated as a singular country for purposes of the provision).  Neither provision implies that Commerce may otherwise only investigate subsidies from the government of only one country—that of manufacture or production; instead, subsections (d) and (e) recognize that, under certain specific factual scenarios, multiple countries may be involved in a singular subsidy scheme and provide guidance for how Commerce is to address the situation.

Subsections (d) and (e) thus apply in limited factual circumstances and do not prohibit Commerce from generally countervailing subsidies provided by the government of one country to a company in the country under investigation or review in a proceeding.  Nor does a general

21

authority to countervail subsidies from a single third-country government subsume or render superfluous those subsections. As Commerce explained, while "{a}n interested party may still allege a subsidy pursuant to sections {1671(d) or (e)} if the case specific facts are more aligned with these frameworks{,}" "the existence of those provisions does not impinge on whether Commerce may investigate and countervail transnational subsidies under distinct fact patterns." IDM at 27. Multiple countries acting together to provide subsidies is not the same as the government of a particular country providing subsidies to a company located in another country.

The continued applicability of subsections (d) and (e) has been evidenced by Commerce's actual actions since the repeal of 19 C.F.R. § 351.527. For example, in the countervailing duty investigation of epoxy resins from Korea, Commerce considered whether the relationship between several Chinese and Korean companies constituted an international consortium. *See Certain Epoxy Resins from the Republic of Korea*, 90 Fed. Reg. 14,605 (Dep't of Commerce Apr. 3, 2025), and accompanying IDM at Cmt. 22 (*Epoxy Resins* IDM). While Commerce ultimately determined that the requirements for finding an international consortium under section 1671(d) were not satisfied, it still examined the relationship under that subsection. In the same investigation, Commerce determined that the cross-border provision of certain inputs for LTAR from China constituted a countervailable subsidy under 19 U.S.C. §§ 1677(A)-(E), 1677(5A), *not* sections 1671(d) or (e). *See Epoxy Resins* IDM at Cmt. 18. And in an investigation of certain van-type trailers from Mexico, Commerce similarly examined whether the relationship between Mexican and Korean companies constituted an international consortium, though preliminarily determining that the requirements of section 1671(d) were not met. *See Certain Van-Type Trailers and Subassemblies Thereof from Mexico*, 91 Fed. Reg. 34,218 (Dep't of Commerce June 5, 2026), and accompanying PDM at 37.

22

As Commerce explained, "{t}he existence of a transnational subsidy {is} case-specific" and its "methodology in investigating and countervailing any other transnational subsidy programs in subsequent cases may develop over time, depending on the case-specific circumstances before {it}." IDM at 27 (citing *RISE Final Rule*, 89 Fed. Reg. at 20,827). While Commerce will examine subsidies provided to an international consortium by multiple countries under section 1671(d) and an upstream subsidy provided by an association of multiple countries constituting a customs union under section 1671(e), Commerce is still permitted under the statute to investigate an alleged transnational subsidy pursuant to section 1671(a) and to assess duties on such a subsidy so long as it determines the existence of a countervailable subsidy—*i.e.,* that an authority provided a financial contribution conferring a benefit and the subsidy is specific. 19 U.S.C. §§ 1671(a), 1677(5)(A)-(E), 1677(5A).

### 3. The Provisions Regarding Nonmarket Economy Countries and Interested Parties Do Not Undermine Commerce's Authority to Countervail Transnational Subsidies

Boviet claims that statutory provisions addressing nonmarket economy countries and interested parties supports a reading that Commerce is prohibited from countervailing transnational subsidies. Boviet Br. at 8-9, 11-13. Boviet's reliance on these provisions is misplaced.

Boviet first asserts that 19 U.S.C. § 1671(f)(2), which addresses section 1671's applicability to nonmarket economy countries, "takes for granted that the country of export is the same as the country providing the otherwise countervailable subsidy." Boviet Br. at 9. But subsection (f) does not restrict Commerce's ability to countervail subsidies provided by the government of one country to a company producing subject merchandise in a different country.

Section 1671(f)(2) states:

23

> A countervailing duty is not required to be imposed under subsection (a) on a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States from a nonmarket economy country if the administering authority is unable to identify and measure subsidies provided by the government of the nonmarket economy country or a public entity within the territory of the nonmarket economy country because the economy of that country is essentially comprised of a single entity.

This provision gives Commerce discretion not to impose a countervailing duty on merchandise imported from a nonmarket economy country when it cannot identify and measure subsidies provided by that country because the country's economy is comprised of a single entity. It does not imply that Commerce cannot otherwise impose countervailing duties on subsidies provided by the government of one country to the production of merchandise in another.

Boviet next relies on the definition of an interested party at 19 U.S.C. § 1677(9) to argue that, by not giving third-country governments interested party status, Congress must have intended "a country" in 1671(a)(1) to mean only the country where the production or manufacture of the merchandise occurs. Boviet Br. at 12. But, again, nothing in section 1677(9) can be reasonably read as prohibiting Commerce from countervailing transnational subsidies, and the lack of interested-party status for third-country governments does not override Congress's deliberate decision to remove the explicit requirement that the government of the country providing the subsidy must be the same as the country of manufacture or production.[8] *Compare* 19 U.S.C. § 1303(a)(1) *with* 19 U.S.C. § 1671(a)(1).

Moreover, as the Alliance has observed, "{t}here are a host of parties impacted directly by the Act that are not granted interested party status{,}" such as "input providers and tollers." Alliance Rebuttal Case Br. at 11. Boviet claims that, if countervailing subsidies provided by

---

[8] In any event, here, the Government of China participated meaningfully in the underlying investigation, filing its own questionnaire responses and case briefs.

24

third countries were permitted, it would not make sense to "grant interested-party status to exporting countries that provide a subsidy, but not third countries that provide a subsidy {as} the two may have equivalent stakes in the outcome of the investigation." Boviet Br. at 13. But Boviet presumes without support that a third country providing a subsidy to a company within another country would have the same vested interest in the outcome as the country under investigation.

Because the plain language of the statute does not prohibit Commerce from countervailing transnational subsidies and Commerce has the authority to determine what types of subsidies to investigate and countervail, plaintiffs' arguments must fail, particularly as the statutory framework does not indicate that Congress intended to continue disallowing Commerce from countervailing transnational subsidies when it removed language explicitly prohibiting Commerce from doing so.

C.      **Legislative History Does Not Show That Congress Intended to Preclude Commerce from Countervailing Transnational Subsidies**

As JA Solar acknowledges, the Court need not proceed further in its analysis if it finds that the plain language resolves the statutory interpretation issue. JA Solar Br. at 17 (citing *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 803 (Fed. Cir. 2018)). Accordingly, the Court need not consider plaintiffs' arguments concerning the legislative history of the countervailing duty statutes. But if it does, the legislative history supports Commerce's ability to countervail transnational subsidies.

As explained above, prior to 1979, section 1303 governed the imposition of countervailing duties on a country's provision of "any bounty or grant upon the manufacture or production or export of any article or merchandise *manufactured or produced in such country*{.}" 19 U.S.C. §1303(a)(1) (emphasis added). Congress, of course, removed this

25

geographic limitation when it enacted section 1671.  Plaintiffs appear to believe that the language in former section 1303 dictates that Commerce cannot countervail transnational subsidies under the current statutory scheme.  JA Solar Br. at 17-18, Boviet Br. at 14.  Plaintiffs base this position on the fact that the SAA expressly linked the term "bounty or grant" from former section 1303 with the term "subsidy" used in the new section 1671, stating that "the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute{.}"  JA Solar Br. at 18 (quoting SAA at 925), Boviet Br. at 14.  But the statement in the SAA supports the proposition that "subsidy" has the same meaning as "bounty or grant"—it does not imply that the country of the government providing the subsidy must be the same as the one in which the merchandise is being manufactured or produced.  Plaintiffs' argument extends the SAA beyond its express language to encompass an explicit qualifier—in this case, a geographic limitation—that appeared in section 1303 but does not appear in section 1671.  Put another way, the SAA clarified *what* was being provided (a "bounty or grant" and a "subsidy"), not *where* the providing authority must be.  The statement in the SAA does not imply a continuation of Congress's geographic restriction.  As already discussed, Congress removing the "manufactured or produced in such country" language contained in former section 1303 clearly signaled its intention to remove the prohibition on countervailing transnational subsidies, and nothing in the SAA shows otherwise.

Plaintiffs also contend that Congress understood that Commerce did not have the authority to countervail transnational subsidies when it proposed legislation—ultimately never passed—granting Commerce the authority to countervail transnational subsidies.  JA Solar Br. at 18-19; Boviet Br. at 18.  But, as Commerce explained, "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction,

26

including the inference that the existing legislation already incorporated the offered change." IDM at 27 (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962) (internal quotation omitted)); *see also Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990); *United States v. Vargas*, 871 F. Supp. 623, 625 (S.D.N.Y. 1994) ("legislative action may either modify, clarify or merely confirm preexisting law."). Notably, neither plaintiff cites specific language in the legislative history of the proposed acts supporting their claim that Congress understood Commerce not to have the ability to countervail transnational subsidies. And certainly Congress has, in the past, proposed legislation that would have confirmed Commerce's already-existing authority to countervail subsidies. *See, e.g.*, 157 Cong. Rec. 14,998 (2011) (statement from Senator that the proposed legislation simply "restates" Commerce's authority to investigate currency undervaluation).

Moreover, as the Supreme Court has observed, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Wright v. West*, 505 U.S. 277, 295 n.9 (1992) (citation & quotation marks omitted). Indeed, "congressional inaction is perhaps the weakest of all tools for ascertaining legislative intent{.}" *Butterbaugh v. Dep't of Just.*, 336 F.3d 1332, 1342 (Fed. Cir. 2003). Because courts must approach congressional acquiescence with "extreme care," *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 (2001), "{plaintiff} faces a difficult task in overcoming the plain text and import of the {countervailing duty} law." *Kumho Tire (Vietnam) Co., Ltd. v. United States*, 741 F. Supp. 3d 1277, 1305 (2024) (quoting *Solid Waste Agency*, 531 U.S. at 170).

27

**D.     Commerce Is Not Foreclosed by Statute from Finding that Transnational Subsidies Can Confer a Benefit and Be Specific**

**1.     Transnational Subsidies Can Confer a Benefit under the Statute**

In cases where goods and services are being provided by a foreign government, Commerce normally treats a benefit as conferred when, "in the case where goods . . . are provided, if such goods . . . are provided for less than adequate remuneration{.}"  19 U.S.C. § 1677(5)(E)(iv).  The statute further directs Commerce to determine the adequacy of remuneration "in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review{.}" *Id.* § 1677(5)(E).

Plaintiffs read section 1677(5)(E)'s requirement tying prevailing market conditions to the country subject to investigation as meaning that the country subject to investigation must be the same as the country providing the subsidy.  JA Solar Br. at 20, Boviet Br. at 11.  But, as with the other statutory provisions they rely on, they draw the wrong inference.

The statute requires Commerce to consider the prevailing market conditions in the country subject to investigation when determining the existence of a benefit.  Commerce has never disputed this requirement and, in fact, considered the prevailing market conditions in Vietnam when conducting its benefit analysis, finding the Vietnamese market distorted because the majority of silicon wafers, silver paste, and solar glass in the Vietnamese market actually come from China—which itself has distorted pricing due to government control—and relying on tier-two benchmarks.  Post-Preliminary Memo at 10.  Commerce acted in accordance with section 1677(5)(E) when it considered the adequacy of remuneration for the Chinese government's provision of inputs for solar cells in relation to the prevailing market conditions in Vietnam and determined that a benefit was conferred.

28

Boviet suggests that the difference between prices based on prevailing market conditions in the country subject to investigation and prices charged by a foreign entity do not necessarily reflect a subsidy by that foreign entity because there may reasons for the price differences that are unrelated to subsidies.  Boviet Br. at 11.  But this argument, aside from being based on pure speculation, constitutes no more than a distraction that attempts to introduce factors Commerce is not required to consider in determining the existence of a countervailable subsidy.  Under the statute, the elements of a countervailable subsidy are financial contribution, specificity, and benefit.  *See* 19 U.S.C. §§ 1677(5)(A)-(B), (5A).  Here, Commerce determined that a third-country government provided a good, the provision of that good was specific, and a benefit was conferred.  And, in determining the existence of a benefit, Commerce conducted its benefit calculation "in relation to prevailing market conditions" in Vietnam, "the country which is subject to the investigation."  19 U.S.C. §§ 1677(5)(E).  Comparative advantage and reasons for government pricing are simply not factors Commerce must consider in its analysis, whether the subsidy is provided by a third-country government or the government of the country under investigation.

