**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

**JA SOLAR VIETNAM COMPANY LIMITED, ET AL.,**

**Plaintiffs,**

**and**

**BOVIET SOLAR TECHNOLOGY CO., LTD, JINKO SOLAR (VIETNAM) INDUSTRIES CO., LTD,**

**Consolidated Plaintiffs,**

**and**

**TRINA SOLAR ENERGY DEVELOPMENT CO., LTD.,**

**Plaintiff-Intervenor,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**THE AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE**

**Defendant-Intervenor.**

**Consol. Court No.: 25-00157**
**Nonconfidential Version**

**REPLY BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF PLAINTIFFS JA SOLAR VIETNAM COMPANY LIMITED, JA SOLAR PV VIETNAM COMPANY LIMITED, JA SOLAR NE VIETNAM COMPANY LIMITED AND JA SOLAR USA INC.**

Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
Savannah R. Maxwell
Clemence D. Kim
Wesley Chen
**Mowry & Grimson, PLLC**
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
jsg@mowrygrimson.com

November 12, 2026

## TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... **I**

**TABLE OF AUTHORITIES** .......... **II**

**ARGUMENT** .......... **1**

I. The Plain Language of 19 U.S.C. § 1671 Prohibits The Countervailing of Transnational Subsidies .......... 1

A. The Statute's Definitions for CVDs Are All Oriented Toward a Specific Country as Confirmed by the Legislative History .......... 3

B. Countervailing Transnational Subsidies Would Render 19 U.S.C. § 1671(d)-(e) Superfluous .......... 9

C. Commerce's Findings That the Transnational Subsidies Were Specific Remain Unsupported by Substantial Evidence and Not in Accordance with Law .......... 11

D. The Major Questions Doctrine Further Requires that this Court Not Afford Discretion to Commerce's Interpretation of the Statute .......... 12

II. Commerce's Determination to Countervail JA Solar's Purchases of Wafers was Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law .......... 14

A. Commerce Failed to Consider the Full Record in Finding that JA Solar's Suppliers of Wafers Were GOC Authorities .......... 14

B. JA Solar's Purchases of Wafers Were Tied to Non-Subject Merchandise .......... 17

III. Commerce's Determination to Use Comtrade Data for Its Benchmark to Value Wafers was Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law .......... 18

IV. Commerce's Determination to Use Comtrade Data for Its Benchmark to Value Solar Glass was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law .......... 21

**CONCLUSION** .......... **22**

## TABLE OF AUTHORITIES

### Cases

Archroma U.S. Inc. v. Dep't of Commerce,
185 F.4th 1341 (Fed. Cir. 2026) ... 1

Changzhou Trina Solar Energy Co. v. United States,
42 CIT __, 352 F. Supp. 3d 1316 (2018) ... 19, 21, 22

Changzhou Trina Solar Energy Co. v. United States,
44 CIT __, 466 F. Supp. 3d 1287 (2020) ... 21

Changzhou Trina Solar Energy Co. v. United States,
975 F.3d 1318 (Fed. Cir. 2020) ... 16

Dep't of Homeland Sec. v. MacLean,
574 U.S. 383 (2015) ... 5

Guangdong Wireking Housewares & Hardware Co. v. United States,
37 CIT 319, 900 F. Supp. 2d 1362 (2013) ... 16

Guangdong Wireking Housewares & Hardware Co. v. United States,
745 F.3d 1194 (Fed. Cir. 2014) ... 16

Huayin Foreign Trade Corp. v. United States,
322 F.3d 1369 (Fed. Cir. 2003) ... 20

Kajaria Iron Castings Pvt. Ltd. v. United States,
156 F.3d 1163 (Fed. Cir. 1998) ... 17

Learning Resources, Inc. v. Trump,
607 U.S. __,146 S. Ct. 628 (2026) ... 13

Lesko v. United States,
161 F.4th 1352 (Fed. Cir. 2025) ... 1

Loper Bright Enterprises v. Raimondo,
603 U.S. 369 (2024) ... 1, 2, 10, 12

Niz-Chavez v. Garland,
593 U.S. 155, 164 (2021) ... 3, 4

NMB Sing. Ltd. v. United States,
557 F.3d 1316 (Fed. Cir. 2009) ... 16

RHP Bearings Ltd. v. United States,
288 F.3d 1334 (Fed. Cir. 2002) .......... 20

SEC v. Chenery Corp.,
318 U.S. 80 (1943) .......... 17

Taizhou United Imp. & Exp. Co. v. United States,
46 CIT __, 560 F. Supp. 3d 1316 (2022) .......... 18

Ventura Coastal, LLC v. United States,
__ CIT __, 736 F. Supp. 3d 1342 (2024) .......... 12

West Virginia v. EPA,
597 U.S. 697 (2022) .......... 12

Williams v. Taylor,
529 U.S. 362 (2000) .......... 9

Zhejiang Dunan Hetian Metal Co. v. United States,
652 F.3d 1333 (Fed. Cir. 2011) .......... 16

**Statutes**

19 U.S.C. § 1677 .......... passim

19 U.S.C. §1671 .......... passim

**Regulations**

19 C.F.R. § 351.511 .......... 18

19 C.F.R. § 351.527 .......... 7, 8

**Other Authorities**

Agreement on Subsidies and Countervailing Measures, Art. 1.1, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 .......... 6

Countervailing Duties, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) .......... 8

Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments,
54 Fed. Reg. 23,366 (Dep't of Commerce May 31, 1989) .......... 8

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020, 87 Fed. Reg. 38,379 (Dep't of Commerce June 28, 2022) .............................................................................................................. 15