### 2.    Commerce Is Not Statutorily Prohibited from Finding That a Transnational Subsidy Is Specific

Plaintiffs argue that a transnational subsidy cannot be specific because, under 19 U.S.C. § 1677(5A)(D), subsidies can only be specific if they are granted "to an enterprise or industry within the jurisdiction of the authority providing the subsidy{.}"  Boviet Br. at 9-10; JA Solar Br. at 22.  But, while plaintiffs contend that "within the jurisdiction" means that the recipient of a subsidy must be within the geographic territory of the authority providing the subsidy, *id.*, nothing in the statute supports this overly restrictive reading.  While we do not contest that geographic jurisdiction could satisfy the statutory requirement, there is no reason to infer that

29

legal jurisdiction cannot also do so.  As Commerce found with regard to the BRI program, Chinese law demonstrates that "outbound investment by state-invested enterprises and their subsidiaries at all levels outside of China are subject to Chinese law. . . . As a result, we are finding that this program is *de facto* specific{.}  IDM at 33.  Commerce further explained with regard to the provision of inputs for LTAR:

> {O}utbound investment by state-invested enterprises and their subsidiaries at all levels outside China are subject to Chinese law. . . . {A} "state-invested enterprise" is defined as a "wholly state-owned enterprise or company with the state being the sole investor, or a company in which the state has a stake, whether controlling or non-controlling."  Because a company with state-owned or state-controlled investors may therefore be subject to Chinese law despite being physically located in a different country, then those companies (and companies controlled by those companies) can be within the jurisdiction of the Government of China.

*Id.* at 44 (internal citations omitted) (emphasis removed).  Commerce thus reasonably found that, because the companies at issue were subject to Chinese law, they were within the jurisdiction of the Chinese government despite being physically located outside of China.

Boviet offers three reasons for its position that the jurisdiction referenced in section 1677(5A)(D) must be geographic, but none are convincing.  Boviet first observes that the heading of paragraph (D) is titled "Domestic subsidy."  Boviet Br. at 10.  But "the title of a statute is of use only when it sheds light on some ambiguous word or phrase in the statute itself." *In re Forest*, 134 F.4th 1198, 1202 (Fed. Cir. 2025) (quoting *Carter v. United States*, 530 U.S. 255, 267 (2000)) (cleaned up).  But there is no ambiguity to the word "jurisdiction" here and this Court well understands that jurisdiction can be not only territorial but legal (*e.g.*, subject matter jurisdiction).  Moreover, while Commerce has not yet presented an analysis of the paragraph title, "Domestic Subsidy" more likely refers to the subsidies Commerce investigates being provided *for* the domestic industry of the country subject to investigation and Commerce's

30

specificity analysis focusing on the domestic economy of that country, rather than the origin of the subsidies being domestic. This is particularly so in light of Congress's decision to remove the geographic restriction contained in former section 1303. It makes sense that Congress would have titled the paragraph "Domestic Subsidy" without expecting "jurisdiction" to be construed as only geographic.

Boviet next contends that the word "within" connotes a territorial limitation. Boviet Br. at 10. This argument makes little sense, given the Federal Circuit and this Court have frequently used "within" to describe subject matter jurisdiction, which is clearly not geographic or territorial in nature. *See, e.g., Beasley v. Shinseki*, 709 F.3d 1154, 1157 (Fed. Cir. 2013) (discussing "legal issues within our jurisdiction."); *United States v. Maverick Mktg., LLC*, 322 F. Supp. 3d 1373, 1379 n.12 (Ct. Int'l Trade 2018) ("The type of claim at issue here is a matter already within the jurisdiction of this Court."); *Former Emp. of Drive Sol Glob. Steering, Inc. v. U.S. Sec'y of Lab.*, 181 F. Supp. 3d 1369, 1379 (Ct. Int'l Trade 2016) ("Plaintiff's challenge . . . is not a matter within the Court's jurisdiction.").

Finally, Boviet observes that section 1677(5A)(D)(iv) states that, when a subsidy is "limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific." Boviet Br. at 10 (quoting 19 U.S.C. § 1677(5A)(D)(iv)). But the enterprise or industry being located within a designated geographical region does not necessarily mean that the jurisdiction of the authority must also be of a geographic nature. Moreover, as Boviet acknowledges, subparagraph (iv) explicitly uses the term "geographical region." The prefatory language in paragraph (D) does not. Thus, even if "geographical region" connotes that the jurisdiction referred to in that subparagraph is geographic (which we do not concede), the fact that Congress did not use the

31

term "geographical" earlier in the same paragraph strongly suggests that it did not intend to limit jurisdiction under that paragraph to only physical jurisdiction.

Because plaintiffs cannot establish that the statute precludes Commerce from finding a benefit or specificity for transnational subsidies, these factors do not undermine Commerce's authority to assess countervailing duties on such subsidies.

### E.    Commerce Did Not Act Arbitrarily or Capriciously in Withdrawing the Regulation and Confirming Its Authority to Countervail Transnational Subsidies

Boviet contends that Commerce's decision to countervail the provision of various inputs for LTAR and the BRI program was arbitrary and capricious because Commerce, in the final determination, allegedly failed to meaningfully address arguments presented by Boviet and instead relied on policy reasons.  *See* Boviet Br. at 19-21.  But Boviet conflates Commerce's final determination to countervail certain transnational subsidies in this specific proceeding with the issue of whether Commerce was permitted to countervail transnational subsidies under the statute at all.

In determining to countervail the transnational subsidies in *this* case, Commerce was required to consider the record evidence and explain its reasoning.  But whether Commerce generally has statutory authority to countervail transnational subsidies is a legal issue not tied solely to Commerce's explanations in the final determination, and plaintiffs misunderstand the relevant framework for assessing whether Commerce has authority under the countervailing duty statute to assess duties on transnational subsidies.  In particular, they contend that the absence of a statutory prohibition on transnational subsidies does not permit Commerce to countervail them. Boviet Br. at 4-5; JA Solar Br. at 14.  But these arguments misconstrue Commerce's authority pursuant to *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and the Federal Circuit

32

has recently confirmed that Commerce has broad delegated authority to fill in the details of a statutory scheme when Congress is silent on the issue. *Archroma*, 2026 WL 2275132, at \*6. Accordingly, plaintiffs cannot reasonably argue that statutory silence is insufficient to permit Commerce to assess countervailable duties on transnational subsidies.

JA Solar argues that, pursuant to *Loper Bright*, the Court must exercise its independent judgment and determine the best reading of a statute rather than deferring to Commerce's interpretation. JA Solar Br. at 14-15. Moreover, according to both plaintiffs, statutory silence is not a grant of authority. Boviet Br. at 5, JA Solar Br. at 14. But plaintiffs seek to constrain Commerce's ability to countervail injurious programs under the statue and seem not to understand the effect of *Loper Bright* with respect to Commerce's authority in antidumping and countervailing duty cases. The Supreme Court "did not throw out the administrative discretion baby with the *Chevron* deference bathwater." *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025), *appeal docketed*, No. 25-1937 (Fed. Cir. July 16, 2025). While true that courts must exercise independent judgment in determining the best reading of a statute, "{t}he best reading of a statute . . . 'may well be that the agency is authorized to exercise a degree of discretion.'" *Lesko v. United States*, 161 F.4th 1352, 1358 (Fed. Cir. 2025) (en banc) (citing *Loper Bright*, 603 U.S. at 394-95). And, as the Supreme Court clarified in *Seven County Infrastructure Coalition v. Eagle County, CO*, 605 U.S. 168 (2025), "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Id.* at 179-80.

The *en banc* decision by the Court of Appeals for the Federal Circuit in *Lesko* is illustrative. In *Lesko*, the Court observed that, while the statute at issue was "silent as to the formalities required to officially order or approve overtime," the statute was "not silent about

33

*who* Congress intended to fill in those details." *Id.* at 1359 (emphasis in original). Because Congress had directed the Office of Personnel Management (OPM) to "prescribe regulations subject to the approval of the President, *necessary for the administration* of this subchapter," the Court held that Congress had "expressly delegated rulemaking authority to OPM to prescribe regulations necessary for administering the { } statute." *Id.* (quoting 5 U.S.C. § 5548(a) (emphasis in original) (quotation marks omitted)). As the Court explained, "Congress's silence on this issue, in combination with its delegation of authority to OPM to prescribe regulations necessary for administering the { } statute, clears the path for OPM to fill up the details of the authorization process." *Id.* at 1360.

Here, the countervailing duty statutes are silent as to whether Commerce may countervail transnational subsidies, stating only in broad terms that Commerce may countervail a subsidy so long as the requirements of financial contribution, benefit, and specificity are met. 19 U.S.C. §§ 1671(a), 1677(5). And, similar to *Lesko*, Congress was not silent about who it intended to effectuate the statutes. In enacting the Uruguay Round Agreements Act (URAA), which significantly modified the countervailing duty laws to their current form,[9] Congress delegated to Commerce the authority to adopt "such regulations { } as may be necessary to ensure that any provision of [the URAA], or amendment made by [the URAA], that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States is appropriately implemented on such date." 19 U.S.C. § 3513(a)(2). Moreover, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316,

---

[9] There have been minor amendments to the countervailing duty provisions since the URAA.

Vol. 1 (1994) (SAA),[10] provides that, "{i}n practice, the Administration will endeavor to amend or issue the regulations . . . {19 U.S.C. § 3513(a)(2)} provides the authority for such new or amended regulations to be issued[.]"  SAA at 677.

Indeed, the Federal Circuit has recently confirmed that the Tariff Act authorizes Commerce to "fill up the details" of a statutory scheme.  *Archroma*, 2026 WL 2275132, at *5.  In doing so, the Court emphasized Commerce's "broad delegated authority" to effectuate the statutory scheme, particularly when the language in the relevant statute is silent.  *Id.* at *6.  While here, Commerce did not prescribe a regulation memorializing its authority to assess duties on transnational subsidies, it nonetheless filled in the details of the statutory scheme by explaining why the statute permitted it to countervail transnational subsidies and exercised its discretion in withdrawing 19 C.F.R. § 351.527.[11]

Because the statute does not limit Commerce's authority to investigate subsidies based on the country they originate from, "Congress's silence on this issue, in combination with its delegation of authority . . . clears the path for" Commerce to fill in the details of how and when to countervail subsidies.  *Id.* at *6 (quoting *Lesko*, 161 F.4th at 1360).  This Court's decision in *Mosaic Co. v. United States*, 160 F.4th 1340 (2025), confirms as much.  160 F.4th at 1347-48

---

[10]  The SAA is the "authoritative expression by the United States concerning the interpretation and application of" the URAA.  19 U.S.C. § 3512(d).

[11]  We recognize that in *Ventura Coastal, LLC v. United States*, 736 F.Supp.3d 1342 (Ct. Int'l Trade 2024), the Court stated that Commerce's authority to issue regulations to implement the statute does not necessarily empower it to give meaning to statutory terms.  *Id.* at 1357-58.  However, *Ventura* dealt with the interpretation of the word "partners" in 19 U.S.C. § 1677(33)(C).  *Id.*  That is very different from Commerce exercising its authority to countervail transnational subsidies under the statute, and recognizing this authority would not render *Loper Bright* meaningless.  Moreover, *Ventura* was issued before the Federal Circuit's decisions in *Archroma* and *Mosaic*, and the Court must consider the impact of those cases.

35

(relying on *Loper Bright* and *Seven County* to hold that Congress intended Commerce to have reasonable flexibility in carrying out the countervailing duty laws).