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part, 90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025) ........................................................................................................ 7

Paper File Folders From the Kingdom of Cambodia: Final Affirmative Countervailing Duty Determination, 90 Fed. Reg. 60,631 (Dep't of Commerce Dec. 29, 2025) ............................. 13

Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), Public Law 114-125, 130 Stat. 122, 155 ........................................................................................ 8

U.R.A.A., Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 925 (1994).... 6

Uruguay Round Agreements Act, H.R. Rep. No. 103-826, pt. 1 at 116 (1994)............................ 5

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994)........................... 8

Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021).............................................................. 9

Plaintiffs JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc. (collectively, "JA Solar") reply to the response briefs of Defendant the United States (the "Government") and Defendant-Intervenor the American Alliance for Solar Manufacturing Trade Committee (the "Alliance"). See Def.'s Resp. in Opp. To Pls.' Rule 56.2 Mot. for J. on the Agency R. (Aug. 13, 2026) (Nonconfidential Version), ECF No. 57 ("Gov't Br."); Def.-Int. Am. All. for Solar Mfg. Trade Comm.'s Resp. to Mot. for J. on the Agency R. (Sept. 3, 2026), ECF No. 62 ("Alliance Br.").

## ARGUMENT

### I. THE PLAIN LANGUAGE OF 19 U.S.C. § 1671 PROHIBITS THE COUNTERVAILING OF TRANSNATIONAL SUBSIDIES

Commerce's interpretation of the statutory provisions at issue is not entitled to deference by this Court under Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024) because the statute is unambiguous and does not expressly delegate the authority to Commerce to define statutory terms. Cf. Gov't Br. at 13-40; Alliance Br. at 11-31. "{C}ourts must exercise independent judgment in determining the meaning of statutory provisions" and may not defer to agency interpretations of unambiguous statutes. Lesko v. United States, 161 F.4th 1352, 1358 (Fed. Cir. 2025) (citing Loper, 603 U.S. at 394, 413). While Commerce may adopt regulations that are "necessary" under the second prong of Loper, that discretion only applies where the statute was "silent" regarding the issue that Commerce seeks to regulate. Archroma U.S. Inc. v. Dep't of Commerce, 185 F.4th 1341, 1343 (Fed. Cir. 2026). 19 U.S.C. § 1671(a) is neither silent nor ambiguous on Commerce's authority to countervail transnational subsidies.

The "best reading" of the countervailing duty ("CVD") statute is that Congress did not intend for Commerce to impose CVDs for subsidies provided by more than one government in a

single investigation. Loper, 603 U.S. at 373. Section 1671(a) provides that Commerce shall impose a CVD only after it:

> determines that the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation into the United States

19 U.S.C. § 1671(a) (emphasis added). The statute's repeated use of the singular "a country" makes clear that Commerce's investigations, and subsequent imposition of CVDs, are limited to the investigation of subsidies bestowed by a single country. See Mem. of P&A in Support of Pls.' Rule 56.2 Mot. for J. on the Agency R. (Feb. 24, 2026) (Nonconfidential Version), ECF No. 46 ("JA Solar Br."). By only permitting for the imposition of CVDs on benefits provided by the government of a single country, the statute explicitly excludes Commerce from imposing CVDs on benefits provided by a second country. If Congress had intended for a CVD investigation to cover alleged subsidies granted by multiple countries, such as through a transnational subsidy, Congress would have used the plural term "countries" in the statute. There can be no discretion for Commerce to fill in the details – like in Lesko – where Congress did not intend for Commerce to be able to countervail a transnational subsidy based on the unambiguous statutory language.

The Government argues that if Congress intended to expressly prohibit the countervailing of transnational subsidies it "would have cabined the language to the government of '*the* country' in which the subsidy is received or stated that the government of a country is providing a countervailable subsidy with respect to the manufacture, production, or export of merchandise *in such country.*" Gov't Br. at 17. Without such cabining language, the Government wrongly maintains that the use of the word "a" in the phrase "a country" should instead be interpreted to mean "several." Id. Such an interpretation of the statute strains credulity when the statute is examined in totality.

### A. The Statute's Definitions for CVDs Are All Oriented Toward a Specific Country as Confirmed by the Legislative History

The statute, when read as a whole and in context of legislative history, establishes that Congress intended for subsidies to be only countervailed from one country, except in very narrow enumerated exceptions.[1]

Contrary to the Government's suggestion that the indefinite article "a" opens the door to investigation of multiple countries, the presence of an indefinite article simply means that the identity of the subsidizing country is not specified. See "A," Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/a (last visited June 1, 2026) ("used as a function word before singular nouns when the referent is unspecified"); see also Gov't Br. at 18. The Government's reliance on Niz-Chavez v. Garland, 593 U.S. 155, 164 (2021) for the proposition that a statute's use of the singular can also denote several is likewise unpersuasive. See Gov't Br. at 18. In Niz-Chavez, the Supreme Court was clear that "{t}he Dictionary Act does not transform every use of the singular 'a' into the plural 'several,'" and that statutory "context is critical" when making this determination. 593 U.S. at 164-166 (emphasis added). Here, the context provided throughout this statute proves that Congress did not intend for Commerce to investigate subsidies from multiple countries, except in very limited circumstances.