Moreover, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress. *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) (decided prior to *Chevron*). And indeed, Commerce's discretion to develop methodologies within its delegated authority to carry out general statutory directives is distinct from *Chevron* deference:

> This court has recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (internal citations omitted, applying this distinct deference separately from and concurrently with *Chevron* deference in force); *accord Nexteel Co. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce has selected a methodology consistent with the statutory language, which we afford greater deference than under the *Chevron* framework") (citing *Fujitsu*, 88 F.3d at 1039); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021). Therefore, general statutory terms implicitly delegate authority to Commerce and give it flexibility. *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025). The statutory provisions at issue here do not limit or restrict Commerce from determining what constitutes a subsidy is so long as it meets the financial contribution, benefit, and

36

specificity requirements.  As explained below, and despite plaintiffs' contentions to the contrary, transnational subsidies can both confer a benefit and be specific.

When Congress has delegated authority to an agency, the reviewing court independently interprets the statute and effectuates the will of Congress "by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries."  *Loper Bright*, 603 U.S. at 371 (internal citations and quotation marks omitted).  Here, Congress has delegated to Commerce the authority and discretion to effectuate the countervailing duty laws; the Court should therefore consider Commerce's broad authority to countervail transnational subsidies in light of the guidelines set in *Loper Bright*, *Lesko*, *Archroma*, and *Mosaic*.  And, in determining whether Commerce acted arbitrarily and capriciously, it should consider the final determination in conjunction with the proposed and final rules revoking 19 C.F.R. § 351.527 and paving the way for Commerce to exercise its authority under the statute to countervail transnational subsidies. *See Archroma*, 2026 WL 2275132, at *6-7 (confirming that, when the issue fits within the bounds of Commerce's delegated power, the only other question is whether Commerce engaged in reasoned decision-making).  Here, Commerce engaged in reasoned decision-making when it revoked section 351.527 after notice-and-comment rulemaking and explained its decision to countervail transnational subsidies, both generally in the *RISE Final Rule* and specifically in the final determination.

As an initial matter, Boviet conspicuously does *not* argue that Commerce acted arbitrarily and capriciously in repealing 19 C.F.R. § 351.527.  Nor could it reasonably do so, given that Commerce complied with notice-and-comment rulemaking requirements and adequately

explained its rationale for withdrawing the regulation.[12] *See generally RISE Proposed Rule*, 88 Fed. Reg. at 29,870; *RISE Final Rule* at 20,826-20,827; *see also* IDM at 45-47.  Commerce explained its logic at the time it promulgated the regulation and the subsequent shift in foreign governments' motivations to provide third-country subsidies, acknowledged that its prior interpretation of 19 U.S.C. § 1671(a) was overly restrictive, found that the statute does not prohibit it from countervailing transnational subsidies, and considered and responded to the comments on the proposed rule.  *RISE Final Rule* at 20,826-20,827; IDM at 45-47 (explaining the procedures Commerce followed in withdrawing the regulation).  No more was required, and Commerce did not act arbitrarily and capriciously.

Even if the Court considers Commerce's general authority to countervail transnational subsidies under the narrow lens of whether Commerce acted arbitrarily and capriciously by failing to engage in reasoned decision-making in its final determination, Boviet's arguments fail. Boviet first claims that Commerce did not meaningfully respond to the arguments raised by the parties to the proceeding.  Boviet Br. at 19.  Boviet is wrong.  Commerce addressed party arguments regarding its obligations under the World Trade Organization, whether section 1671(a) precludes Commerce from countervailing transnational subsidies, whether Commerce can find the benefit and specificity factors met, *Loper Bright*, Congress's failed legislation, and the significance of subsections (d) and (e) of section 1671.  IDM at 25-27, 33, 44.  Commerce also relied on the reasoning in its proposed and final rules and explained why the withdrawal of the regulation was not arbitrary and capricious.  *Id.* at 25-27, 45-47.

---

[12]  The Court should, of course, reject any attempt by plaintiffs to raise such an argument on reply.

Boviet complains that Commerce "brusquely dismissed" certain arguments raised by Boviet in its case brief, but admits that Commerce acknowledged these arguments. Boviet Br. at 19. As an initial matter, Boviet is incorrect that Commerce did not address benefit and statutory history. Indeed, Commerce addressed benefit just two pages earlier in its final determination, explaining that its benefit calculation for transnational subsidies is largely the same as its calculation for subsidies provided by the government of the country under investigation. IDM at 26. Commerce also explained its reasons for revoking 19 C.F.R. § 351.527 and cited the *RISE Final Rule* when responding to comments regarding the relationship between former section 1303 and section 1671. *Id.* at 46-47 ("the language in {section 1303} was repealed in its entirety and the language that existed in {that section} was revised and is different from that found in the language codified, pursuant to the URAA, in {section 1671} of the Act.") (quoting *RISE Final Rule* at 20,827).

With regard to the other arguments cited by Boviet, Commerce explained that, despite those arguments, the statute "does not affect Commerce's ability { } to investigate and countervail transnational subsidies." IDM at 28. Thus, while Commerce did not address all of Boviet's arguments in detail, it did address them.[13] Commerce considered all of Boviet's arguments and reasonably determined to spend its limited resources detailing its response to those arguments it deemed significant, focusing its efforts on whether the language and context of the relevant sections of the statute permitted it to countervail transnational subsidies. This

---

[13] Boviet notes that Commerce did not mention the major questions doctrine, but this is a purely legal question the resolution of which does not depend on explanation by the agency. In any event, the doctrine is inapplicable.

does not render Commerce's final determination arbitrary and capricious.[14]  *See, e.g., Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025) ("The substantial-evidence standard requires Commerce to consider all evidence on the record, but such consideration does not necessitate explicit mention and discussion of each piece of evidence."); *Husteel Co., Ltd. v. United States*, 98 F. Supp. 3d 1315, 1359 (Ct. Int'l Trade 2015) (Commerce need not "specifically address" arguments that are not significant).

### F.    The Major Questions Doctrine Does Not Apply

Boviet contends that the major questions doctrine bars Commerce's ability to countervail transnational subsidies.  Not so.  This doctrine applies only in "extraordinary" cases involving "major policy decisions," which the Supreme Court has described as "decisions of vast economic and political significance;" assertions of "extravagant statutory power over the national economy;" and assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 597 U.S. 697, 700, 716, 721, 723-724 (2022) (quotation omitted); *see also Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).  Another indication of a "major questions" case is whether the policy decision is within the agency's expertise.  *West Virginia*, 597 U.S. at 729.

This case can hardly be considered an "extraordinary" one involving "major policy decisions" of "vast economic and political significance."  Rather, it involves a subset of programs affecting only companies benefitting from subsidies provided by foreign governments other than their own—here, China.  The situation here is not akin to *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 246 (2026) (involving trillions of dollars and nearly every U.S. trading

---

[14]  One of the arguments Boviet complains that Commerce "brusquely dismissed" concerns third-country dumping.  Of course, statutory provisions regarding *dumping* are inapposite in a countervailing duty proceeding.

partner), *West Virginia*, 597 U.S. at 714, or any other case in which a court has applied the major questions doctrine.

Boviet claims that China's BRI program, which Commerce cited as an example of a transnational subsidy program, "involves billions of dollars in foreign investment by the Chinese government." Boviet Br. at 17. But Boviet alleging that the BRI program as a whole involves billions of dollars[15] does not mean that Commerce's countervailing of transnational subsidies under that program would involve that same amount or that it is outside of Commerce's clear authority to investigate and countervail injurious subsidies. Boviet also contends that the issue of transnational subsidies has great political significance, but Commerce imposing countervailing duties on certain specific programs from an entire array of countervailable subsidies is not an issue of great political significance; rather, it is an example of Commerce exercising its authority under the statute. Boviet cannot establish that the countervailing of transnational subsidies is equivalent to the types of issues for which courts have invoked the major questions doctrine.[16] Certainly, if the imposition of duties on thousands of companies pursuant to Section 301 of the Trade Act of 1974 did not implicate the doctrine, this case cannot either. *See HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1242, 1255 (Fed. Cir. 2025).

Nor does the countervailing of transnational subsidies "attempt{ } to modify the very nature of {Commerce's} regulatory authority," "transform{ing} the scope" of Commerce's authority under the statute. *HMTX*, 156 F.4th at 1255. As in *HMTX*, while countervailing transnational subsidies "may, *at best*, be a new use of {Commerce's} regulatory authority" based

---

[15] Boviet provides no support for this contention.

[16] Indeed, we are not aware of *any* cases applying the major questions doctrine to Commerce's assessment of antidumping or countervailing duties.

on the withdrawal of the regulation that prevented it from previously doing so, "{it does} not involve a transformation of {that} authority." *Id.* (emphasis added). Congress expressly mandated that Commerce impose duties upon a finding that countervailable subsidies exist. *See* 19 U.S.C. §§ 1671 *et seq.* But, outside of limited exceptions not applicable here, Congress did not limit the types of subsidies that Commerce can consider to be countervailable. *Id.* § 1677(5)-(5B); *see also Modifications of Regulations Regarding Benefit and Specificity in Countervailing Duty Proceedings*, 85 Fed. Reg. 6,031, 6,041 (Dep't of Commerce Feb. 4, 2020). The countervailing of transnational subsidies cannot be reasonably considered as invoking "highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 723-24. And the determination of what constitutes a countervailable subsidy is not, as Boviet asserts, "outside Commerce's wheelhouse," Boviet Br. at 18, but squarely within Commerce's bailiwick. *See Thai Pineapple Pub. Co. v. United States,* 187 F.3d 1362, 1365 (Fed. Cir. 1999) ("Commerce is the 'master of antidumping {and countervailing duty} law.'"). Thus, even if this Court holds that the doctrine applies, as explained above, "clear congressional authorization" exists for the authority claimed by Commerce. *West Virginia*, 597 U.S. at 723.

At bottom, plaintiffs' arguments fail no matter what lens the Court uses to examine whether Commerce is permitted to countervail transnational subsidies. Accordingly, the Court should sustain.

### III.    Commerce Reasonably Relied on Facts Available in Finding that JA Solar's Loans Were Associated with the BRI Program

#### A.    Framework for Applying Facts Available

Pursuant to statute, Commerce will use facts otherwise available to fill gaps in the record if: (1) necessary information is not available; or (2) an interested party withholds information

requested by Commerce, fails to provide the information in the form or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. 19 U.S.C. § 1677e(a). Commerce may use as "facts available" any "information or inferences which are reasonable to use under the circumstances" to make the applicable determination or substitute for the missing information. SAA at 869. Commerce also "enjoys broad, although not unlimited, discretion" in "the proprietary use of facts available." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 675 F. Supp. 2d 1287, 1304 (Ct. Int'l Trade 2009) (cleaned up).

In countervailing duty proceedings, Commerce requires information from both the foreign government in question and the foreign producers or exporters. "Typically, foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1297 (Ct. Int'l Trade 2010), *aff'd in part, rev'd in part on other grounds*, 678 F.3d 1268 (Fed. Cir. 2012). Accordingly, "{c}ooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," and "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

B. **The GOC Did Not Provide Information Necessary for Commerce to Make Its Determination**

Because the GOC did not provide sufficient information for Commerce to determine whether JA Solar had received loans under the BRI Program, Commerce properly relied on facts available in concluding that JA Solar's loans were associated with that program and the program was countervailable.

43

As stated above, Commerce generally requires information from both the foreign government—which provides the subsidy—and the producers or exporters receiving the subsidy. *See Essar Steel*, 721 F. Supp. 2d at 1297. Accordingly, in its investigation, Commerce issued a transnational subsidy questionnaire to the GOC requesting, among other things, information about the alleged BRI program. *See* GOC Questionnaire (P.R. 290). The GOC responded that it found the questions inapplicable because it did not have knowledge that the mandatory respondents had used the program. PDM at 11 (citing GOC Transnational Subsidy QR at 3-7). The GOC thus failed to provide information sufficient for Commerce to properly analyze the financial contribution and specificity of the BRI program, or whether the loans received by JA Solar were related to the program. IDM at 48-99, PDM at 11.

Given the GOC's lack of response, Commerce reasonably concluded that necessary information was not on the record and, on the basis of facts available pursuant to 19 U.S.C. § 1677e(a)(1), determined that the BRI program provided a financial contribution and was specific. *See* IDM at 48-49. And, because JA Solar had reported that it had "outstanding loans from ███ commercial banks" including ████████████████████████████████ ████████████████████████████████████████████ ██████ {;}" JA Solar Section III QR at 60-61 (P.R. 457; C.R. 191), JA Solar Calculation Memo at 6, Att. II (P.R. 863, C.R. 777-778); Commerce found that JA Solar had received loans from Chinese commercial banks but could not discern whether those loans were related to BRI projects. IDM at 49. Commerce thus relied on facts available to find JA Solar's loans associated with the BRI program.