The CVD statute's foundational definitions at 19 U.S.C. § 1677 demonstrate that Congress clearly structured the statute to orient Commerce toward examining an alleged subsidy in a single country—not the transnational provision of a subsidy by one country in the territory of another country. Several of these foundational definitions, as set forth below, refer specifically to "the

---

[1] The legality of countervailing transnational subsidies is also on appeal in CIT No. 25-00143, Kumho P&B Chemicals Inc. v. United States. Briefing in that case, however, did not address the statutory interpretation arguments presented here.

country," "the authority," or "the government" of the exporting country subject to the investigation:

- **Countervailable Subsidy**: "A subsidy is described in this paragraph in the case in which an authority—(i) provides a financial contribution, (ii) provides any form of income or price support . . . , or (iii) . . . entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in *the government* . . . {T}he term 'authority' means a government of a country or any public entity within the territory of **the** country." 19 U.S.C. § 1677(5)(B) (emphasis added).

- **Benefit Conferred**: "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including . . . in the country in which the equity infusion is made, . . . (iii) in the case of a loan guarantee, if there is a difference . . . between the amount the recipient of the guarantee pays . . . and the amount the recipient would pay for a comparable commercial loan if there were no guarantee by the authority, … the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E) (emphasis added).

- **Specificity (Domestic Subsidy)**: "In determining whether a subsidy . . . is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply: . . ." 19 U.S.C. § 1677(5A)(D) (emphasis added).

- **Interested Party**: "The term 'interested party' means— . . . (B) the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported, . . . ." 19 U.S.C. § 1677(9) (emphasis added).

This statutory context illustrates that Congress intended the article "a" in the phrase "a country" to be singular, not plural. See Niz-Chavez, 593 U.S. at 164-166. Indeed, the statute uses the definite article "the country" in defining a countervailable subsidy under 19 U.S.C. § 1677(5)(B).

By contrast, there are multiple instances of Congress using the plural term "countries" in the antidumping and CVD statutes. See, e.g., 19 U.S.C. § 1677(3) (defining "country" to include "an association of 2 or more foreign countries" in a customs union); 19 U.S.C. § 1677(7)(F)(iii) (noting that the International Trade Commission considers "dumping in the markets of foreign countries…"); 19 U.S.C. § 1677j(b) (discussing "merchandise completed or assembled in other

foreign countries"). If Congress intended for an investigation to cover alleged subsidies granted by multiple countries, it would have used the plural form "countries" in the statute as it did in other instances. See Dep't of Homeland Sec. v. MacLean, 574 U.S. 383, 391 (2015) (internal citation omitted). Congress instead referred to a single country in sections 1671(a) and 1677(5)(B), which indicates that CVD investigations are not intended to extend to transnational subsidies.

The legislative history supports the above plain language reading. The Government and the Alliance maintain that Congress removed the geographic limitation on countervailing transnational subsidies when it repealed 19 U.S.C. § 1303(a)(1) and replaced it with 19 U.S.C. § 1671(a). See Gov't Br. at 25-26; Alliance Br. at 13. Specifically, both parties note that 19 U.S.C. § 1303(a)(1) initially stated that Commerce may impose duties:

> whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government

19 U.S.C. § 1303(a)(1) (1988), *repealed by* Uruguay Round Agreements Act, Pub. L. No. 103-465, § 261(a), 108 Stat. 4809, 4908 (1994) (emphasis added). The Government's and the Alliance's argument that Congress' removal of the phrase "in such country" in section 1671(a) shows that Congress intended to remove the prohibition against countervailing transnational subsidies ignores the underlying context that led to this amendment.

Congress repealed section 1303(a)(1) and replaced it with section 1671(a) to update the definition of "subsidy" to conform with the Agreement on Subsidies and Countervailing Measures ("SCM"). See Uruguay Round Agreements Act ("U.R.A.A."), H.R. Rep. No. 103-826, pt. 1 at 116 (1994) (noting that the repeal of section 303 of the Act is "necessary to conform U.S. law to the Agreement"). The Statement of Administrative Action stated that "{i}n general, the

Administration intends that the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute, unless that practice or interpretation is inconsistent with the definition contained in the bill." U.R.A.A., Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 (emphasis added) ("SAA"). The Government maintains that the SAA "clarified what was being provided . . . not where the providing authority must be." Gov't Br. at 26. The definition of subsidy, however, included a geographical limitation in section 1303(a)(1). That geographical limitation was carried over to 19 U.S.C. § 1671(a) through the statute's limitation of "a country" and "within the territory of a country." This language is consistent with the SCM which defines a subsidy as "a financial contribution by <u>a</u> government or any public body <u>within the territory of a</u> Member (referred to in this Agreement as 'government')." Agreement on Subsidies and Countervailing Measures, Art. 1.1, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, 1869 U.N.T.S. 14 ("SCM"). Congress, thus, did not intend to permit Commerce to countervail transnational subsidies when it removed the reference to "in such country" in section 1303 when drafting section 1671(a). Instead, the best reading is that Congress sought to conform the geographical limitations in section 1671(a) with the language in the SCM.