In doing so, Commerce explained that, in investigating loans from Chinese banks with regard to policy lending programs, it examines "whether there are any government plans or other

44

policy directives that identify objectives or goals for developing the industry and call for lending to support such objectives or loans." IDM at 49 (citing, *e.g.*, *Common Alloy Aluminum Sheet from the People's Republic of China*, 83 Fed. Reg. 17,651 (Dep't of Commerce Apr. 23, 2018), and accompanying PDM at 40-42; *Certain Paper Plates from the People's Republic of China*, 90 Fed. Reg. 8,281 (Dep't of Commerce Jan. 28, 2025), and accompanying IDM at Cmt. 1). Here, Commerce determined that the GOC had a policy in place to encourage the development of Chinese firms that shift production overseas in support of BRI capacity cooperation projects. IDM at 32-33. Commerce also explained that China and Vietnam have signed BRI-related agreements and the two countries are working to strengthen cooperation and for China to develop third-country markets. *Id.* Finally, Commerce observed that, in previous proceedings, it had found Chinese state-owned commercial banks such as the ones used by JA Solar to be "authorities" within the meaning of the relevant statute. *Id.* at 49 (citing *Common Alloy Aluminum Sheet from the People's Republic of China*, 83 Fed. Reg. 57,427 (Dep't of Commerce Nov. 15, 2018), and accompanying IDM). Commerce's reliance on facts available to find that JA Solar's Chinese commercial bank loans were from authorities and associated with BRI project was reasonable, adequately explained, and supported by the record.

JA Solar argues that Commerce erred in countervailing its loans under the BRI program because the loans are inconsistent with the descriptions of the program contained in the petition and initiation checklist and because Commerce found no discrepancies regarding the loans during verification. JA Solar Br. at 36-37. As an initial matter, Commerce's countervailability determinations are not bound to the alleged criteria outlined in an initiation checklist; rather, in accordance with the statutory framework, Commerce must find that an authority provided a financial contribution, a benefit was conferred, and the subsidy is specific. 19 U.S.C.

45

§§ 1677(5)(A)-(E), 1677(5A).  Here, because the GOC did not provide requested information necessary for Commerce to analyze whether a countervailable subsidy existed, Commerce relied on facts available to determine that the provision of policy lending from Chinese banks in support of BRI projects in Vietnam was both a financial contribution in the form of a direct transfer of funds from Chinese authorities and *de facto* specific because the loans were provided to a limited number of enterprise or industries, including the solar industry. [17]  IDM at 31-33. Commerce then measured the benefit received by JA Solar.  *Id.* at 18-19.  Commerce's actions complied with the applicable statutory requirements and JA Solar cannot demonstrate otherwise.

JA Solar complains that Commerce unlawfully relied on the GOC's lack of response to find, on the basis of AFA, that JA Solar's loans were related to BRI capacity cooperation projects.  JA Solar Br. at 37.  But Commerce did not apply an adverse inference; instead, because there was information missing on the record as a result of GOC not providing the requested information, Commerce applied *facts available* under 19 U.S.C. § 1677e(a).  IDM at 48-49.

Moreover, although JA Solar contends that record evidence establishes that its loans were not related to BRI projects, Commerce reasonably found that the information provided by JA Solar was not sufficient to fill the gaps in the record left by the GOC.  Commerce requested specific information from the GOC regarding the BRI Loans.  PDM at 11; GOC Questionnaire at II-1 - II-4, II-8, II-13 - II-15, II-19 - II-20.  The GOC responded that it did not have knowledge that the mandatory respondents used the alleged programs.  PDM at 11; GOC Transnational Subsidy QR at 3-7, 19-20.  While JA Solar did submit information on the loans it had received, this information was not sufficient for Commerce to discern whether the loans were related to

---

[17]  While the bases on which Commerce determined specificity shifted from the preliminary determination to the final one, the gap on the record created by the GOC remained unchanged.

BRI projects.  JA Solar claims that its interest rates showed that the loans were not at below-market rates but rather ordinary commercial loans and that the loan contracts did not ████ ██████████████, JA Solar Br. at 38, but this information only goes toward benefit, not financial contribution or specificity, and the ███████████████████████ was not enough on its own for Commerce to confirm that the loans were not related to the BRI program.  IDM at 49.  Commerce verified JA Solar's reporting of its loans, but because of the GOC's lack of response, Commerce could not sufficiently assess whether the loans were provided pursuant to the BRI program.  As Commerce explained, "the record does not support {JA Solar's] argument that its loans are not associated with BRI projects or that the loans are not contingent upon the company's investment in a 'BRI Industrial zone' or physical location in specific areas 'such as industrial parks, special economic zones, other areas designed by the government and/or designated in cooperation with the GOC or the GOC-owned entities.'"  *Id.*  As such, Commerce reasonably relied on facts available to find that JA Solar's loans were associated with the BRI program and that the program was countervailable.

**IV.    Commerce's Countervailing of the Provision of Inputs for LTAR Was Lawful and Supported by Substantial Evidence**

**A.    Because the GOC Failed to Provide Necessary Information, Commerce Reasonably Found Chinese Input Suppliers to Be Authorities**

**1.    Framework for Determining Government Authorities**

Commerce may find a countervailable subsidy exists when an authority provides a financial contribution "to a person and a benefit is thereby conferred."  19 U.S.C. § 1677(5)(B).  An "authority" is defined as "a government of a country or any public entity within the territory of the country."  19 U.S.C. § 1677(5)(B).  Although government ownership of a company is "highly relevant" to establishing an "authority," it "is not dispositive."  *Pt. Kenertec Power Sys.*

47

*v. United States*, No. 20-03687, 2021 WL 6123546, at *3 (Ct. Int'l Trade Dec. 28, 2021), *aff'd*, No. 2022-1408, 2023 WL 234179 (Fed. Cir. Jan. 18, 2023).  An "authority" under section 1677(5)(B) may include a privately-owned entity if the government has "meaningful control over the company and their resources."  *Yama Ribbons & Bows Co., Ltd. v. United States*, 606 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2022) (sustaining Commerce's determination—based on AFA—that there were CCP officials present in the respondent's privately-owned input suppliers and therefore meaningful government control existed and the suppliers were "authorities"); *see also* Public Bodies Memo at 3 (Exh. 2 Att. 1) (finding that "certain enterprises that have little or no formal government ownership are public bodies if Commerce determines that the government exercises meaningful control over them") (P.R. 534).

Commerce has previously determined that even "truly private ownership in China does not necessarily mean autonomy from the state" because there exist efforts to exert control over private firms through executive and manager membership in the CCP and government influence over private firms is increasingly common.  Public Bodies Memo at 24-25 (the "Chinese government is also exerting increasing control over firms in which it has no ownership stake whatsoever" by recruiting private sector executives and managers into the CCP).  Furthermore, Commerce has found that the CCP may, for the limited purpose of applying countervailing duty laws, properly be considered as the "government" under 19 U.S.C. § 1677(5)(B).  *Id.* at 2, fn. 1. Obtaining information about the presence and role of CCP officials in the management and operation of a respondent's privately-owned input suppliers is therefore necessary to Commerce's determination of whether those suppliers are "authorities" within the meaning of 19 U.S.C. § 1677(5)(B).

48

### 2.    Commerce Properly Applied Facts Available to Find Chinese Input Suppliers to Be Authorities

Commerce reasonably found, based on facts available, that certain Chinese input suppliers of polysilicon, silicon wafers, silver paste, and solar glass[18] were authorities within the meaning of 19 U.S.C. § 1677(5)(B) because the GOC failed to provide Commerce with full responses to Commerce's requests, particularly with respect to the Input Producer Appendix, and necessary information was thus missing from the record.

It is not reasonably disputable that the GOC failed to provide requested information necessary for Commerce to determine whether plaintiffs' reported silicon wafer suppliers were government authorities.  In response to Commerce's requests, the GOC responded that it did not maintain or collect the requested information, disclaimed the relevance of the requests, and "only provided basic registration and ownership structure for certain silicon wafer producers in question."  IDM at 37, 58; PPDM at 5; GOC NSA QR1 at 6-7, Exhs. A.1-A.2; GOC NSA QR2 at 7-8, 34, Exhs. A.1-A.4.  The GOC also failed to suggest any alternative means for Commerce to acquire the requested information.

In determining the necessity of relying on facts available, Commerce explicated the nature of information it had requested for the Input Producer Appendix and confirmed why such information was necessary for it to analyze whether these entities were authorities.  IDM at 37-40, 58; PPDM at 4-7.  Specifically, Commerce explained that the information it had requested regarding the role of CCP officials in the management and operation of these producers was relevant because "record evidence suggests that the CCP exerts significant control over activities

---

[18]  Commerce found that Chinese input suppliers for all four products were "authorities." IDM at 36.  However, JA Solar appears to restrict its argument to only suppliers of solar wafers. As such, we may refer only to suppliers of solar wafers in this section.

49

in China and is part of the governing structure in China." IDM at 37. As such, "the presence of CCP officials as owners, managers, or directors of a producer is pertinent for determining whether a producer constitutes" an authority. *Id.* at 38. Commerce further observed "that Chinese law requires the establishment of CCP organizations in all companies, whether state, private, domestic, or foreign-invested, and that such organizations may wield a controlling influence in the company's affairs, as noted by multiple sources in the Public Bodies Memorandum." IDM at 38 (cleaned up) (citing NSA1 at Exhs. NSA-7, NSA-8 (P.R. 327, C.R. 70)).

As observed above, Commerce is entitled to broad discretion in the use of facts available. *See Ad Hoc Shrimp Trade Action Comm.*, 675 F. Supp. 2d at 1304 (Ct. Int'l Trade 2009). Commerce employed that discretion to determine that necessary information was missing from the record, and that the GOC had withheld requested information and significantly impeded the proceeding. Because the GOC refused to provide the "necessary information regarding the ownership of the input producers as well as the role of CCP officials in the input producers," Commerce reasonably relied on facts available pursuant to section 1677e(a) and examined the best available information on the record to determine whether the input suppliers were authorities within the meaning of section 1677(5)(B). PPDM at 6-8; IDM at 37-40.

In assessing the facts available on the existing record, Commerce found that evidence showed that certain input suppliers, such as China National Building Material Group Co., Ltd. (CNBM) and Flat Solar "are either owned and controlled by the CCP and are actively involved in carrying out the {GOC's} industrial policies." IDM at 38-39. Commerce observed that CNBM is "fully owned by the State-owned Assets Supervision and Administration Commission of the State Council" and "CNBM's chairman and director are CCP officials." IDM at 38 (citing

50

NSA2 at 14-17, 83; Exh. NSA2-27) (P.R. 482, 495). Commerce similarly noted that "Flat Solar's founder and chairman is a member of the CCP and a representative of the Xiuzhou District People's Congress." *Id.* (citing NSA2 at 15, 83, Exhs. NSA2-29 - NSA2-30) (P.R. 482, 495)). Commerce also found that other facts available on the record showed that certain input suppliers were "authorities" within the meaning of the statute, including evidence that "silicon wafer producer LONGi { } established a CCP Party Committee in 2020, in addition to its existing CCP branches{,}" the director and lifetime honorary chairman of producer Suzhou Good-Ark Electronics Co. Ltd. was a member of the People's Congress, and that the Chinese solar products industry was a focus of GOC industrial plans and policy initiatives. PPDM at 7 (citing NSA1 at 3-4, 8-10, Exhs. NSA-2 - NSA-6, NSA-17 - NSA-20; NSA2 at 5-6, Exhs. NSA2-4 - NSA 2-7 (P.R. 327-329, 482-483; C.R. 70-72)). For input producers without specific record evidence, Commerce explained that "GOC authorities account for at least 71 percent of silicon wafer and solar glass production in China{.}" PPDM at 7 (citing NSA1 at 6; NSA2 at 8, 13); *see also* IDM at 41. Given the existing record evidence, Commerce properly found as facts available that plaintiffs' Chinese input suppliers were authorities.