Indeed, context surrounding the negotiations of the SCM illustrates that the agreement was intended to include a geographical limitation on countervailing subsidies. "{T}he phrase 'within the territory' was inserted in response to US concerns about its overseas development aid programmes." Huan Zhu & Weihuan Zhou, The New US Countervailing Duty Rules on "Transnational" Subsidies: A Creative Departure from WTO Law, 00 J. Int'l Econ. L. 00 (Original Article) (2026), https://doi.org/10.1093/jiel/jgag026 (attached as Exhibit 1). The former head of

the import administration at Commerce, in discussing the relevance of the phrase "within the territory" in the SCM, confirmed that he "had no intention of opening that particular can of worms, with the political explosiveness involved (the US at the time was the largest single donor of overseas development assistance) so we decided not to treat as countervailable those subsidies given by a government outside of its territory." Gary N. Horlick, An Annotated Explanation of Articles 1 and 2 of the WTO Agreement on Subsidies and Countervailing Measures, 8 Glob. Trade & Cust. J. 298 (2013) (attached as Exhibit 2). The Government acknowledges that Commerce's past practice to prohibit the countervailing of transnational subsidies arose because of "bilateral and multilateral aid programs" but nonsensically finds that Commerce's past practice "does not reflect Congressional intent." Gov't Br. at 20, n.4. Section 1671(a), however, directly implements the phrase "within the territory" to align with the SCM and the history behind this addition confirms that the drafters of the SCM intended for this phrase to ensure that U.S. foreign aid programs to other countries (i.e., a transnational subsidy) would not be countervailable.

Commerce itself found the countervailing of transnational subsidies to be prohibited by the statute and accordingly implemented 19 C.F.R. § 351.527. See JA Solar Br. at 13. Commerce relies on the rescission of this regulation as its legal support for countervailing certain transnational subsidies in the investigation subject to this appeal. See id. (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part, 90 Fed. Reg. 17,399 (Dep't of Commerce Apr. 25, 2025) (P.R. 869) and accompanying Issues and Dec. Mem. at 24-26 ("Final IDM") (P.R. 858)). In asking for comments on its proposed regulation, Commerce found that transnational subsidies are not countervailable "to the extent that funds for the program are not provided by government of the country in

question." Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments, 54 Fed. Reg. 23,366, 23,374 (Dep't of Commerce May 31, 1989). Now, the Government argues that Commerce based its prior interpretation that Commerce was banned from countervailing transnational subsidies on the former section 1303, not on the language of section 1671 as enacted during the U.R.A.A. See Gov't Br. at 25. This argument is not supported by the timing of Commerce's promulgation of 19 C.F.R. § 351.527. Commerce published its regulation in 1998 – four years after Congress enacted the U.R.A.A. into law. Compare Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), with Countervailing Duties, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) ("1998 Regulation"). Commerce explained that it issued its CVD regulations to "conform to the Uruguay Round Agreements Act, which implemented the results of the Uruguay Round multilateral trade negotiations," and to "codify certain administrative practices determined to be appropriate under the new statute..." 1998 Regulation, 63 Fed. Reg. at 65,348 (emphasis added). Commerce itself believed at the time of publishing the regulation, and close in time to the enactment of the statute, that it was updating the regulations to bring them into conformity with U.R.A.A. and that the statute barred countervailing transnational subsidies. Additionally, from 1998 to 2024, Congress amended the Tariff Act numerous times. See, e.g., Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), Public Law 114-125, 130 Stat. 122, 155. Congress was aware of 19 C.F.R. § 351.527 and not once did Congress amend the statute to allow Commerce to countervail transnational subsidies.

Moreover, as recently as 2021, Commerce continued to find that the statute does not allow for countervailing transnational subsidies. In the countervailing duty investigation of utility scale wind towers from Malaysia, Commerce found that not countervailing transnational subsidies did

not "contravene{} the statutory directive." Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) and accompanying IDM at 57 ("Utility Wind Towers IDM"). Commerce explained that 19 U.S.C. § 1671(a) references "the government of a country" and "within the territory of a country" which "indicates that the general rule is that Commerce's CVD analysis is focused on a particular (*i.e.*, "the") government of a country." Id. at 58 (emphasis in original). Neither the Government nor the Alliance has a response to this case despite it being raised in JA Solar's opening brief. See JA Solar Br. at 16. Nor could they, given that Commerce originally interpreted the statutory language enacted following the U.R.A.A. as placing a bar on countervailing subsidies from more than one country, except for the narrow exceptions in 19 U.S.C. § 1671(d)-(e).

In sum, the best reading of section 1671(a), as confirmed by the legislative history, is that Congress intended to impose geographical limitations prohibiting Commerce from countervailing transnational subsidies.

### B. Countervailing Transnational Subsidies Would Render 19 U.S.C. § 1671(d)-(e) Superfluous

Commerce's proposed interpretation of the statute cannot stand where it would effectively render other provisions of the statute superfluous. See Williams v. Taylor, 529 U.S. 362, 367 (2000) (holding that it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute").

The statute permits Commerce to countervail subsidies from multiple countries in two scenarios: (1) as an international consortia under 19 U.S.C. § 1671(d), and (2) as a part of upstream subsidies cumulated by a customs union under 19 U.S.C. § 1677-1(a) and 19 U.S.C. § 1671(e). The Government and the Alliance maintain that these sections of the statute merely lay out specific factual scenarios that Congress wanted to address, which they argue does not undermine

Commerce's authority to countervail transnational subsidies. See Gov't Br. at 21-22; Alliance Br. at 20-22. These provisions would be superfluous if Commerce could countervail a subsidy provided by one country to a producer in another country even if the two countries were not a part of a consortia or customs union. See JA Solar Br. at 15. This Court should reject the Alliance's argument that sections 1671(d) and (e) are not superfluous because these sections provide additional rules on how Commerce should treat such subsidies. See Alliance Br. at 20-22. Defining the treatment of such subsidies is only necessary if such subsidies are otherwise not countervailable under section 1671(a). The treatment of subsidies provided under an international consortia or upstream subsidy to a customs union is identical to Commerce's treatment of a transnational subsidy – namely, Commerce "cumulate{d} . . . countervailable subsidies" (or "included the amount") of the alleged subsidy provided by multiple countries in its subsidy rate. 19 U.S.C. § 1671(d)-(e).