Notwithstanding Commerce's explanation of its decision to rely on facts available and its analysis of the record evidence, JA Solar argues that "the only reasonable reading of the record" is that JA Solar's silicon wafer purchases came from non-GOC authorities. JA Solar Br. at 23. JA Solar first alleges that Commerce ignored documentation it had submitted identifying its silicon wafer suppliers and showing that the suppliers were not government authorities. *Id.* at 23-24. According to JA Solar, its silicon wafers were sourced from ███████████ ███████████ and Commerce verified JA Solar's purchases of silicon wafers from ████ ██████. *Id.* at 24.

51

But Commerce explained that JA Solar's submitted information was not an adequate substitute for the information requested from the GOC. As Commerce observed, when examining the involvement of CCP officials in a company, the entity best placed to provide requested information "is the CCP (or the GOC) itself." IDM at 40. Indeed, in prior proceedings, Commerce has found that the GOC was able to obtain the requested information, and that "statements from the companies, rather than from the GOC or from members of the CCP themselves, were not sufficient as a basis for determining whether CCP officials were embedded in a company's structure as owners, senior managers, or directors." IDM at 40 (citing *Citric Acid and Certain Citrate Salts from the People's Republic of China*, 79 Fed. Reg. 78,799 (Dep't of Commerce Dec. 31, 2014), and accompanying IDM at 4-6, 61; *Carbon and Alloy Steel Threaded Rod from the People's Republic of China*, 85 Fed. Reg. 8,833 (Dep't of Commerce Feb. 18, 2020), and accompanying IDM at 16). This makes sense—simply because JA Solar's suppliers were ▮▮▮▮▮▮▮▮ and Commerce verified that JA Solar reported all its purchases of silicon wafers from them does not mean that no CCP officials were "owners, members of the board of directors, or manager{s} of input producers{,}" or that the CCP did not otherwise exert control over ▮▮▮▮▮▮ . *Id.* at 40. Commerce did not ignore the evidence submitted by JA Solar, but reasonably found that it was not an adequate substitute for the requested information the GOC failed to submit.

JA Solar also argues that Commerce's application of a separate rate to its suppliers in the companion antidumping duty investigation means that these suppliers "were not government authorities based on Commerce granting separate rate status to other JA Solar affiliates with the same ownership structure as JA Solar's wafer suppliers." JA Solar Br. at 24-25 (cleaned up) (citing IDM at 59). But Commerce's separate rate determination in an antidumping duty

proceeding is fundamentally different from its determination in a countervailing duty proceeding that a company is a government authority within the meaning of section 1677(5)(B).  As Commerce has explained, the decision to grant a separate rate relates to government control over export prices while the determination that a company is a government authority relates to financial contributions.  *See Certain Steel Wheels from the People's Republic of China*, 77 Fed. Reg. 17,017 (Dep't of Commerce Mar. 23, 2012), and accompanying IDM at Cmt. 8.  JA Solar's argument also ignores that, unlike in antidumping duty proceedings, in countervailing duty proceedings Commerce is investigating foreign government programs; Commerce understands that those governments are in the best position to provide information about their subsidy programs and asks the governments to directly provide requested necessary information.  IDM at 40; *see also Essar Steel*, 721 F. Supp. 2d at 1297; *Archer Daniels Midland Co. v. United States*, 779 F. Supp. 3d 1349, 1365 (Ct. Int'l Trade 2025) (sustaining Commerce's determination that evidence submitted by a respondent is "insufficient to fill the gap created" created by a foreign government's failure to supply the requested information).

Moreover, even if ███████████████ wafer suppliers "share the same ownership structure with other ███████████ that have been granted separate rates by Commerce," JA Solar Br. at 27, this does not mean that the record of the instant countervailing duty investigation contains requisite information concerning whether CCP officials were embedded in those suppliers' company structures as owners, senior managers, or directors, or whether the CCP was otherwise able to exert a degree of control over the suppliers.  Commerce makes its determinations on a case-by-case basis and each proceeding before the agency "is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir.

2014) (internal citation omitted)).  And, of course, the burden of creating an adequate administrative record lies with interested parties.  *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).  JA Solar may disagree with Commerce's reliance on facts available to find that its input suppliers were authorities, but it cannot establish that Commerce's determination was unlawful or unsupported by the record.

> **B.      Commerce Properly Found that the Record Did Not Demonstrate that JA Solar's Purchases of Silicon Wafers Were Tied to Non-Subject Merchandise**

JA Solar argues that, even if Commerce properly determined that its silicon wafer suppliers were government authorities within the meaning of section 1677(5)(B), the agency should not have countervailed the silicon wafer subsidies because JA Solar's silicon wafer purchases were allegedly tied to the production of non-subject merchandise.  JA Solar Br. at 27-30.  But, as Commerce explained, the record evidence at the time the subsidy was bestowed does not demonstrate that the subsidy was tied to non-subject merchandise.  IDM at 60-61.  Accordingly, JA Solar's argument must fail.

Section 1677(5)(E)(iv) provides that a "benefit shall be treated as conferred" to the recipient if "goods and services are provided for less than adequate remuneration."  To that end, Commerce has "tying rules" meant to be used as "guidelines for reasonably attributing the benefit from a subsidy based on the stated purpose of the subsidy . . . at the time of bestowal." *CVD Preamble*, 63 Fed. Reg. at 65,403.  Importantly, neither the statute nor Commerce's regulations limit Commerce's authority to countervail the provision of goods for LTAR when those goods are used, exclusively or otherwise, in the production of subject merchandise.  *See Taizhou United Imp. & Exp. Co. v. United States*, 560 F. Supp. 3d 1316, 1321-22 (Ct. Int'l Trade 2022) (recognizing Commerce will countervail all or most goods provided at LTAR unless the respondent can show that the good was not tied to non-subject merchandise).

As such, Commerce's practice is to find that a subsidy is "tied to particular products, operations, or markets only if the bestowal documents (*e.g.*, purchase/sales documents in the case of an input for LTAR) explicitly indicate that an intended link to the particular products, operations or markets was known to the government authority and so acknowledged prior to, or concurrent with, conferral of the subsidy." IDM at 61 (citing *CVD Preamble*, 63 Fed. Reg. at 65,402); *see also Taizhou*, 560 F. Supp. 3d at 1322 (Commerce will countervail goods provided at LTAR "unless a respondent can show that the good was 'tied' to non-subject merchandise, meaning that the subsidized good was purchased with an intent for its dedicated use in the production of non-subject merchandise."). Put another way, Commerce's focus when determining whether a good purchased at LTAR is "tied" to subject merchandise is not "how a firm has actually used the subsidy{,}" but "the purpose of the subsidy based on information available at the time of bestowal." IDM at 60-61 (quoting *CVD Preamble*, 63 Fed. Reg. at 65,403).

Here, Commerce explained that, contrary to JA Solar's assertions, the record evidence did not support a finding that JA Solar's purchases of Chinese silicon wafers were tied to non-subject merchandise—*i.e.*, that at the time of purchase, documentation demonstrated that the silicon wafers were expected to be used solely and specifically in the production of non-subject merchandise. IDM at 60-61. JA Solar argues that it provided ███████████████ ███████████████ that included ████████████ showing that JA Solar had purchased its silicon wafers "with the intention for use in non-subject merchandise." JA Solar Brief at 29 (citing JA Solar Verification Exhs. VE-4, VE-9 (C.R. 655-687, 729-731).

Commerce acknowledged JA Solar's verification submissions, but found that "the verification report does not indicate that Commerce reviewed documentation that would

55

demonstrate that certain purchases of Chinese silicon wafers were to be used specifically to produce non-subject merchandise." IDM at 60. The verification report shows that Commerce requested documents such as contracts, purchase orders, supplier invoices, mill certificates, and receipts for two pre-selected purchases of Chinese silicon wafers and that Commerce expected JA Solar to "be ready to trace the purchases through the relevant financial accounts." JA Solar Verification Report at 20 (P.R. 802, C.R. 759). After examining the evidence provided by JA Solar and the tracing of the financial accounts, Commerce only found that there were "no discrepancies" between the provided documentation and the "silicon wafer template provided." *Id*. Commerce did *not* find that the evidence showed that JA Solar's purchases were tied to the production of non-subject merchandise.

Indeed, the documentation cited by JA Solar does not appear to contain references to whether the wafers were used for subject or non-subject merchandise. *See, e.g.*, Silicon Wafer Verification Exhs. VE-9, VE-10 (P.R. 786, C.R. 729-732). JA Solar's attempts to have the Court reweigh evidence already analyzed by Commerce should thus be rejected. *See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015) (rejecting effort to reweigh evidence).

## V.    Commerce's Benchmark Selections for Calculating the Benefit for the Provision of Silicon Wafers and Solar Glass For LTAR Were Lawful and Supported by Substantial Evidence

To calculate benchmarks for determining the benefit received for the provision of silicon wafers and solar glass for LTAR, Commerce determined to rely on certain United Nations (U.N.) Comtrade data. Plaintiffs assert that Commerce should have instead used Bloomberg data for silicon wafers and PVInsights for solar glass, as those datasets were more specific. However, Commerce found that, while those datasets were more specific, they suffered from a serious

56

flaw—the inability to remove prices from distorted markets.  IDM at 53-59, 68-71.  As such,

Commerce reasonably concluded that the Comtrade data constituted the best available data on

the record.  The Court should not disturb Commerce's benchmark selections.

### A.    Legal Framework for the Selection of Benchmarks

Under the countervailing duty laws, a respondent must receive a "benefit" in order to be

assessed countervailing duties.  *See* 19 U.S.C. § 1677(5)(B).  In determining whether

government-provided goods have been provided for LTAR, Commerce must identify a

benchmark price to compare with the price of the government-provided good.  *See Essar Steel*

*Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012).  If the exporter receives government-

provided goods for less than the benchmark price, it has been conferred a "benefit."  19 U.S.C.

§ 1677(5)(E)(iv).

Commerce "will normally seek to measure the adequacy of remuneration by comparing

the government price to a market-determined price for the good . . . resulting from actual

transactions" in the country under investigation.  19 C.F.R. § 351.511(a)(2)(i).  This is known as

a tier-one benchmark.  *See Essar*, 678 F.3d at 1273.  When data for actual transactions within the

country under investigation are not available or are not market-determined, Commerce calculates

a tier-two benchmark, in which it:

> compar{es} the government price to a world market price where it
> is reasonable to conclude that such price would be available to
> purchasers in the country in question.  Where there is more than
> one commercially available world market price, {Commerce} will
> average such prices to the extent practicable, making due
> allowance for factors affecting comparability.

19 C.F.R. § 351.511(a)(2)(ii).  In other words, Commerce may use broad, worldwide data and

take the average of that data to reasonably approximate the market price.  When calculating a

tier-two benchmark price, Commerce is not required to use data for products that are "nearly

identical" to the product purchased by the exporter.  *See Archer Daniels*, 968 F. Supp. 2d at 1279.

Rather, "the selected benchmarks {need only} be comparable."  *Id.* (holding that Commerce

could use a general benchmark price for sulfuric acid, without differentiating by grade); *see also*

*Essar Steel*, 678 F.3d at 1273-74 ("Though the Australian iron ore is not identical to NMDC's

iron ore, Commerce's regulations require only that it be a comparable market-determined price

that would be available to the purchasers in the country at issue.").  In addition, consistent with

regulation and practice, Commerce excludes data that reflect non-market determined prices.  *See*

19 C.F.R. § 351.511(a)(2)(ii); *see also Steel Concrete Reinforcing Bar from the Republic of*

*Turkey*; 84 Fed. Reg, 36,051 (Dep't of Commerce July 26, 2019), and accompanying IDM at

Cmt. 1 (excluding from the benchmark calculation export prices from Azerbaijan and Russia

because "government control over the natural gas market in both countries renders their domestic

prices distorted").

### B.    Commerce Reasonably Relied on Comtrade Data for the Silicon Wafers Benchmark

#### 1.    Commerce's Selection of Comtrade Data over Bloomberg Data

Because Commerce found that plaintiffs had received a countervailable subsidy from the

GOC through the provision of silicon wafers for LTAR, it was required to select a benchmark to

compare the prices paid by plaintiffs against.  As Commerce explained, even though "the

financial contribution is from a Chinese authority, and the price is set by a Chinese authority,"

section 1677(5)(E)(iv) requires that "the adequacy of remuneration { } be determined in relation

to" market conditions "in the country which is the subject of the investigation."  PPDM at 9-10.