Further, both the Government and the Alliance again ignore that Commerce reached this very conclusion prior to revoking its regulation. In Utility Wind Towers, Commerce found that "to allow Commerce to inherently address subsidies from governments outside the country under investigation without evidence of the responding companies' participation in an international consortium engaged in the production of subject merchandise – would render the international consortium provision superfluous." See Utility Wind Towers IDM at 58. Consistent with Commerce's own reading, the best reading of section 1671(a) under Loper is that Commerce is prohibited from countervailing transnational subsidies because any other reading renders sections 1671(d)-(e) superfluous.

### C. Commerce's Findings That the Transnational Subsidies Were Specific Remain Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce's finding that the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for less than adequate remuneration ("LTAR") were all de facto specific was unsupported by substantial evidence and otherwise in not accordance with law because the statute limits Commerce's specificity analysis for domestic subsidies "to an enterprise or industry within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D) (emphasis added). The statute then defines authority as "a government of a country or any public entity within the territory of the country." 19 U.S.C. § 1677(5)(B)(iii) (emphasis added).[2] The statute, therefore, does not permit Commerce to find that a domestic subsidy is specific as a matter of law or fact where the subsidy is provided by an authority other than the investigated country.

Like their arguments regarding section 1671(a), the Government and the Alliance maintain that this interpretation represents a too narrow reading of the statute. See Gov't Br. at 29-30; Alliance Br. at 23-24. The Government's and the Alliance's arguments, however, ignore that Commerce's specificity finding was premised on the provision of these inputs by "state-invested enterprises" controlled by the Government of China ("GOC"). Final IDM at 44 (P.R. 858). In other words, the GOC did not provide these alleged subsidies but instead these subsidies came from a public entity allegedly controlled by the GOC. There can be no doubt that the statute contains a geographic limitation with respect to public entities, i.e., that public entity can only be an authority where it is located "within the territory of the country." 19 U.S.C. § 1677(5)(B)(iii); cf. Alliance Br. at 15 (noting that the phrase "within the territory" imposes "an express territorial

---

[2] Please note that JA Solar's opening brief inadvertently referred to this language as "that country" instead of "the country." JA Solar Br. at 21, 22.

limitation on what entities may provide a countervailable subsidy"). These LTAR subsidies, therefore, can only be specific if the state-invested enterprises were in Vietnam. That is not the case and Commerce, therefore, exceeded its delegated authority in countervailing the cross-border provision of Chinese silicon wafers, silver paste, and solar glass for LTAR provided by entities in China.

### D. The Major Questions Doctrine Further Requires that this Court Not Afford Discretion to Commerce's Interpretation of the Statute

Both the Government and the Alliance maintain that Commerce has broad authority to fill in the details of a statutory scheme under Loper because Congress was silent on the issue of whether Commerce can lawfully countervail transnational subsidies. See Gov't Br. at 33; see also Alliance Br. at 9-10. That premise is incorrect. Congress broadly oriented the statute to subsidies in a single country except for the two enumerated exceptions where Congress permits Commerce to investigate subsidies from other countries. "{F}or a court to conclude that an agency has the power to give meaning to the words of the statute, the source of the agency's authority must be found in the words of the statute; it cannot be presumed by virtue of silence or ambiguity." Ventura Coastal, LLC v. United States, __ CIT __, __, 736 F. Supp. 3d 1342, 1357 (2024) (citing Loper, 603 U.S. at 395). The statute is not silent or ambiguous. No discretion should be granted to Commerce's interpretation of such language.

Further, the major questions doctrine supports that no discretion should be granted to Commerce's interpretation of the statute. It is well established that when an agency "claim{s} to discover in a long-extant statute an unheralded power" which would result in a "transformative expansion in {its} regulatory authority," the major questions doctrine requires the agency identify "clear congressional authorization" supporting that authority, rather than "a merely plausible textual basis." West Virginia v. EPA, 597 U.S. 697, 723–24 (2022). The doctrine is especially

fitting here where Commerce's longstanding interpretation of the statute was that the agency lacked authority to countervail transnational subsidies. See Learning Resources, Inc. v. Trump, 607 U.S. __,146 S. Ct. 628, 641 (2026) (Roberts, J., plurality) (holding that "lack of historical precedent" was a "telling indication"). Applying the doctrine, this Court should reject Commerce's interpretation that it is now allowed to countervail transnational subsidies under section 1671(a) because a power of such significance requires clear congressional approval. Such approval does not exist. On the contrary, the statute is unambiguous that Congress intended to prohibit the countervailing of transnational subsidies.

The Government argues that the major questions doctrine does not apply because transnational subsidies involve only a "subset of programs" and therefore do not constitute an issue of "vast economic and political significance." Gov't Br. at 40 (quoting Learning Resources, 607 U.S. at 246). Defendant-Intervenor asserts that the major questions doctrine is not implicated because Commerce is not seeking to expand its authority "outside its traditional regulatory sphere." Alliance Br. at 31. These arguments ignore the growing number of allegations and subsequent countervailing of transnational subsidies by Commerce. See, e.g., Paper File Folders From the Kingdom of Cambodia: Final Affirmative Countervailing Duty Determination, 90 Fed. Reg. 60,631 (Dep't of Commerce Dec. 29, 2025) (countervailing alleged cross-border provision of Chinese-origin inputs). Worse than seeking to expand its authority outside its regulatory sphere, Commerce asks that this Court expand Commerce's authority beyond the authority delegated to it by Congress under section 1671(a). This Court should apply the major questions doctrine and decline to do so.