Commerce therefore assessed market conditions in Vietnam to determine whether a usable tier-

one benchmark existed and, in so doing, considered "whether the presence of the Chinese

58

government, through Chinese suppliers of the input that we determine to be authorities under the statute, could distort the domestic market of the investigated country, Vietnam." *Id.* at 10.

Based on the record, Commerce found "that the goods from the government provider (China) constitute a majority of the Vietnamese market for the good{s} subject to these LTAR allegations based on record information showing that 71 percent (for silicon wafers and solar glass) . . . of the purchases by quantity were produced and supplied by GOC 'authorities.'" *Id.* (citing GOV NSA QR1 at Exhs. NSA-2, NSA-3; GOV NSA QR2 at Exhs. NSA2-3, NSA2-6, NSA-27); *see also* NSA1 at 6; NSA2 at 8, 13. Given the market distortions in Vietnam, Commerce determined that it would need to rely on a tier-two benchmark for the provision of silicon wafers. IDM at 52.

Commerce also analyzed the Bloomberg benchmark data proposed by Boviet for silicon wafers and found that the Bloomberg data was specific to the silicon wafer inputs but, crucially, did "not clearly indicate the markets incorporated within the dataset and do not specify how the price data were calculated for the various datasets listed." PPDM at 12. Commerce had particular concern over whether the Bloomberg data "include exports from China and Vietnam{,}" *i.e.*, markets that Commerce had found distorted, of "data from any aggregated countries or zones." *Id.* And, indeed, Commerce found that the Bloomberg data did "include Chinese-origin silicon wafers, including prices of silicon wafers in China." IDM at 53 (citing Boviet Benchmark Submission at Exhs. NSAW2-3, NSAW-8) (P.R. 671, C.R. 497). As Commerce noted, the Bloomberg description states that "{p}rices collected in Chinese yuan are converted to U.S. dollars with 13% Chinese value-added tax (VAT) deducted." *Id.* at 53-54 (citing Boviet Benchmark Submission at Exhs. NSAW2-3, NSAW-8). Commerce also observed that the Bloomberg data lists average prices for certain markets, such as "shipped-to-EU

59

average" or "shipped-to-India average," but that it was unclear whether these averages included wafer prices from distorted markets such as China and Vietnam. *Id.* at 54. In addition, Commerce explained that the Bloomberg data were "not disaggregated to reveal all markets incorporated within these average prices" and Commerce could not remove distorted markets from the Bloomberg data consistent with its practice.[19] *Id.*

Given the fundamental problems with the Bloomberg data, Commerce determined that the Comtrade data was "the best information on the record for determining a tier two benchmark for evaluating whether silicon wafers were provided for less than adequate remuneration." *Id.* at 52; *see also* UN Comtrade, Disaggregated Monthly Export Data for Silicon Wafers, HTS 3818 (P.R. 809). Commerce explained that, unlike the Bloomberg data, the Comtrade data "displays disaggregated data and allows for exclusion of distorted markets, and it represents world export prices for silicon wafers." *Id.* at 55. And, indeed, Commerce excluded imports from China and Vietnam, as well as exports to China and Vietnam, from its tier-two benchmark. *Id.* at 56, 59.

### 2. Plaintiffs' Arguments Do Not Undermine Commerce's Selection

Plaintiffs contend that the Bloomberg data more closely match the solar wafers they purchased. JA Solar Br. at 31-33; Boviet Br. at 27-30. JA Solar notes that silicon wafers used in solar cell production are "composed of pure-grade polysilicon," whereas the Comtrade data for HTS subheading 3818.00 category include "chemical elements" in addition to silicon. JA Solar Br. at 31. Plaintiffs also complain that the Comtrade data "includes shapes beyond wafers including 'discs' or 'similar forms.'" JA Solar Br. at 31; Boviet Solar Br. at 28. But Commerce squarely addressed these issues, adjusting the Comtrade benchmark to make it more comparable

---

[19] In addition to its finding that the markets in China and Vietnam distorted, Commerce also found the silicon wafer markets in Thailand and Cambodia distorted pursuant to its final determinations in its investigations of solar cells from Thailand and Cambodia issued contemporaneously with the final determination in this case. IDM at 54 n.211.

to the type of silicon wafers used in the production of solar cells. IDM at 56. Specifically, in addition to removing imports from and exports to distorted markets, Commerce removed countries shown by the record as not producing photovoltaic silicon wafers. *Id.* at 56. Commerce, to the extent possible, narrowed the Comtrade data to both correspond to plaintiffs' purchases of solar wafers and eliminate distorted prices. In any event, even if the Bloomberg data were more specific, this does not override the fundamental issues with the inability to disaggregate data from distorted markets. Faced with a choice between two imperfect options, Commerce reasonably relied on the Comtrade data.

Plaintiffs also rely on Commerce's purported history of relying on Bloomberg data in other proceedings involving solar cells, claiming that Commerce did not explain its departure from an alleged practice of relying on Bloomberg data to value silicon wafers. Boviet Br. at 22-26; JA Solar Br. at 46. But Commerce does not have a stated practice of relying on Bloomberg data; rather, it has used Bloomberg data for benchmark calculations in certain other proceedings when the record supported it doing so. Here, Commerce found that the record did not support reliance on Bloomberg data, explaining that, "in this investigation, we gathered *additional information on Bloomberg data* to conduct our analysis to determine the best benchmark for silicon wafers."[20] IDM at 55 (emphasis added). Plaintiffs cannot demonstrate that the records of the other proceedings and the arguments raised by the parties were so similar to the underling proceeding that Commerce was required to select the Bloomberg data despite its obvious flaws.

Far from having a practice of relying on Bloomberg data, Commerce *does* have a practice of removing distorted prices from benchmarks. And Commerce found that it was particularly

---

[20] To the extent the Court finds that Commerce had a practice, which it should not, this statement, in conjunction with Commerce's detailed explains as to why it chose not to rely on Bloomberg data, adequately demonstrates why Commerce departed from using Bloomberg data.

61

important to do so in an investigation involving price distortion caused by the GOC's presence in the market:

> {G}iven these threshold investigations in which Commerce is examining the cross-border provision of an input from Chinese authorities, and based on the particular evidence of this proceeding (*i.e.*, evidence of Chinese-origin silicon wafer prices in the Bloomberg data, and evidence that the Chinese market for this good is distorted), we determine that the Bloomberg data do not serve as a usable tier two benchmark source. The record evidence cited above demonstrates that these prices reflect the distortions of the GOC's presence. Further, the nature of the Bloomberg data is such that we are unable to disaggregate individual prices by country of origin.

IDM at 54-55. As Commerce explained, "using a benchmark that is based on government prices essentially results in comparing the financial contribution to itself." *Id.* at 55. While Boviet contends that Commerce's benchmark should include prices that would be available in Vietnam, Boviet Br. at 26, including data from Vietnam and China would ignore the very purpose of benchmarking—to compare a price from a government authority to one that is not distorted, including by the government's involvement in the market. Moreover, removing prices from China and Vietnam—the distorted market of the country under investigation—does not mean that the remaining prices are unavailable to purchasers in Vietnam. Boviet claims that removing Chinese and Vietnamese prices would render the tier-two benchmark meaningless, Boviet Br. at 26, but the opposite is true—it would frustrate the purpose of a benefit calculation to compare government prices to a benchmark that included those same government prices. IDM at 55. And removing prices from Vietnam and China does not render the tier-two benchmark meaningless because the benchmark still gives Commerce the ability to rely on a world market price for silicon wafers that excludes distorted prices.

Courts have recognized that Commerce makes its determinations on a case-by-case basis and that each proceeding "is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao*, 766 F.3d at 1387 (internal citation omitted). Moreover, "Commerce is allowed to change its mind—in fact, it is regularly required to do so, since, for example, it is required to use 'the best available information' when making benchmark determinations{.}" *Risen Energy Co. v. United States*, 658 F. Supp. 3d 1364, 1377 (Ct. Int'l Trade 2023). The pertinent question "is whether the record adequately supports the decision of {Commerce.}" *Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, AFL–CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993). The answer here is yes. Commerce explained its practice of excluding prices from distorted markets, found that prices from China and Vietnam could not be disaggregated from the rest of the Bloomberg data, addressed its usage of Bloomberg data in other proceedings, and narrowed the Comtrade data to better match the input in question. Plaintiffs cannot establish that the Bloomberg data is so indisputably superior in spite of its serious flaws that Commerce was required to rely on it.

### C.    Commerce Reasonably Relied on Comtrade Data for the Solar Glass Benchmark

For similar reasons to its benchmark selection for silicon wafers, Commerce determined that it should rely on Comtrade data for its solar glass benchmark. IDM at 68-70. As with the benchmark for silicon wafers, plaintiffs argue that Commerce should have relied on PVInsights data instead because it had done so in other solar cells proceedings and the data is more specific to the type of solar glass at issue here. JA Solar Br. at 34-36; Boviet Br. at 31-32. These arguments are unavailing.

Like with silicon wafers, GOC authorities account for at least 71 percent of solar glass production in China. PPDM at 16. Commerce also found that both the Chinese and Vietnamese

63

solar glass markets were distorted "due to the market conditions of the China-sourced" goods. IDM at 68. While Commerce preliminarily selected the non-China solar glass prices reported in the PVInsights data as its benchmark for solar glass, PPDM at 17, after considering party arguments and further analyzing the solar glass benchmarks, Commerce selected Comtrade data as its solar glass benchmark in the final determination. IDM at 69. Upon examination of the PVInsights data, Commerce found it could not adjust the PVInsights data to remove solar glass prices from China, Vietnam, Thailand, and Cambodia—markets Commerce had determined to be distorted. *Id.* Consequently, Commerce concluded that "the PV Insights source no longer serves as a usable tier two benchmark" and determined to rely on Comtrade data with HS subheading 7007.19. *Id.*

Plaintiffs take issue with Commerce's solar glass benchmark for similar reasons as those for the silicon wafers benchmark, arguing that the PVInsights data are more specific and highlighting Commerce's past usage of the PVInsights data. But, as stated above, Commerce's benchmarks do not need to be nearly identical to the good under consideration, only comparable, and Commerce is not required to continue using a benchmark it has determined to be inappropriate just because it has previously used that benchmark. Here, Commerce determined that using the PVInsights data as a benchmark without the ability to remove prices from markets distorted by the GOC's presence would fundamentally undermine the purpose of the benchmark, explaining that "using a benchmark that is based on government prices . . . results in comparing the financial contribution to itself." IDM at 69. Because Commerce could "find no mechanism { } to remove solar glass prices" from distorted markets it was now finding to be distorted, IDM at 69, it reasonably relied on the Comtrade data as the best available information on the record.

64

Boviet relies on this Court's non-published decision in *Changhou Trina* in arguing that the Court has rejected this exact solar glass benchmark as overinclusive. Boviet Br. at 31-32 (quoting *Changhou Trina Solar Energy Co., Ltd. v. United States*, No. 17-00246, 2018 WL 6271653, at *7) (Ct. Int'l Trade Nov. 30, 2018)). But *Changhou Trina*, in addition to being non-binding, is distinguishable. Crucially, that case involved neither PVInsights data as a comparator nor the issue of whether Commerce could remove prices from distorted markets from the other dataset. Rather, the other dataset only provided an annual average while the Comtrade data provided monthly data. *Id.* at 6. As such, the Court had no occasion to consider whether Commerce could reasonably rely on the Comtrade data when the other potential data source contained distorted prices incapable of being disaggregated.

**D.    Commerce Properly Excluded Vietnamese Export Prices from Its Benchmark Calculations**

Commerce appropriately removed from its input benchmarks prices from markets that it found distorted due to the GOC's involvement in the market, including China and Vietnam. For Vietnam, Commerce found that Chinese government authorities "constitute a majority of the Vietnamese market." PPDM at 16. JA Solar disputes Commerce's removal of Vietnamese export prices, claiming that a finding of distortion "must be supported by more facts and reasoning than simply citing to a high percentage of import share." JA Solar Br. at 56. But, as Commerce has explained, it will normally consider government distortion to be "minimal unless the government provider constitutes a majority or . . . a substantial portion of the market." *CVD Preamble*, 63 Fed. Reg. at 65,377. Here, Commerce found that a substantial portion of the Vietnamese market was constituted by solar glass from Chinese government authorities. As such, it reasonably found the Vietnamese market distorted and excluded prices from that country.