For these reasons, Commerce's determination to countervail the transnational subsidy programs was not in accordance with law because Commerce exceeded its statutory mandate. This

Court should remand with instructions to Commerce to remove any subsidies calculated from these programs.

## II. Commerce's Determination to Countervail JA Solar's Purchases of Wafers was Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law

Commerce's determination to countervail JA Solar's purchases of solar silicon wafers ("wafers") was unsupported by substantial evidence and otherwise not in accordance with law because (1) JA Solar purchased its wafers from non-GOC authorities and (2) these wafers can be tied to the production of non-subject merchandise. See JA Solar Br. at 23-30.

### A. Commerce Failed to Consider the Full Record in Finding that JA Solar's Suppliers of Wafers Were GOC Authorities

A subsidy exists only where "an authority" provides a financial contribution. 19 U.S.C. § 1677(5)(B). JA Solar purchased its wafers from [ ]. See JA Solar Br. at 24-26 (Confidential Version), ECF No. 45. These suppliers are non-GOC authorities as evidenced by Commerce granting separate rates to entities with the same ownership structure in the companion antidumping duty investigation on solar cells and modules from China. See id.

The Government and the Alliance both argue that Commerce adequately explained that the information submitted by JA Solar is an insufficient substitute for the information requested by Commerce from GOC to establish that JA Solar's suppliers were private actors. See Gov't Br. at 52 (citing Final IDM at 40 (P.R. 858)); see also Alliance Br. at 35. Both the Government and the Alliance treat JA Solar's argument as mere disagreement with Commerce's weighing of the evidence. See Gov't Br. at 54; Alliance Br. at 35-36. These arguments, however, defend a determination Commerce did not make. Commerce did not weigh JA Solar's evidence about its suppliers. Rather, Commerce unlawfully disregarded this information based on an alleged failure committed by the GOC.

Commerce explained that "{t}he petitioner provided evidence relating to three silicon wafer producers in China" and that "{f}or any other producers for which no record information was available, we relied on 'facts otherwise available.'" Final IDM at 58 (P.R. 858). Commerce placed JA Solar's suppliers in the latter category. See id. at 58-59 (footnote omitted). JA Solar's suppliers, however, were not unknown. JA Solar reported that it "sourced silicon wafers from [ ]." Letter to Commerce re: New Subsidy Allegation Questionnaire Response of JA Solar Vietnam Company Limited and Affiliates at 1-2, Ex. NSA1-1 (Oct. 8, 2024) (Confidential Version) (C.R. 481). JA Solar submitted the full ownership chain of these suppliers. See Letter to Commerce re: JAVN Affiliation Questionnaire Response at Ex. 1 (Jul. 22, 2024) (Confidential Version) (C.R. 63). Commerce verified JA Solar's reported wafer purchases. See Mem. from Frank Schmitt to the File Re: Report on Verification of JA Solar Vietnam Company Limited and Its Affiliates at 19-20 (Feb. 20, 2025) (Public Version) (P.R. 801). Commerce never addressed JA Solar's arguments in its case brief at the agency that Commerce granted separate rates to JA Solar affiliates with the same ownership structure as [ ] such that JA Solar's suppliers of wafers cannot constitute GOC authorities. See Letter to Commerce re: Case Brief at 9, 30-31 (Mar. 24, 2025) (Confidential Version) (C.R. 768) (citing Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020, 87 Fed. Reg. 38,379, 38,380 (Dep't of Commerce June 28, 2022)). The Final Determination summarizes JA Solar's argument, but Commerce failed to address how JA Solar's suppliers of wafers can constitute GOC authorities considering this evidence. See Final IDM at 51, 58-59 (P.R. 858). A

finding that "no record information is available" for JA Solar's suppliers and that these suppliers are GOC authorities is simply not supported by substantial evidence on the record.

The Government's argument that the GOC did not provide necessary information for Commerce to make its determination that JA Solar's wafer suppliers were non-GOC authorities, and that the GOC had previously provided such information, does not change the fact that Commerce ignored the evidence discussed by JA Solar in its case brief before the agency. See Gov't Br. at 52 (citing Final IDM at 40 (P.R. 858)). Even when Commerce relies on facts otherwise available, it may not "disregard of information of record that is not missing or otherwise deficient." Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011). Commerce's analysis of whether an entity constitutes a government "authority" is analogous to its separate rate analysis as both begin with government ownership and consider government presence on the board, government control, and pursuit of government policies. See Guangdong Wireking Housewares & Hardware Co. v. United States, 37 CIT 319, 332, 900 F. Supp. 2d 1362, 1376 (2013), aff'd, 745 F.3d 1194 (Fed. Cir. 2014). A determination that entities with the same ultimate ownership operate free of government control "fairly detracts" from Commerce's finding that these suppliers are GOC authorities. Changzhou Trina Solar Energy Co. v. United States, 975 F.3d at 1326 (Fed. Cir. 2020). JA Solar is not asking that this Court reweigh the evidence, see Alliance Br. at 35-36, but instead maintains that Commerce was required to consider and address this evidence in the first instance. See NMB Sing. Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009). Commerce's failure to do so thereby renders its finding that JA Solar purchased its wafers from GOC authorities as unsupported by substantial evidence and otherwise not in accordance with law.