Courts have upheld Commerce's practice of finding a market distorted because of a government's predominant role in that market. *See Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025) (affirming rejection of benchmark data for natural gas that included prices from Russia because its natural gas market was distorted through the Russian government's predominant role in that market). Commerce's "regulations only require Commerce to determine whether the GOC constitutes a substantial portion of the { }, such that Commerce may reasonably conclude that prices are distorted." *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1382 (Ct. Int'l Trade 2013) (sustaining Commerce's determination that the GOC's predominant role in the Chinese market for wire rod was distortive). Here, Commerce found that the GOC constituted a substantial portion of the Vietnamese solar glass market, and so reasonably and lawfully excluded Vietnamese export prices from its benchmark calculations.

### E.    Commerce Properly Included VAT and Import Duties in Its Benchmark Calculations

Boviet claims that Commerce should not have included VAT and import duties in its benchmark calculations because, as an EPE, the prices Boviet paid do not include VAT or import duties. Boviet Br. at 33. Commerce considered this argument in its final determination, but correctly rejected it. As Commerce explained, under 19 C.F.R. § 351.511(a)(2)(iv), which is titled "Use of delivered prices," Commerce will adjust the comparison price to reflect the price that a company actually paid or would pay; {t}his adjustment includes delivery charges and import duties." 19 C.F.R. § 351.511(a)(2)(iv); *see also* IDM at 72; *CVD Preamble*, 63 Fed. Reg. at 65,378 ("This adjustment will account for delivery charges and import duties."). As such, Commerce complied with the regulation when it included VAT and import duties in its benchmark calculation.

66

Notwithstanding Commerce's compliance with the express language of the regulation, Boviet argues that VAT and import duties should be removed because Boviet does not actually pay these duties and including VAT and import duties would prevent Commerce from performing an apples-to-apples comparison. Boviet Br. at 33. But Boviet's suggestion to remove these duties would require Commerce to act in contravention of the regulation by not accounting for delivery charges and import duties, and by not using "delivered prices" as the comparison benchmark price. IDM at 73. As Commerce explained, the "delivered price" is "simply the nominal price at the point of delivery. Thus, whether a firm recovers VAT . . . or is exempted due to country specific circumstances is immaterial to the delivered price that Commerce must use as the comparison price" under the regulation. *Id.* Commerce also found that, because the regulation only directs Commerce to adjust the comparison price to reflect the price "a firm" would pay, rather than what the *respondent* would pay, it was appropriate to include VAT and import duties because including VAT would be reflective of what "a firm located in Vietnam" would generally pay. *Id.* Boviet cannot circumvent the express regulatory language based solely on the fact that it—as an EPE—does not pay VAT and import duties on the goods it purchases.

## VI.    Commerce's Determination to Countervail Subsidies Under the Import Duty Exemption on Imported Raw Materials for EPEs is Supported by Substantial Evidence and Otherwise in Accordance with Law

### A.    The Import Duty Exemptions Program Exists and Provides Countervailable Subsidies

Commerce reasonably determined that certain import duty exemptions on imported raw materials for EPEs and export processing zones constituted a program that provided countervailable subsidies. Under 19 U.S.C. § 1677(5)(D)(ii), a government provides a financial contribution when it forgoes revenue that it would otherwise be due. Furthermore, a benefit can exist with regard to the exemption of import charges to the "extent that the exemption extends to

67

inputs that are not consumed in the production of the exported product, making normal allowances for waster, or if the exemption covers charges other than import charges{.}" 19 C.F.R. § 351.519(a)(ii).  Finally, a subsidy can be found to be specific when it is contingent upon export performance.  19 U.S.C. § 1677(5A)(A) and(B).

Commerce properly found that the GOV provides a financial contribution to EPEs in the form of revenue forgone because it does not collect import revenue under the program.  As Commerce observed:

> The GOV stated that, in Article 26.3 of Decree 35/200/ND-CP, export processing enterprises are entitled to tax policies applied to free trade zones. . . .  The GOV further reported that{ } the Law on Export and Import Duties . . . states that the following goods are not subject to export or import duties: 1) goods exported abroad a free trade zone; 2) goods imported from abroad to a nontariff zone and used within such a non-tariff zone; and 3) goods transported from one free trade zone to another.  Thus, goods imported by export processing enterprises and used within the free-trade zone are not subject to import duty.

PDM at 40.  Because Boviet is an EPE, it received import duty exemptions.  Boviet Section III QR at 18 (P.R. 469).  And, because the benefit at issue is an exemption from import charges, Commerce properly examined benefit under 19 C.F.R. § 351.519(a)(1)(ii).  IDM at 79.  Finally, because the program is designated for EPEs and is contingent on export performance, Commerce reasonably found it specific.  *Id.*

Boviet claims that the GOV does not experience revenue foregone because, as an EPE, Boviet operates in a free trade zone and is thus outside of the customs territory of Vietnam; therefore, according to Boviet, there can be no revenue that the GOV would otherwise be due. Boviet Br. at 34.  But Commerce explained why, even though it had previously found a foreign government not to be foregoing revenue when it designated an EPE, its understanding had evolved since that time.  IDM at 81-82.  As Commerce clarified, the government action of

68

designating a firm as an EPE may itself constitute a financial contribution and conferral of a benefit:

> The government designation of either a firm or a zone as being outside the customs territory constitutes a government act or program is consistent with the definition of "government provided" under § 351.102(a)(25). By establishing areas in which it will not collect taxes or import charges on capital goods, the government has taken an explicit action to provide both a financial contribution and a benefit to a firm that is operating within the designated area. Absent the government action, the firm otherwise would have paid either direct taxes or import charges to the government. These government actions provide incentives to exporters, and, as the Supreme Court explained in *Zenith*, a purpose of the countervailing duty law and the imposition of countervailing duties is "to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments."

*See* IDM at 82 (quoting *Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg, 101,694, 101,730 (Dep't of Commerce Dec. 16, 2024) (*REAL Preamble*) (quoting *Zenith Radio Corp.* v. *United States,* 437 U.S. 443, 455-56 (1978))). Commerce thus adequately explained its shift toward finding EPEs receiving import duty exemptions to constitute revenue foregone and properly concluded that "the GOV's action of designating an EPE { } provides a financial contribution to the designated firms in the form of revenue foregone." IDM at 82-83.

Additionally, this Court has rejected the argument that a respondent operating in a special economic zone is outside the customs territory of the country providing the duty exemption. *See ATC Tires Priv. Ltd. v. United States*, 322 F. Supp. 3d 1365, 1370 (Ct. Int'l Trade 2018). Boviet points out that the Court in that case distinguished between the Indian special economic zone and the Vietnamese EPE. Boviet Br. at 34. While true that the Court cited a previous Commerce determination involving import duty exemptions in Vietnam, any distinction between the Vietnamese and Indian systems does not dictate an outcome in *this* case, especially given that the

69

Court did *not* hold that import duty exemptions for Vietnamese EPEs cannot be considered revenue foregone.  The Court merely observed that there were differences in the monitoring processes between Vietnam and India and that the Vietnamese program was not based on contingent liability.  *ATC Tires*, 322 F. Supp. 3d at 1372.  But Commerce described in depth why the Vietnamese monitoring program was not sufficiently rigorous and explained in the *REAL Preamble* why establishing areas in which the government will not collect duties constitutes revenue foregone.  IDM at 79-82.  Boviet cannot demonstrate that Commerce acted unlawfully in determining that import duty exemptions for EPEs was a program providing countervailable subsidies.

B.    **Boviet has Failed to Show That an Exception Is Warranted**

Boviet claims that, even if the Import Duty Exception Program does provide countervailable subsidies, it is entitled to an exception under 19 C.F.R. § 351.519(a)(4)(i) because the GOV allegedly has a reasonable and effective system for confirming which inputs are consumed during production of the exported products and in what amount.  Boviet Br. at 35-39.  But Commerce reasonably determined that the program did not comply with section 351.519(a)(4)(i).  IDM at 79-84.

Commerce will consider the entire amount of an exemption to confer a benefit unless it determines that:

> {t}he government in question has in place and applies a system or procedure to confirm which inputs are consumed in the production of the exported products and in what amounts, and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export{.}

19 C.F.R. § 351.519(a)(4)(i).  Commerce has taken this to mean that EPEs must be subject to rigorous customs enforcement measures that ensure goods entering the free trade area are

70

accounted for through exportation from or entry to the customs territory. *See Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam*, 77 Fed. Reg. 64,471 (Dep't of Commerce Oct. 22, 2012) (*CWP from Vietnam*), and accompanying IDM at Cmt. 3.

Commerce explained that, because the GOV does not track the amount of waste exiting the EPE and the Vietnam Customs Authority did not conduct an inspection of Boviet's facilities during the period of investigation, the system does not meet the regulatory requirements of section 351.519(a)(4)(i) and is not subject to rigorous customs enforcement. PDM at 41-42. In addition, Commerce found during its verification of the GOV that, while EPEs are subject to three inspections, two of the three inspections are not required to be performed annually and none of the inspections for Boviet were performed during the period of investigation. IDM at 79 (citing GOV Verification Report at 9-11 (P.R. 803, C.R. 761)). Based on these considerations, Commerce reasonably concluded that an exception was not warranted under section 351.519(a)(4)(i).

Boviet nonetheless claims that, because "the GOV does maintain a reasonable and effective system and set of procedures consistent with Vietnamese accounting standards," "Commerce has no basis to find that the exception contained in 19 C.F.R. § 351.519(a)(4)(i) does not apply." Boviet Br. at 39. But the standard is not whether Commerce has *no basis* to find that the exception *does not* apply. Rather, the default under the regulation is that an exemption *does* confer a benefit *unless* Commerce determines there is a rigorous system in place. *See* 19 C.F.R. § 351.519(a)(4).

In making its argument, Boviet cites Section 5 of Circular 38/2015/TT-BTC and Article 75.5 on EPE procedures, which state that "the EPE shall follow export procedures and the domestic enterprise shall open a corresponding declaration of imports." Boviet Br. at 36

71

(quotation marks omitted).  Boviet also relies on various documentation that parties must complete and export procedures that parties must follow for waste exiting the EPE.  *Id.* at 36-39.

As an initial matter, Boviet never raised Section 5 of the Circular specific to EPEs or Article 75.5 on EPE procedures for exports/imports in its briefs before Commerce.  As such, the Court should reject this argument for failure to exhaust administrative remedies.  *See Boomerang Tube LLC v. United States,* 856 F.3d 908, 912 (Fed. Cir. 2017).  While certain exceptions to the exhaustion requirement—such as futility or pure question of law—exist; *see, e.g. Itochu Bldg. Prods. v. United States,* 733 F.3d 1140, 1145-48 (Fed. Cir. 2013); Boviet cannot demonstrate that any of the exceptions apply here.

Even if the Court considers the argument, it fails.  Notwithstanding whether there are forms and procedures in place, record evidence demonstrates that EPEs are not *actually* subject to rigorous scrutiny.  EPEs are supposed to be subject to post-customs clearance and customs settlement report inspections.  GOV Verification Report at 9-11.  But, of 128 EPEs in the Bac Giang province, ███████ were subject to the customs settlement report inspection in 2023.  *Id.* The central level also conducted ███████ post-customs clearance inspections, with the Bac Giang Province conducting ███████.  *Id.*  No inspections were performed for Boviet during the period of investigation.  IDM at 80.  Thus, for the entire period, there was no demonstrable system in place for an inspection to "confirm which inputs are consumed in the production of exported products{,}" 19 § C.F.R.  351.519(a)(4)(i), and no verification of the accuracy of the forms Boviet was required to fill out.[21]  IDM at 79-80.  Furthermore, as Commerce explained, the GOV's system is not reasonable because it allows producers to sell recovered forms of scrap

---

[21]  Commerce also noted other issues with the inspections and forms that purportedly show the existence of a rigorous system.  IDM at 79-81.

72

or discarded products created from imported inputs without customs procedures even after making allowances for unrecoverable waste. *Id.* at 80. In light of the regulatory requirements and the evidence on the record, Commerce properly determined that the Import Duty Exemptions program did not warrant an exception.