The Government and the Alliance argue that the fact that JA Solar's suppliers of wafers have identical ownership structures with other JA Solar affiliates that have previously received separate rates from Commerce is insufficient to demonstrate that these suppliers are non-GOC authorities. See Gov't Br. at 52-53; Alliance Br. at 35. This Court should dismiss these arguments as unlawful post-hoc rationalizations. This Court must review Commerce's determination on the grounds that Commerce invoked. See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) (holding that a court may uphold agency action only on the grounds that the agency invoked when it took the action). Commerce failed to consider these arguments and the Government and the Alliance cannot cure this failure in this appeal. Final IDM at Cmt. 8 (P.R. 858).

For these reasons, this Court should remand with instructions for Commerce to consider the record evidence of the identity and ownership of JA Solar's suppliers of wafers. Once properly considered, the only reasonable reading of the record was that JA Solar's suppliers of wafers are non-GOC authorities such that Commerce's decision to countervail these purchases was unsupported by substantial evidence and otherwise not in accordance with law.

**B. JA Solar's Purchases of Wafers Were Tied to Non-Subject Merchandise**

Further, Commerce's determination to countervail JA Solar's purchases of wafers was unsupported by substantial evidence and otherwise not in accordance with law because JA Solar's purchases can be tied to non-subject merchandise. See JA Solar Br. at 27-30.

"{G}rants that are tied to the production or export of only non-subject merchandise do not provide a countervailable benefit to the subject merchandise." Kajaria Iron Castings Pvt. Ltd. v. United States, 156 F.3d 1163, 1168-69 (Fed. Cir. 1998) (citation omitted). The Government maintains that Commerce only ties subsidies to non-subject merchandise if the GOC knew at the time of bestowal that the respondent intended its purchases for use in non-subject merchandise.

See Gov't Br. at 55. This is not the standard as the Government later recognizes in citing Taizhou United Imp. & Exp. Co. v. United States, 46 CIT __, __, 560 F. Supp. 3d 1316, 1322 (2022). In that case, the court explained that Commerce countervails goods provided for LTAR "unless a respondent can show that the good was 'tied' to non-subject merchandise, meaning that the subsidized good was purchased with an intent for its dedicated use in the production of non-subject merchandise." Id. (emphasis added). In other words, it is the respondent's knowledge that matters.

Commerce successfully verified JA Solar's statements that it knew at the time of bestowal that its purchases of Chinese wafers were for use in non-subject merchandise. See JA Solar Br. at 28-30. The Government argues that the verification report shows only "no discrepancies" and not that JA Solar's purchases could be tied to non-subject merchandise. Gov't Br. at 56; see also Alliance Br. at 36. Such argument is nonsensical when Commerce verified that JA Solar's wafers were indeed [ ]. See JA Solar Br. at 29 (Confidential Version).

For these reasons, Commerce's determination to countervail JA Solar's purchases of wafers was unsupported by substantial evidence and otherwise not in accordance with law because the only reasonable reading of the record was that these purchases can be tied to non-subject merchandise. This Court should remand with instructions for Commerce to exclude JA Solar's purchases of wafers from Commerce's subsidy calculation.

## III. COMMERCE'S DETERMINATION TO USE COMTRADE DATA FOR ITS BENCHMARK TO VALUE WAFERS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce's reliance on Comtrade data for HTS 3818.00 instead of the Bloomberg data for its benchmark for wafers was unsupported by substantial evidence and otherwise not in accordance with law. Commerce must make "due allowance for factors affecting comparability" in a tier-two benchmark. 19 C.F.R. § 351.511(a)(2)(ii). Product specificity is a "vital

comparability concern." Changzhou Trina Solar Energy Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1316, 1332 (2018) ("Trina II"). The Government and the Alliance concede that the Bloomberg data are more specific. See Gov't Br. at 56; Alliance Br. at 40. As in Trina II, where Commerce "made little effort to counter claims that Comtrade data was based on too broad a product category to provide an accurate world market price," 42 CIT at __, 352 F. Supp. 3d at 1332, here Commerce failed to support its reliance on the overly broad Comtrade data. The Government's and the Alliance's arguments cannot justify Commerce's reliance on the Comtrade data where: (1) Commerce's country-level adjustments did not cure the Comtrade data of its overly broad nature and (2) Commerce failed to sufficiently explain its departure in this case from its use of Bloomberg in a related proceeding.

The Government argues that Commerce "squarely addressed" the overbreadth of the Comtrade data by "removing imports from and exports to distorted markets" and "countries shown by the record as not producing photovoltaic silicon wafers." Gov't Br. at 60-61. Commerce's adjustments addressed which countries were in the data but not which products. HTS 3818.00 is not specific to solar-grade silicon wafers because it is an overly broad basket category that covers elements and compounds other than solar-grade silicon and shapes other than wafers. See Letter to Commerce re: Surrebuttal on JA Solar's Response to Commerce's NSA Questionnaire on Wafers at 4, Ex. 1-4 (Oct. 30, 2024) (Public Version) (P.R. 698-699). Commerce's adjustment merely removed countries that do not produce PV wafers but retained all HTS 3818.00 exports from Japan, Norway, Germany, Türkiye, the Philippines, Malaysia, and Singapore. Final IDM at 56, n.224 (P.R. 858). No reasonable mind could find that Commerce's adjustments resolved the overly broad nature of the Comtrade data where Commerce's adjustments merely narrowed the benchmark to countries that made wafers and did not narrow the benchmark to solar silicon wafers.

See Huayin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal quotation marks omitted) (holding that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").