### C. Commerce Lawfully Applied AFA for the Failure to Report An Exemption from Vietnam's Antidumping Duty Order

At verification, Commerce discovered that the GOV had an antidumping duty order on imports of aluminum frames and that plaintiffs were exempted from paying duties under that order. Boviet Verification Report at 2, 10; JA Solar Verification Report at 2, 13. Because plaintiffs had failed to report this exemption from antidumping duties, Commerce found that necessary evidence to evaluate the administration of the program was not on the record and that plaintiffs had withheld requested information, failed to provide the information by the established deadline, and significantly impeded the investigation. IDM at 9-11, 93. Commerce also found that plaintiffs did not cooperate to the best of their ability and thus applied AFA to find the program conferred a benefit. *Id.* This determination was lawful and supported by substantial evidence, and Boviet cannot demonstrate otherwise.

As described above, Commerce shall apply facts available when necessary information is not on the record or if a party withholds requested information, fails to provide such information by the deadline, or significantly impedes a proceeding. In addition, if Commerce finds that a party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may apply an adverse inference. *See* 19 U.S.C. §1677e(b).

In its initial questionnaire, Commerce requested that Boviet "{i}ndicate each of the raw materials for which your company received import duty exemptions during the POR. In addition, indicate the duties and other import fees that would have been charged on these items

73

absent the import duty exemption." Initial Questionnaire at III-13 (P.R. 28). Boviet reported its VAT and import tariff exemptions template, the Original/Standard Import Duty Rate, the Most Favored Nation (MFN) rate, the ASEAN-China Free Trade Agreement (ACFTA) duty rates, and the ASEAN Trade in Goods Agreement (ATIGA) duty rates. IDM at 91; Boviet Section III IQR at 20-22, Exh. 10.2 (P.R. 469, C.R. 251, 260). It did not report exemptions from antidumping duties. However, during verification, Commerce discovered that Vietnam has an antidumping duty order on aluminum frames from China, and that Boviet, as an EPE, was exempted from paying such duties. Boviet Verification Report at 2, 9-10.

Because Boviet did not comply with Commerce's requests when it failed to report all duties and import fees it would have been charged in the absence of the import duty exemption, Commerce reasonably applied facts available because necessary information for evaluating the Import Duty Exemptions program with regard to antidumping duties was not on the record. IDM at 93. Commerce also reasonably found that Boviet had not done the maximum it was able to do in responding to Commerce's requests and therefore did not cooperate to the best of its ability, warranting an adverse inference. As Commerce explained, because Boviet "did not report all exemptions under this program, {Commerce} was unable to verify the program at verification{.}" IDM at 93. Put another way, Commerce could not verify the extent of Boviet's exemptions under the program and examine whether other duties were also exempted. As such, Commerce reasonably and lawfully applied AFA with regard to this program.

Boviet argues that, as an EPE, it would not have to pay these duties because it is never charged import duties and therefore the "entire notion of an import duty exemption is a misnomer{.}" Boviet Br. at 41. But as explained above, the Import Duty Exemptions program exists and provides countervailable subsidies; as such, any duties or import fees that Boviet

would have been charged if it were not an EPE should have been reported.  Boviet cannot rely on its status as an EPE to shield itself from Commerce's reporting requirements.  Boviet's claim that it should not have to report duty exemptions and that it would not have "occasion to be aware of {this information} in its normal business{,}" Boviet Br. at 42, is also undermined by its own reporting of other duties it would have otherwise paid in the absence of the import duty exemption.  *See* Boviet Section III QR at 20-21, Exhs. 10.2-10.3 (P.R. 469; C.R. 251, 260-261).  Boviet admits as much, acknowledging that it reported "the standard import rates for Vietnam, MFN{,} or ASEAN, for its imports{.}"  Boviet Br. at 41.  While Boviet stated that "these are not duty rates that Boviet's imports were actually subject to{,}" it nonetheless demonstrated that it knew how to comply with Commerce's requirement to list import duties and fees it was exempted from as an EPE.  As such, its failure to list antidumping duties on aluminum frames evinces not just a withholding of requested information but a failure to act to the best of its ability.

Boviet asserts that, even if it should have reported the duties, its failure to do so was an "inadvertent mistake or misunderstanding of Commerce's request" because it has no reason to pay attention to import duties in its normal business due to its status as an EPE.  Boviet Br. at 42-43.  But Boviet's position is undermined by the record.  As the verification report states:

> We observed that the import declaration for the entry of ▮▮▮▮▮▮ ▮▮▮▮, bill of entry number ▮▮▮▮▮▮▮▮▮, included an exemption from an antidumping tax.  Company officials explained that the Government of Vietnam had placed antidumping duties on imports of aluminum extrusions from China.  Company officials provided a press release from the Government of China as supporting documentation.  Company officials explained that because Boviet Solar is an EPE it was not required to pay antidumping duties.

Boviet Verification Report at 9.  The record clearly demonstrates that information regarding exemptions from antidumping duties is contained within Boviet's records and that the company had knowledge of such duties.  Moreover, Boviet did not at any point prior to verification inform Commerce that there may be other import duties from which it was exempted as an EPE but that it did not have the knowledge of or capacity to ascertain the full extent of those duties.  If Boviet was unsure about the extent of the reporting required by Commerce or faced difficulty in reporting accurately, it was Boviet's responsibility to report these issues to Commerce rather than fail to fully respond and claim later that this failure was an inadvertent mistake.  *See* 19 U.S.C. § 1677m(c)(1); *see also Yamaha Motor Co., Ltd. v. United States*, 910 F. Supp. 678, 686 (Ct. Int'l Trade November 20, 1995) ("if the instructions were confusing,{respondent} should have sought clarification from Commerce.").

Finally, Boviet posits that there is no missing information from the record because it provided the requested information during verification.  This argument fails for more than one reason.  First, the information provided by Boviet does not constitute the type of information Commerce accepts at verification—minor corrections or information corroborating, supporting, or clarifying factual information on the record.  *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021).  Rather, it would be a submission of new factual information that was not on the record and should have been reported in response to Commerce's questionnaires.  Boviet had not previously reported any information regarding antidumping duties on aluminum frames, or exemptions from antidumping duties at all.  As such, no tenable argument exists that the information corroborates, supports, or clarifies information already on the record.  Moreover, the limited information provided by Boviet at verification would not have been sufficient for Commerce to accurately probe the extent of Boviet's usage of the program or

76

determine whether Boviet had been exempted from other antidumping duties.  IDM at 11

(explaining that Commerce would need reports of all import duty exemptions to fully analyze the

benefit plaintiffs received).

**VII.    Commerce's Determination to Apply AFA to JA Solar for Import Duty Exemptions on Imported Equipment Was Lawful and Supported by Substantial Evidence**

Commerce reasonably applied AFA to JA Solar based on the company's failure to report

import duty exemptions on imported equipment during the average useful life period, and JA

Solar cannot demonstrate otherwise.

During the investigation, the GOV reported that Article 12.6 of Decree 87/2010/ND-CIP

provides for the exemption of duties on imports of equipment and machinery imported to create

fixed assets. PDM at 43; GOV QR at 45.  In a section titled "Other Subsidies," Commerce also

directed the mandatory respondents to report whether "the GOV (or entities owned directly, in

whole or in part, by the GOV or and provincial or local government) provide, directly or

indirectly, any other forms of assistance to your company between January 1, 2014, and the end

of the {period of investigation.}"  Initial Questionnaire at III-21.  January 1, 2014 represented

the first relevant year of the average useful life period.  In response, JA Solar stated that the

question was "{n}ot applicable, {it} did not apply for, use or receive any assistance under other

subsidy programs."  JA Solar Section III QR at 56-57.  Boviet, on the other hand, reported that it

used this program to import equipment during the relevant period.  PDM at 43 (citing Boviet

IQR at 23, Exh. 10.4).  In its preliminary determination, Commerce determined that the program

provided a financial contribution and was *de jure* specific, but that the benefits received by

Boviet did not give rise to a countervailable subsidy.  *Id.* at 43.  Because JA Solar did not report

use of the program, Commerce did not analyze whether it had received a benefit.

During verification, Commerce—in order to confirm JA Solar's reported non-use of the program—asked JA Solar whether any imports of machinery were completed during the average useful life period.  JA Solar Verification Report at 2, 12-13.  JA Solar represented that all three of its affiliated entities (JA Solar, JAPV, and JANE) had imported machinery since 2014.  *Id*.  Commerce thus found during verification that the JA Solar entities had imported this machinery duty free during the average useful life period, inconsistent with JA Solar's reporting.  *Id.* at 12-13.

Because JA Solar had failed to report its import of machinery duty free during the average useful life period, Commerce found that it did not have the necessary information to evaluate the program and JA Solar's usage of it.  IDM at 88.  Commerce also found that JA Solar had not cooperated to the best of its ability when it failed to provide the requested information, and so applied AFA to JA Solar with respect to the program.  *Id*.

JA Solar claims that it reported in compliance with the parameters of Commerce's questionnaire because Commerce had only asked JA Solar to "{i}ndicate each of the items of equipment and machinery for which your company received import duty exemptions during the POI."  JA Solar Br. at 40 (citing JA Solar Section III QR at 28).  According to JA Solar, it was not required to report the import of machinery during the average useful life period in response to Commerce's "Other Subsidies" question.  *Id.* at 40-41.  But, as Commerce explained, the question JA Solar relies on as only requiring the reporting of equipment during the period of investigation pertains specifically to raw materials.  IDM at 87 (citing Initial Questionnaire at III-13 ("Explain, in detail, whether the exemption is limited to *raw materials* consumed in the production of the exported product.")).  And, while JA Solar claims—without support—that the exemptions it received for the imported equipment during the average useful life period fell

78

under the exemptions on raw materials, this does not excuse JA Solar from failing to report *any other forms of assistance* during the average useful life period in response to Commerce's "Other Subsidies" question.  If JA Solar was unsure whether to report its importation of machinery in response to this question, it should have reached out to Commerce for clarification.  This is particularly so in light of the fact that Boviet did report its importation of equipment during the average useful life period.

Finally, JA Solar complains that Commerce did not provide it with a notice of deficiency under 19 U.S.C. 1677m(d).  But JA Solar's argument ignores that Commerce was unaware of JA Solar's deficiency until verification, where JA Solar confirmed that it had received exemptions from import duties on equipment imported during the average useful life period.  IDM at 86; JA Solar Verification Report at 12.  But when Commerce discovers errors for the first time at verification, it is not obligated to issue a notice of deficiency or give the respondent an opportunity to remedy.  *See, e.g.*, *Bridgestone Americas Tire Operations, LLC v. United States*, No. 24-000263, 2026 WL 2114514, at *8 (Ct. Int'l Trade July 22, 2026); *Hung Vuong Corp. v. United States,* 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) (verification "does not entail a request for information" under the statute and "is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information."); *Dalian Meisen Woodworking Co., Ltd. v. United States*, No. 20-00109, 2023 WL 3058783, at *4 (Ct. Int'l Trade Apr. 24, 2023) ("if {Commerce} need not *accept* corrective substantive information at verification as to deficiencies in a respondent's *original* submissions, it need not *seek* corrective substantive information when *verification* responses are deficient.") (emphasis in original).  JA Solar cannot establish that

79

Commerce was required to afford it another opportunity to comply after verification, and cannot

show that Commerce was unjustified in applying AFA to it with regard to usage of the program.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motions, sustain

Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:                                                /s/Sosun Bae
SAMUEL CHILDERSON                          SOSUN BAE
Attorney                                                      Senior Trial Counsel
U.S. Department of Commerce            United States Department of Justice
Office of the Chief Counsel for Trade    Civil Division
  Enforcement and Compliance            Commercial Litigation Branch
1401 Constitution Avenue, NW            P.O. Box 480
Washington, D.C. 20230                      Ben Franklin Station
Tel: (240) 956-8573                             Washington, D.C. 20044
Email: Justin.Merhar@trade.gov         Telephone: (202) 305-7568
                                                              Fax: (202) 514-8624
                                                              Email: Sosun.Bae@usdoj.gov

August 13, 2026                                   Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's July 22, 2026 scheduling order, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules. According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 24,357 words, excluding those exempted portions of this brief.

/s/ Sosun Bae
SOSUN BAE