The Alliance concedes that "Commerce expressly acknowledged that Bloomberg's pricing series was more tailored to solar wafers," but contends that "{t}he problem was reliability." Alliance Br. at 40; see also Gov't Br. at 61. The argument that Bloomberg data were unreliable cannot pass muster when Commerce has relied on these data in a similar proceeding. See RHP Bearings Ltd. v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (holding that an agency action "is arbitrary when the agency offers insufficient reasons for treating similar situations differently"). Commerce relied on the Bloomberg data as its benchmark to value wafers in the tenth administrative review of the CVD order on solar cells and modules from China ("Solar Cells China 2021"). See Final IDM at 55, n.214 (P.R. 858). The Government maintains that Commerce "gathered additional information on Bloomberg data" such that the Bloomberg data were no longer reliable because it was unclear whether these data contained prices from China and Vietnam. Gov't Br. at 61 (quoting Final IDM at 55 (P.R. 858)). Commerce, however, failed to provide a sufficient reason for treating the Bloomberg data differently from Solar Cells China 2021. Commerce relied on data from Solar Cells China 2021 for its finding that "the Chinese market for silicon wafers is distorted based on the level of government participation in the market." Id. at 54, n.208. In Solar Cells China 2021, Commerce found the Chinese wafer market to be distorted but nevertheless used the Bloomberg data it now rejects because it may contain Chinese prices. Commerce failed to sufficiently explain, even if the Bloomberg data did contain Chinese and Vietnamese prices, how it could use these data in one segment where it found a similar distortion in the market but reject these data in this investigation.

In sum, Commerce's determination to rely on the Comtrade data as its benchmark for wafers was unsupported by substantial evidence and otherwise not in accordance with law because Commerce failed to account for the non-wafer products in any Comtrade-based benchmark and to adequately explain its departure from Solar Cells China 2021. This Court should remand with instructions for Commerce to rely on the Bloomberg data as its benchmark for wafers.

## IV. COMMERCE'S DETERMINATION TO USE COMTRADE DATA FOR ITS BENCHMARK TO VALUE SOLAR GLASS WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce's replacement of the PVInsights data with Comtrade data for HTS 7007.19 as the benchmark for solar glass was unsupported by substantial evidence and otherwise not in accordance with law. The Court has held that HTS 7007.19 represents an overinclusive basket-category because that subheading "includes many types of safety glass (often a type of flat glass) unrelated to solar glass," Trina II, 42 CIT at __, 352 F. Supp. 3d at 1334. In fact, the Court has sustained Commerce's reliance on PVInsights over those Comtrade data. See Changzhou Trina Solar Energy Co. v. United States, 44 CIT __, __, 466 F. Supp. 3d 1287, 1299 (2020) ("Trina III"). The Government argues that "Commerce found it could not adjust the PVInsights data to remove solar glass prices from China, Vietnam, Thailand, and Cambodia." Gov't Br. at 64; see also Alliance Br. at 43. The record refutes that premise. At the Post-Preliminary Determination, Commerce "found it appropriate to select the Non-China solar glass prices reported by PV Insights." Final IDM at 69 (P.R. 858). In other words, Commerce preliminarily used a "Non-China" price and provided no explanation for its later reversal that these prices could not be removed from the data. Neither response brief addresses that contradiction. Commerce's remaining rationale, that PVInsights may include prices from "solar glass markets in Thailand, Cambodia, Vietnam, and Malaysia" cannot bear the weight placed on it. Id. at 69. Commerce did

not sufficiently weigh the inclusion of these allegedly distorted prices against HTS 7007.19's acknowledged overbreadth. See Mem. from Scot Fullerton to Christopher Abbott re: Post-Preliminary Decision Memorandum at 16 (Mar. 13, 2025) (P.R. 806) (explaining it selected the PVInsights data as product specific). Commerce treated the former as disqualifying and the latter as immaterial because "{t}here is no statutory or regulatory requirement that benchmarks be identical." Final IDM at 69-70 (P.R. 858). The court, however, has made clear that the overly broad nature of the data can render a benchmark fatally flawed. See Trina II, 42 CIT at __, 352 F. Supp. 3d at 1334. The overinclusive nature of HTS 7007.19 relative to solar glass thereby rendered Commerce's selection of the Comtrade data as its benchmark source as unsupported by substantial evidence and otherwise not in accordance with law. For these reasons, this Court should remand with instructions for Commerce to rely on the non-China PVInsights prices as its benchmark for solar glass.

## CONCLUSION

JA Solar respectfully requests that this Court grant its motion for judgment on the agency record and remand Commerce's final determination consistent with JA Solar's initial brief, this reply brief and the reply briefs filed by other respondent parties to the extent they are consistent with the arguments presented in this reply brief.

Respectfully submitted,

Dated: November 12, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
Kristin H. Mowry
Bryan P. Cenko
Savannah R. Maxwell
Clemence D. Kim
Wesley Chen
**Mowry & Grimson, PLLC**
5335 Wisconsin Avenue, NW, Suite 810
Washington, DC 20015
202-688-3610
*Counsel to JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc.*

## CERTIFICATE OF COMPLIANCE

As required by Paragraph 2 of the Standard Chambers Procedures of the Court of International Trade, I, Jeffrey S. Grimson, hereby certify that this brief complies with the word limitations set forth in Paragraph 2(B) of the Standard Chambers Procedures and the Scheduling Order to this case. Excluding the table of contents, table of authorities, signature block and any certificates of counsel, the word count for this brief is 6,993 words.

Dated: November 12, 2026

/s/ Jeffrey S. Grimson
Jeffrey S. Grimson
**Mowry & Grimson, PLLC**
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610
*Counsel to JA Solar Vietnam Company Limited, JA Solar PV Vietnam Company Limited, JA Solar NE Vietnam Company Limited and JA Solar USA Inc.*