UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| JA SOLAR VIETNAM COMPANY LIMITED ET AL.,<br>Plaintiffs,<br>and<br><br>BOVIET SOLAR TECHNOLOGY CO., LTD., JINKO SOLAR(VIETNAM) INDUSTRIES COMPANY LIMITED<br>Consolidated Plaintiffs,<br>and<br><br>TRINA SOLAR ENERGY DEVELOPMENT COMPANY LIMITED,<br>Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br>Defendant,<br>and<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING TRADE COMMITTEE,<br>Defendant-Intervenor. | ) | Consol. Court No. 25-0157 |

**REPLY BRIEF OF**
**CONSOLIDATED PLAINTIFF BOVIET SOLAR TECHNOLOGY CO., LTD.**


C. Kevin Marshall
Hannah L. Templin
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com

*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W.
Washington, DC 20005
email: gmenegaz@igtlaw.com
*Counsel to Boviet Solar Technology Co., Ltd.*


Dated: November 12, 2026

# TABLE OF CONTENTS


**INTRODUCTION** .......... 1

**ARGUMENT** .......... 2

**I. Commerce Cannot Countervail Subsidies from China in an Investigation Against Vietnam** .......... 2

**A. Text and statutory history confirm that Commerce is not authorized to countervail transnational subsidies** .......... 2

**B. Commerce cannot resurrect *Chevron* deference under another name** .......... 11

**C. The major questions doctrine confirms that Commerce does not have discretion to countervail transnational subsidies** .......... 13

**D. Commerce's reasoning was arbitrary and capricious** .......... 14

**II. Commerce's Benchmark Selection and Calculations for Certain Programs are Arbitrary and Capricious and Unsupported by Substantial Evidence** .......... 15

**A. Commerce's benchmarks are not comparable to the inputs being benchmarked** .......... 16

**B. Commerce arbitrarily departed from past practice when it abandoned Bloomberg/PV Insights data** .......... 18

**C. Commerce Incorrectly added VAT and Import Duties** .......... 20

**III. Commerce's Finding Regarding the Import Duty Exemptions on Imported Raw Materials for EPEs is Unsupported by the Record and Unlawful** .......... 20

**A. Commerce's finding that the program exists is not supported by substantial evidence** .......... 20

**B. The Government of Vietnam accounts for resalable scrap** .......... 21

**CONCLUSION** .......... 23

## TABLE OF AUTHORITIES

### CASES

*Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006).......................... 18

*Archroma U.S., Inc. v. Dep't of Commerce*, 185 F.4th 1341 (Fed. Cir. 2026)............................ 12

*ATC Tires Private Ltd. v. United States*, 322 F. Supp. 3d 1365 (Ct. Int'l Trade 2018)............... 21

*Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026)......................................................... 1

*Bethlehem Steel Corp. v. United States*, 7 CIT 339, 341 (1984) .................................................. 3

*Bondi v. VanDerStok*, 145 S. Ct. 857 (2025)..................................................................... 12

*Bond v. United States*, 572 U.S. 844 (2014) ......................................................................... 5

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015)......................................................................................... 15

*Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).............................. 7

*Changzhou Trina*, 2018 Ct. Intl. Trade LEXIS ......................................................................... 19

*Dorbest Ltd. et al. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)...................... 16

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ........................................ 16-17

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002). ............................................ 12

*Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365 (Fed. Cir. 2014) ....................... 8

*FTC v. Bunte Bros*., 312 U.S. 349 (1941).................................................................................. 1

*Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988) ...................................................... 2

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .............................................................................. 10

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986)................................................................ 12

*Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026)............................................................. 12-13

*Lesko v. United States*, 161 F.4th 1352 (Fed. Cir. 2025)........................................................... 12

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .................................................. 1, 12-14

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) .......................................... 5

*Mosaic Co. v. United States*, 160 F.4th 1340 (Fed. Cir. 2025) .... 13

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) .... 2

*PPG Indus., Inc. v. United States*, 928 F.2d 1568 (Fed. Cir. 1991) .... 14

*Stanley v. City of Sanford*, 606 U.S. 46 (2025) .... 5

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001) .... 18

*Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212 (1989) .... 12

*U.S. Dep't of Labor v. Americare Healthcare Servs., Inc.*, 171 F.4th 838 (6th Cir. 2026) .... 12

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .... 6

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978) .... 1

**STATUTES**

16 U.S.C. §1855(d) .... 12

19 U.S.C. § 1303 .... 2-4, 10-15

19 U.S.C. § 1671(a) .... 2-4, 10-14

19 U.S.C. § 1671(d) .... 9-10

19 U.S.C. § 1671(e) .... 9-10

19 U.S.C. § 1671(f) .... 10

19 U.S.C. § 1677(5) .... 3-7, 7, 15-18, 20

19 U.S.C. § 1677(5A) .... 5-7

19 U.S.C. § 1677(9) .... 8

19 U.S.C. § 1677-1 .... 9

28 U.S.C. §2241(a) .... 6

**REGULATIONS**

19 C.F.R. § 351.511(a)(2) .... 18, 22

19 C.F.R. § 351.519(a) .... 20-22

19 C.F.R. §351.527 (2023) .... *passim*

**ADMINISTRATIVE DECISIONS**

*Certain Textiles and Textile Products from Turkey; Initiation of a Countervailing Duty Investigation*, 49 Fed. Reg. 32,639 (August 15, 1984) ........ 1

*Countervailing Duty Order on Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg.17382 (April 25, 2019) ........ 16

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, in Part*, 90 ITADOC 17399 (April 25, 2025) ........ 14

*Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria*, 58 Fed. Reg. 37,217, 37,233 (July 9, 1993) ........ 1, 3-4, 14-15

*Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 ITADOC 30593 (June 9, 2021) ........ 1, 3, 9, 14

*Viscose Rayon Stapel Fiber from Austria: Preliminary Countervailing Duty Determination*, 45 Fed. Reg. 1,468, 1,469 (January 7, 1980) ........ 1

*Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2022*, 89 Fed. Reg. 88962 (November 12, 2024) ........ 16

**OTHER AUTHORITIES**

Antonin Scalia & Bryan Garner, *Reading Law* (2012) ........ 4

Countervailing Duties, 63 Fed. Reg. 65,348, (November 25, 1998) ........ 1, 3, 14-15

Ellen P. Aprill, *Unpacking the Most Important Paragraph in* Loper Bright, Yale J. Reg. Notice & Comment (Jan. 15, 2025) ........ 13

Gary N. Horlick, *An Annotated Explanation of Articles 1 and 2 of the WTO Agreement on Subsidies and Countervailing Measures*, 8 Global Trade & Customs J. 297, 298 (2013) ........ 4

H.R. Conf. Rep. 100-576, printed in 1988 U.S.C.C.A.N. 1547 ........ 10

Merriam-Webster, *Jurisdiction*; available at https://tinyurl.com/3v8pchnz ........ 6

Pub. L. No. 96-39, §101 ........ 3

*Regulations Improving and Strengthening the Enforcement of Trade Remedies Through the Administration of the Antidumping and Countervailing Duty Laws*, 89 Fed. Reg. 20,766 (March 25, 2024) ........ 1, 14-16

Tariff Act of 1890, 26 Stat. 567 ........ 2

Tariff Act of 1894, 28 Stat. 509 ........ 2

Trade Agreements Act of 1979, Pub. L. 96-39, 93 Stat. 177, printed in 1979 U.S.C.C.A.N. 381 ........ 11

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, 925 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ........ 3-7, 11, 14

U.S. Const. amend. XIV ........ 6

## INTRODUCTION

Consolidated Plaintiff Boviet Solar Technology Co., Ltd. ("Boviet") hereby files its reply brief to Defendant United States' (ECF57) and Defendant-Intervenor's (ECF62) response briefs. For over a century, Congress has authorized countervailing duties to remedy a particular problem: "the unfair competitive advantage that foreign producers" receive from "subsidies paid by *their governments*." *Zenith Radio Corp. v. United States*, 437 U.S. 443, 456 (1978) (emphasis added). Congress has never authorized Commerce to countervail *transnational* subsidies—as Commerce itself repeatedly recognized. *See, e.g.*, 45 FR 1468, 1469 (1980); 49 FR 32639, 32640 (1984); 58 FR 37217, 37233 (1993); 63 FR 65348, 65405 (1998); 86 ITADOC 30593, cmt. 6, at 57-59 (2021), *accessed at* https://tinyurl.com/bdfxn5e4; 19 C.F.R. §351.527 (2023).

Until 2024. Suddenly, a few months before *Loper*, Commerce discovered that power to countervail transnational subsidies had lurked in the Tariff Act for decades. 89 FR 20766, 20826-27 (2024). That "an agency has long failed to reach for a power and only later changes its mind" is "persuasive evidence that the power was never conferred in the first place." *Barbosa da Cunha v. Freden*, 175 F.4th 61, 92-93 (2d Cir. 2026); *see FTC v. Bunte Bros.*, 312 U.S. 349, 351-52 (1941). Indeed, text, context, and statutory history confirm that Commerce was right the first six times: The Tariff Act extends only to domestic subsidies. Commerce's newfound position is contrary to law, and its failure to explain its reversal is arbitrary and capricious.

Commerce also departed arbitrarily from long-established benchmark practice when it jettisoned Bloomberg/PVinsights data for mismatched UN Comtrade data. And Commerce concluded without substantial evidence that Boviet received import-duty exceptions, given that Boviet is an EPE, outside Vietnam's customs territory.

# ARGUMENT

## I. Commerce Cannot Countervail Subsidies from China in an Investigation Against Vietnam.

### A. Text and statutory history confirm that Commerce is not authorized to countervail transnational subsidies.

A "long parade of textual and contextual clues," which Defendant and Defendant-Intervenor struggle to wave away, indicates that Congress did not confer the power for which Commerce now reaches. *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021).

***First*, §1671(a)(1) itself.**[1] Congress did not enact §1671 in a vacuum. American law authorized countervailing duties long before Congress enacted the present §1671. Congress, "knowledgeable about {this} existing law," built on existing concepts. *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988). That statutory history necessarily informs proper understanding of the text.

From the start, countervailing duties targeted foreign government subsidization of *their own* products. Boviet.Br.13-14. The earliest countervailing duties were imposed on foreign governments subsidizing their sugar exports. Tariff Act of 1890, 26 Stat. 567, 584; Tariff Act of 1894, 28 Stat. 509, 521. The Tariff Act of 1930, codified as the former §1303 for nearly half a century, authorized duties "{w}henever any country … shall pay or bestow … any bounty or grant upon the manufacture or production or export of any article or merchandise *manufactured or produced in such country*."

In 1979, Congress made the system two-track in response to an international trade agreement. Boviet.Br.14. Section 1303 continued to apply to countries that did not enter into agreements against unlawful subsidies, and Congress added §1671 to cover "subsidies" of

[1] Unless otherwise indicated, all Code citations are of Title 19.

countries that did. Congress built into the latter §1303's explicit territorial language via the original §1677(5), which specified that "{t}he term 'subsidy' has the same meaning as the term 'bounty or grant'" as "used in" §1303. Pub. L. No. 96-39, §101. And as "used in" §1303, "bounty or grant" encompassed only in-country subsidies. Accordingly, courts and Commerce consistently recognized Congress established "a complete harmony and continuity between" the terms. *Bethlehem Steel Corp. v. United States*, 7 CIT 339, 341 (1984); *see* 58 FR at 37233 (reading terms together in 1993, including in light of §1677(5)).

In 1994, to implement the Agreement on Subsidies and Countervailing Measures, Congress further amended Title 19. Boviet.Br.15-16. It repealed §1303 and its cross-references. Statement of Administrative Action ("SAA"), 1994 U.S.C.C.A.N. 4040, 4238. It tweaked §1671, and in §1677(5) replaced the cross-reference definition of "subsidy" with a free-standing definition of "countervailable subsidy" (generally, a "subsidy … which is specific"), to reflect certain clarifications in the Subsidies Agreement. *Id.* But Congress confirmed that, in general, "subsidy" bore "the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute." *Id.* In issuing implementing regulations in 1998, Commerce reached the same conclusion. 63 FR at 65405.

The text of the current §1671(a) reflects as much. Countervailing duties apply when "the government of a country or any public entity within the territory of a country is providing … a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported." As Commerce explained just five years ago, this language "focuse{s} on a particular (*i.e.*, 'the') government of a country," not the governments of third countries. 86 ITADOC 30593, cmt. 6, at 58.

Now, Commerce would rewrite the statutory history by *ignoring* Congress's original definition of "subsidy" for §1671. That definition, in force from 1979 to 1994 in §1677(5), incorporated the (geographically limited) usage of "bounty or grant" in §1303. The Government never mentions this key link, just skipping to 1994 and reinterpreting the SAA in a vacuum. U.S.Br.13, 26. Yet, at the time, Commerce itself drew the link, when interpreting the post-1979 provisions on the eve of the 1994 revisions. 58 FR at 37233; Boviet.Br.14.

Defendant-Intervenor focuses on Congress's repeal of §1303 in 1994. Def.-Int.Br.28. But "{w}ords must be given the meaning they had" when "*adopted*." Antonin Scalia & Bryan Garner, *Reading Law* 78 (2012) (emphasis added). If, as to transnational subsidies, §1671 when enacted meant the same thing as §1303, the subsequent repeal of §1303 would not itself retroactively change that meaning, nor does Defendant-Intervenor point to anything else that did.

At any rate, the SAA confirms that the 1994 revisions did not depart from the longstanding understanding that only in-country subsidies were countervailable. The Subsidies Agreement defines "subsidy," in its first section, as a "financial contribution by a government or any public body within the territory of a Member (referred to in this agreement as 'government')." Subsidies Agreement, art. 1.1(a)(1); *see also* Gary N. Horlick, *An Annotated Explanation of Articles 1 and 2 of the WTO Agreement on Subsidies and Countervailing Measures*, 8 Glob. Trade & Customs J. 297, 298 (2013) (explanation by Agreement's author that the phrase "{w}ithin the territory" was intended to confirm that "subsidies given by a government outside of its territory" were not countervailable). The SAA then confirms that §1671, along with the new definition of (countervailable) "subsidy" in §1677(5), implemented this aspect of the Agreement. 1994 U.S.C.C.A.N. at 4238.

The Government's *only other* textual justification for jettisoning the transnational-subsidies rule is that "{t}he use of the indefinite article 'a'" in §1671(a)(1)'s phrase "the government of ***a*** country" supposedly indicates that the subsidizing country may be different from the subject country. U.S.Br.16-17. But Congress would not bury a massive departure from *both* prior law *and* the Subsidies Agreement *in a single letter*. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994); Boviet.Br.6; *see also Bond v. United States*, 572 U.S. 844, 855-56 (2014) (interpreting statute in light of treaty it implements).

Nor can the "spirit of the Tariff Act" authorize what its text does not. *Contra* Int.Br.18. "{N}o statute yet known pursues its stated purpose at all costs," and "the 'textual limitations upon {the} law's scope' must be understood as 'no less a part of its purpose than its substantive authorizations.'" *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025) (quotations omitted).

***Second*, the definition of a "specific" subsidy in §1677(5A).** The further requirement from the 1994 revisions that, to be countervailable, a subsidy must be "specific," puts the nail in the coffin of Commerce's new assertion of authority. §1677(5)(A); *see also* Horlick, *supra*, at 298 (specificity "developed in US CVD practice in the early 1980s," then was made the Subsidies Agreement's second section). Section 1677(5A), in defining "{s}pecificity," identifies three types—export, import, and "{d}omestic" subsidies. §1677(5A)(A)-(D). Each bakes in territorial limitations.

Export subsidies provide a financial benefit based on "actual or anticipated exportation or export earnings." 19 C.F.R. §351.514(a). Countervailing duties originated with this category, which was always in-country. *Supra* at 2. Import subsidies encourage "the use of *domestic* goods over imported goods." §1677(5A)(C) (emphasis added). And "domestic" subsidies are all other ways governments "intervene in *their economies*." 1994 U.S.C.C.A.N. at 4242 (emphasis added).

*Contra* U.S.Br.30-31. For this category, "specificity" is a tool to narrow the field of *in-country* subsidies: Because "all governments" intervene in their economies, it is not feasible to make all domestic subsidies countervailable. 1994 U.S.C.C.A.N. at 4242. The specificity test "winnow{s} out" those a government makes "broadly available," such as "public highways and bridges" or "tax credit{s} … available to all industries and sectors." *Id.* (quotation omitted).

Subsection 1677(5A)(D) ("Domestic subsidy") enshrines this geographical limitation when it explains that domestic subsidies are provided "to an enterprise or industry *within the jurisdiction of the authority providing the subsidy*." The Government and Defendant-Intervenor contend that "within the jurisdiction" refers to *legal*, not *territorial*, jurisdiction. U.S.Br.30-31; Def.-Int.Br.22-23. Indeed, Defendant-Intervenor suggests legal authority is the *only* "plain meaning" of the word "jurisdiction," selectively quoting a Merriam-Webster definition. Def.-Int.Br.22.

But Defendant-Intervenor omits half of the definition, which describes jurisdiction as "the limits or *territory* within which authority may be exercised." Merriam-Webster, *Jurisdiction* (emphasis added). Indeed, the phrase "within the jurisdiction" often tethers authority to a particular territory. *E.g.*, U.S. Const. amend. XIV ("No State shall … deny to any person within its jurisdiction the equal protection of the laws"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (the Fourteenth Amendment's provisions apply "to all persons within the territorial jurisdiction"); 28 U.S.C. §2241(a) (district courts may grant writ of habeas corpus "within their respective jurisdictions").

Even the Government's more modest argument conflicts with the rest of §1677(5A)(D)—not to mention this common usage. Subsection 1677(5A)(D)(iv) indicates that a subsidy is specific if it "is limited to an enterprise or industry located within a designated *geographic region within*

*the jurisdiction* of the authority providing the subsidy." This of course refers to territorial authority. It "codifie{d}" a preexisting test under which "subsidies granted by a state or province that are not limited to a specific enterprise … are not considered specific," but "subsidies provided by a central government to particular regions … are specific regardless of the degree of availability." 1994 U.S.C.C.A.N. at 4244. Defendant-Intervenor concedes the point, but says that the express mention of geography in §1677(5A)(D)(iv) makes all the difference. Def.-Int.Br.23. Not so. "{I}dentical words used in different parts of the same act are intended to have the same meaning." *Brooke Gp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 230 (1993) (quotation omitted). If "within the jurisdiction" refers to territorial jurisdiction in §1677(5A)(D)(iv), it necessarily refers to territorial jurisdiction elsewhere in the *same subsection*.

***Third*, the examples of "benefit{s} conferred" in §1677(5)(B) & (E).** In defining "{c}ountervailable subsidy," §1677(5) also indicates when a "benefit" has been "conferred"—as alleged here, when "goods or services are provided {to the recipient} for less than adequate remuneration." §1677(5)(E)(iv). Adequate remuneration is "determined in relation to prevailing market conditions … *in the country which is subject to the investigation or review*." §1677(5)(E) (emphasis added). This framework presupposes that the subsidizing authority and the recipient involve the same country. Boviet.Br.11. Because different countries have different comparative advantages, the price a foreign company charges does not necessarily reflect a subsidy by the foreign government, even if it is lower than the prevailing price in one's own country.

For instance, Defendant-Intervenor treats as suspect that a Vietnamese manufacturer can buy a product cheaper from China than from domestic manufacturers. Def.-Int.Br.24-25. But that is *why* countries trade. That a Vietnamese company can get some products cheaper from China

than domestically no more inherently betrays a subsidy than does the ability of an Italian firm to buy a cheaper barrel of oil from Saudi Arabia than domestically.

The Government responds that it need not consider comparative advantage. U.S.Br.29. But that is the point. The Tariff Act avoids entangling countervailable subsidies with unobjectionable differences among countries that impact price. *Supra* at 5-6. If Commerce were tasked with untangling transactions across international lines, surely Congress would have required it to account for comparative advantage.

***Fourth*, the definition of interested parties in §1677(9).** The Tariff Act affords "interested party" status to persons whose interests a CVD order would affect. §1677(9)(A)-(B). Third-country governments are conspicuously absent. Boviet.Br.11-13.

The Government and Defendant-Intervenor suggest this omission is unremarkable because many parties lack "interested party" status. U.S.Br.24-25; Def.-Int.Br.26-27. Plus, the Government adds, a third country presumably would not have "the same vested interest in the outcome as the country under investigation." U.S.Br.25. It is not clear why that would be so, when third countries subsidize companies operating outside their borders to further strategic, economic, or geopolitical aims.

Regardless, "interested party" status does not simply reflect a party's vested interest. Commerce must be able to ask the subsidizing government for "information regarding whether {it} provides a financial contribution and whether that contribution is specific," "because, normally, those governments are in the best position to provide information." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1370 (Fed. Cir. 2014) (quotation omitted). The "interested parties" provision enables this by permitting Commerce to *burden* interested parties who stonewall. Boviet.Br.12-13. Here, the Government laments that China "failed to provide

requested information," leaving it without "the necessary record information to conduct its analysis." U.S.Br.7. But it overlooks what that reveals about the statutory scheme: Because China is not an interested party, Commerce lacked the tools to press it to assist. It is inconceivable that Congress would hamstring Commerce's efforts to develop an accurate record in a subset of CVD investigations by leaving an entire category of subsidizing governments unburdened.

***Fifth*, the international consortium provision in §1671(d) and the upstream subsidy provision in §1671(e).** If Congress omitted things that one might expect if transnational subsidies were countervailable, it also included provisions that would be superfluous. Subsection 1671(d) explains that, if members of a consortium "receive countervailable subsidies from their respective home countries," Commerce "shall cumulate all such countervailable subsidies." As Commerce itself recognized just five years ago, a general authorization to countervail transnational subsidies "would render {this} provision superfluous." 86 ITADOC 30593, cmt. 6, at 58. Commerce could *always* characterize international-consortium subsidies as "transnational" and countervail them on that ground alone. Boviet.Br.7.

Similarly, §1671(e) directs Commerce to investigate upstream subsidies, defined in §1677-1(a)(1) to include a subsidy "paid or bestowed by an authority" and "used in the same country as the authority in the manufacture or production of {subject} merchandise." As Commerce also recognized, "{t}his provision indicates that the relevant 'authorities' for Commerce's analysis are, typically, in the country subject to the investigation/review." 86 ITADOC 30593, cmt. 6, at 58. The provision "contains an explicit, but limited," exception to that typical rule, authorizing Commerce to treat multiple countries as "one country if the countervailable subsidy is provided by {a} customs union." *Id.* (quoting §1677-1(a)). Here too, the exception proves the rule.

The Government never acknowledges, let alone grapples with, Commerce's own prior conclusion that reading §1671(a) to authorize transnational subsidies would render both §1671(d) and (e) superfluous. Instead, it regurgitates that §1671(d)-(e) are irrelevant here because they "apply in limited factual circumstances" not present. U.S.Br.21-22. That misses the point. Boviet.Br.8. Because the Act specifies two circumstances in which third-country subsidies *may* be countervailed, it is basic statutory construction that other scenarios *may not*. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018). Nor is it an answer that Commerce sometimes still assesses whether an international consortium is present. *Contra* U.S.Br.22. It is unsurprising that agencies might take a belt-and-suspenders approach to justifying their actions—especially when, as here, one of the justifications is legally dubious.

Defendant-Intervenor claims—without acknowledging Commerce's reasoning in 2021—these provisions serve an independent purpose by providing additional clarification in specific contexts. Def.-Int.Br.20-21. But, as Commerce implicitly recognized in 2021, §1671(d)-(e) detail nothing that would not already be obvious under a general transnational-subsidies regime. Whether the subsidy is labeled "transnational" or "upstream," or whether it is provided by an international consortium, Commerce would always "include the amount" of the alleged subsidy in its subsidy rate. §1671(d)-(e). Congress had to "address the treatment" of upstream subsidies and international consortia (Def.-Int.Br.21) *because* transnational subsidies are generally not countervailable. *Cf.* 1988 U.S.C.C.A.N. 1547, 1622-23 (explaining that §1671(d), enacted during the period when §1671(a) incorporated §1303's express geographical limitation, established that "subsidies provided by multiple governments to an international consortium which exports its products" are countervailable).

***Sixth*, the NME countries provision in §1671(f).** In explaining how to assess countervailing duties on imports from nonmarket economies, Congress expressly equated the subsidizing country with the subject country. Boviet.Br.9. Defendant and Defendant-Intervenor admit this, but suggest the provision is an exception to, rather than part of, the general rule. U.S.Br.23-24; Def.-Int.Br.21. But when *multiple* provisions reflect the same presumption that also underpins more than a century of prior law, and *no* provision says something different, it is hard to write everything off as "exceptions."

***Finally*, the Subsidies Agreement provisions in §1671(a)(2)-(c).** Subsections 1671(a)(2)-(c) explain that, if imports originated in a "Subsidies Agreement country," countervailing duties can be imposed only if the ITC determines that the subject imports materially injured the domestic industry. Per §1671(b), a "Subsidies Agreement country" has assumed obligations under the Subsidies Agreement or an equivalent. 1994 U.S.C.C.A.N. at 4238. The point is to "encourage countries to assume the{se} obligations," a logic that makes sense only if the subsidizing country and exporting country are *the same*. 1979 U.S.C.C.A.N. 381, 431. By decoupling subsidization and exportation, Commerce's interpretation undermines this incentive structure. Here, for example, because the subject imports were "imported from" Vietnam, whether the material-injury requirement applies turns on whether Vietnam agreed to the Subsidies Agreement. §1671(a)(2)-(b). Yet China, the actual subsidizer, benefits from Vietnam's agreement, whether or not China has assumed the same obligations.

### B. Commerce cannot resurrect *Chevron* deference under another name.

Lacking statutory language that *authorizes* it to countervail transnational subsidies, the Government pivots, claiming it does not need it: As long as Congress has not *prohibited* Commerce from countervailing transnational subsidies, the agency may do so. U.S.Br.32-37.

Not so. "{T}he absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 815-16 (Fed. Cir. 2002). That is especially true where the agency seeks to impose new fees or taxes: "Congress must indicate clearly its intention to delegate" such authority. *Skinner v. Mid. Am. Pipeline Co.*, 490 U.S. 212, 224 (1989); Boviet.Br.4-5. A contrary rule would invert the separation of powers: An agency "has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Government's argument "comes close to saying that {it} has the power to do whatever it pleases merely by virtue of its existence," an "incredible" suggestion. *FAG*, 291 F.3d at 817 (quotation omitted).

The Government argues that its general authority to enforce the Tariff Act grants it broad discretion to fill all perceived gaps in the statutory scheme. U.S.Br.35. This argument misunderstands *Loper*. A general grant of rulemaking authority gives Commerce "limited authority to promulgate interpretive and procedural rules and issue statements of policy." *U.S. Dep't of Lab. v. Americare Healthcare Servs., Inc.*, 171 F.4th 838, 857 (6th Cir. 2026) (Bush, J., concurring). That is all the Federal Circuit recognized in *Lesko* and *Archroma*. *See Lesko v. United States*, 161 F.4th 1352, 1359 (Fed. Cir. 2025) (regulation detailing "the formalities required to officially order or approve overtime" by federal workers); *Archroma U.S., Inc. v. Dep't of Com.*, 185 F.4th 1341, 1348 (Fed. Cir. 2026) (regulation detailing "when, and how, a domestic interested party is required to indicate its intent to participate in {a} sunset review").

But general rulemaking authority does *not* give Commerce discretion to impose whatever binding rules it sees fit—let alone new fees or taxes. Boviet.Br.4-5. *Loper* itself declined to treat a general grant of rulemaking power as authorizing substantive gap-filling, *see* 16 U.S.C. §1855(d), as did a subsequent case, *see Bondi v. VanDerStok*, 604 U.S. 458, 481-82 (2025). And *Learning*

*Resources* (which the Government ignores apart from the major-questions doctrine, and Defendant-Intervenor ignores entirely) declined to find "a delegation of {Congress's} birth-right power to tax within the quotidian power to 'regulate.'" 607 U.S. 229, 249 (2026). This makes sense. If every grant of administrative authority triggered deference, *Loper* would have little-to-no effect. Because *no rule* can be issued without a congressional grant of rulemaking authority, *any rule* within an agency's jurisdiction would trigger deference. That is exactly the *Chevron* framework that *Loper* rejects.

Instead, an agency must identify specific discretionary gap-filling authority. For example, *Loper* listed provisions authorizing an agency to define particular statutory terms or otherwise exercise its judgment as applied to specific entities or scenarios. *See* 603 U.S. at 394-95 & nn.5-6. Each is "limited in scope and restricted to a particular set of situations." Ellen P. Aprill, *Unpacking the Most Important Paragraph in* Loper Bright, Yale J. Regul. Notice & Comment (Jan. 15, 2025). Likewise, in *Mosaic*, the Federal Circuit determined "based on the SAA" that Congress had authorized Commerce to determine whether certain information was relevant. *Mosaic Co. v. United States*, 160 F.4th 1340, 1347-48 (Fed. Cir. 2025). The Government identifies no comparable delegation here.

**C. The major-questions doctrine confirms that Commerce does not have discretion to countervail transnational subsidies.**

Commerce's assertion of authority to countervail transnational subsidies bears all the hallmarks of a major-questions case. Boviet.Br.16-19. The Government responds that this case is just a run-of-the-mill exercise of its power to countervail subsidies. U.S.Br.40-42; Def.-Int.Br.31-33. But Commerce's own prior statements confirm that its newfound power breaks from prior understanding and practice. In 1993, during the period in which "subsidy" in §1671 was defined by §1303, Commerce explained that the "transnational subsidies rule" against countervailing

transnational subsidies was "not merely a rule of administrative convenience" but "essentially re-state{d} the statute." 58 FR at 37233. Soon after the 1994 amendments, Commerce reached the same conclusion and issued regulations codifying it, *see* 63 FR at 65405, and it reiterated that reasoning five years ago, *see* 86 ITADOC 30593.

The Government also downplays the political significance of the question. U.S.Br.41. But the considerations in deciding whether a subsidy is "unfair" can be "complex" and contested "internationally." *PPG Indus. v. United States*, 928 F.2d 1568, 1574 (Fed. Cir. 1991) (quotation omitted). Through diplomacy, the United States has persuaded most of the world to eliminate "trade distorting subsidies" used "to give *their firms* an unfair competitive advantage." 1994 U.S.C.C.A.N. at 4228 (emphasis added); *see id.* (describing a "significant U.S. achievement{}" in "defining, for the first time," the term "'subsidy'"); *supra* at 4 (explaining geographical limitation in Agreement's definition of "subsidy"). In Commerce's own words, transnational subsidies implicate "evolv{ing}" "dynamics of global trade" and "novel approaches to subsidization," and the United States' response will affect foreign relations. 89 FR at 20826-27 (discussing countervailing transnational subsidies as a response to China's "Belt and Road{} Initiative"). These complex questions are for Congress. Boviet.Br.18.

**D. Commerce's reasoning was arbitrary and capricious.**

Finally, Commerce's determination must be set aside as arbitrary and capricious. Boviet.Br.19-21. The Government all but admits that it did not thoroughly address Boviet's challenges to its newly asserted authority, U.S.Br.39, and primarily invokes as an excuse its overbroad understanding of its own delegated authority, *id.* at 32-37. Though the Government claims Commerce analyzed text and statutory history, *id.* at 39; Def.-Int.Br.34, its statutory argument started and ended with the indefinite article "a" in §1671(a)(1). IDM, 90 ITADOC 17399

(2025). Commerce ignored all of the other textual problems with its interpretation, discussed above. *Id.*

And though the Government claims Commerce "explained its reasons" for departing from the prior regulation, U.S.Br.39; Def.-Int.Br.39, in neither Commerce's IDM nor its Final Rule did it mention, let alone grapple with, its prior, contrary analyses. Commerce has never explained how its 1993 analysis of statutory terms and history—in which it concluded that the term "subsidy" in §1671 included §1303's geographic limitation—erred. 58 FR at 37233. (Or worked through the reverse of the present scenario—whether a subsidy provided by the country under investigation to a third country should or must also be countervailed. *See id.*) It has never explained where its reasoning in issuing its 1998 regulation—which reached the same conclusion as to §1671 after §1303's repeal, while pointing to the international-consortium and custom-unions provisions—went awry. 63 FR at 65405. Nor has it explained why its 2021 IDM—which concluded that §1671's text focused on domestic subsidies and which highlighted the superfluity problem—was wrong. Commerce's neglect of its own prior *analyses* highlights its failure to grapple with the *issues* they resolved. That neglect is paradigmatically arbitrary and capricious. Boviet.Br.2-3, 19.

## II. Commerce's Benchmark Selection and Calculations for Certain Programs Are Arbitrary and Capricious and Unsupported by Substantial Evidence.

Remand is separately warranted because Commerce departed without reason from long-established benchmark practice, relying upon overbroad UN Comtrade export data instead of product-specific sources upon which Commerce has previously relied. The Government's and Defendant-Intervenor's arguments fail to contend with two primary issues: (1) the benchmarks Commerce relied upon for solar wafer and solar glass are not comparable to the inputs being benchmarked, and (2) Commerce arbitrarily departed from its past practice of reliance on the same solar world benchmark sources.

**A. Commerce's benchmarks are not comparable to the inputs being benchmarked.**

The Government insists it is not obligated to rely upon the *most* comparable or nearly identical benchmarks, but only needs to rely upon *a* comparable benchmark. U.S.Br.57-58; Def-Int.Br.38-40. Tellingly, it later quotes the opposite: Commerce "is required to use '*the best available information*' when making benchmark determinations." U.S.Br.78 (emphasis added). The "term 'best available' is one of comparison," signifying "'excelling all others.'" *Dorbest Ltd. v. United States*, 462 F.Supp.2d 1262, 1268 (CIT 2006). Indeed, §1677(5)(E) directs Commerce to measure the adequacy of remuneration in relation to prevailing market conditions, and its benchmark selections must ensure a margin calculated "*as accurately as possible*." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F.Supp.3d 1306, 1337 (CIT 2015) (emphasis added).

Commerce and the courts have emphasized that product specificity is key in selecting accurate benchmarks. *See* Boviet.Br.22-26 (citing the long history of Commerce's selecting benchmarks based on product specificity in the *Solar from China* Order). As Commerce itself explained here, it "normally looks for product comparability between the benchmark and the products purchased by the mandatory respondents and relies on data that reflect the narrowest category of products encompassing the input products." Post-Prelim IDM at 12. For example, in *Wooden Cabinets from China*, Commerce determined to rely upon a wood-species specific benchmark "because different species of sawn wood, such as birch and oak, are different products with different prices." 89 FR 88962 (2024) & IDM Cmt. 6. Likewise in *Passenger Vehicles from China*, Commerce relied upon grade-specific benchmarks for rubber. 84 FR 17382 (2019) & IDM Cmt. 12.

The Government claims *Essar* established that only mere comparability is required.

U.S.Br.57-58. But in *Essar*, Commerce was not choosing between competing tier-two benchmarks, where one was more comparable than another. Instead, after determining it could not rely upon tier-one benchmarks, Commerce had only one available tier-two benchmark and found that it sufficed. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273-74 (Fed. Cir. 2012). And the tier-two benchmark was for the same product (iron ore), even if not the identical iron ore used by the respondent. Here, by contrast, Commerce has multiple tier-two benchmarks, one of which (Bloomberg/PV Insights) is nearly identical to the product at issue. Instead, Commerce chose a tier-two benchmark (UN Comtrade) that covers *entirely different products*.

Regardless, UN Comtrade does not even meet the lower standard of mere "comparability." For silicon wafer, Commerce relied upon exports under HTS3818, which includes "chemical elements" and "chemical compounds" beyond silicon as well as shapes beyond wafers including "discs" or "similar forms." JA Solar Rebuttal Benchmarks (October 30, 2024) at Exhibit 1, **PR698**. Vastly different products—such as LED chips and phosphide wafers—are being traded under this broad HTS. Boviet.Br.29-30. Nor has Commerce adjusted the HTS3818 data to be comparable. U.S.Br.60-61. Commerce removed *countries* from the dataset that do not produce photovoltaic silicon wafers. But it did not address the *products* being exported under HTS3818 that are not specific to photovoltaic silicon wafers, even if the country also happens to produce some photovoltaic silicon wafers. Confirming the mismatch, the HTS3818 dataset showed widely varying AUVs not explained by quantity differences, while the Bloomberg data and the Respondents' own purchases demonstrate that the value of actual solar silicon wafers changed very little during the POI. Boviet.Br.30.

Similarly for solar glass, the UN Comtrade data is overinclusive and not comparable. Commerce relied upon HTS7007.19 covering "safety glass, consisting of toughened (tempered)

or laminated glass: Toughened (tempered) safety glass; Other." "Toughened safety glass" is a broad category inclusive of wholly different types of glass. It is not reasonable to conclude that a world price of such "toughened safety glass" would have any relevance to a purchaser of solar glass in Vietnam.

Neither of these benchmarks fulfills Commerce's requirements. §1677(5); 19 C.F.R. §351.511(a)(2)(ii). Commerce should have relied on the identical benchmarks it consistently used in the past. For wafer, the record has daily prices for the precise size and type of wafer used by Boviet: "Monocrystalline silicon wafers -182mm" for use in the solar industry. Boviet NSA Benchmarks at Exhibit NSAW-1, **PR733**. For glass, the record has prices for the precise size and type of glass used by Boviet: "2mm and 3.2mm solar glass." JA Solar Benchmark at Exhibit NSA2-16 **PR731**. The Court should find that Commerce's benchmark selections, which are not actually based on prevailing market prices available in Vietnam, are not supported by substantial evidence.

**B. Commerce arbitrarily departed from past practice when it abandoned Bloomberg/PV Insights data.**

The Government and Defendant-Intervenor contend that each record stands alone and that Commerce is not required to make the same decision it made previously with regard to benchmarks. U.S.Br. at 61; Def-Int.Br. at 38-39. However, "[a]n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001); *Anderson v. U.S. Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (CIT 2006) (A "principal justification for the administrative state is that in 'area[s] of limitless factual variations, like cases will be treated alike.'"). In *every prior* review where Commerce has benchmarked solar wafer, it chose Bloomberg data over the HTS3818 dataset. In *every prior* review where Commerce benchmarked solar polysilicon, it chose

Bloomberg or other world benchmark sources specific to the input. Boviet.Br.23-24. And critically, these were *world* benchmarks, inclusive of Chinese and Vietnamese prices. Similarly, Commerce has relied on PVinsights and other similar sources, rather than HTS7007.19, for a solar-specific benchmark. Boviet.Br.31. In fact, when Commerce attempted to rely upon HTS7007.19, this Court rejected that dataset as "fatally overinclusive of non-solar glass." *Changzhou Trina*, 2018 Ct. Intl. Trade LEXIS at *18-19.

The Government insists this case is dissimilar to prior cases in which Commerce used Bloomberg/PV Insights data. U.S.Br.60-61; Def-Int.Br.38-39. Not so. The benchmark sources have not changed. The regulation and statute did not change with regard to benchmark selection or distortion. The finding that the supplying-country market was distorted by government involvement did not change; in past reviews, Commerce had similarly found distortion in the Chinese market. Yet Commerce never before objected that it could not rely upon a world benchmark without removing Chinese and Vietnamese prices. Rather, Commerce concluded that the specificity of the Bloomberg data, or similar world benchmark, made it the most accurate benchmark. Commerce's contrary decision now—under the same circumstances—is arbitrary.

Commerce's practice in the antidumping *Solar from China* reviews further underscores Commerce's arbitrary decision-making in this investigation. In antidumping reviews, the surrogate-value selection requirements are far more restricted: Commerce will rely on a single economically comparable country and exclude all non-market economy and export-subsidy country data. Yet, Commerce still found for the last thirteen years in antidumping reviews that Bloomberg data was the best information to value wafer and polysilicon—despite including non-economically comparable, non-market, and export-subsidy countries. Boviet.Br.24-26. In fact, Commerce emphasized that Bloomberg's being a world source made it *reliable*, even though it

included some non-market pricing. *See Solar from China Prelim. AD 2019-20* IDM Cmt. 5 ("Because our SV is the market price for the entire international market, we find no basis for concluding that it does not represent a market price.").

The Court should find that Commerce's benchmark decisions were arbitrary because they run contrary to this established practice.

**C. Commerce incorrectly added VAT and import duties.**

Finally, the Government and Defendant-Intervenor argue that removing VAT and import duties from the benchmarks would "contraven{e}" the regulation "by not accounting for delivery charges and import duties, and by not using 'delivered prices' as the comparison benchmark price." U.S.Br.67; Def-Int.Br.45. But benchmarks need not always include import duties; rather, the regulation requires Commerce to adjust for such duties to "reflect the price that a firm actually paid or would pay if it imported the product." 19 C.F.R. §351.511(a)(2)(iv). Because Boviet is an export processing enterprise ("EPE")—like most solar-producing firms in Vietnam—the prices Boviet actually paid do not include VAT or import duties. Commerce should have calculated a benchmark based on what a Vietnam solar producing company would pay without import duties.

**III. Commerce's Finding Regarding the Import Duty Exemptions on Imported Raw Materials for EPEs is Unsupported by the Record and Unlawful.**

**A. Commerce's finding that the program exists is not supported by substantial evidence.**

Subsections 1677(5)(B) and -(D)(i)-(ii) require that, for a countervailable benefit to be found, the government forego revenue that would otherwise be due. Likewise, 19 C.F.R. §351.519(a) defines remission or drawback of import duties as a benefit. Both provisions inherently require that the goods entered the country's customs territory. That did not happen here: As an EPE, Boviet is considered outside of the customs territory of Vietnam. As such, its imports were not subject to import duty liability in the first place, and there is no foregone government

revenue.

The Government argues that the act of designating a company as outside of the customs territory is a government action, and that, absent that action, the firm otherwise would have paid either direct taxes or import charges. U.S.Br.67. This is an extremely attenuated and unreasonable reading of the statutory requirement that a financial contribution is "foregoing or not collecting revenue that is otherwise due." Further, this has not been the Court's understanding of this language. While *ATC Tires* found that a particular Indian Special Economic Zone ("SEZ") program met the requirement of a foregone revenue, it was not based on the understanding that *any* SEZ qualifies. Instead, the Court reasoned that the particular circumstances of that SEZ were a foregone revenue *because the company remained contingently liable* for import duties until it demonstrated it had met the requirement to export all goods produced and achieved a net foreign exchange goal. *ATC Tires*, 322 F. Supp. 3d at 1372. That is not the case here. Boviet.Br.34-35.

**B. The Government of Vietnam accounts for resalable scrap.**

Even if the program were countervailable, no benefit will be found if the government has a "reasonable, effective system" to "confirm which inputs are consumed in the production of the exported products and in what amounts." 19 C.F.R. §351.519(a)(4)(i).

In the Final Results, Commerce reasoned that Vietnam's system is not reasonable and effective because it does not track the amount of waste exiting the EPE, nor did the government inspect Boviet's facilities during the period of investigation. U.S.Br.71. Now, Defendant appears to have backtracked on the "does not track waste" argument, addressing only the customs authority inspections. That is unsurprising: Boviet explained in detail that it is not possible under the Vietnam EPE system and regulations to not track waste exiting the EPE. Boviet.Br.35-38.

The Government also insists that Boviet failed to previously invoke Section 5 of Circular 38/2015/TT-BTC. But Boviet and the Government of Vietnam cited the entire circular in their

administrative case briefs to support that an EPE, when it "sells scrap or discarded products into the domestic market, … is required to perform export procedures, and its buyer is required to perform import procedures." GOV Administrative Br.20, **PR838**; Boviet Administrative Br.48, **PR839**. Further, Boviet cited the particular Article in its Court brief because only in the IDM did Commerce reference Article 71 inaccurately, causing Boviet to clarify here the correct Article 75.5 for EPEs. At any rate, this one article is not the only support for the fact that waste is accounted for; Boviet cites many other provisions specifically addressed in its administrative brief. There is no exhaustion issue.

As for its claim that Vietnam failed to properly inspect Boviet, the Government creates a whole new standard absent from the regulation. U.S.Br.72. The regulation does not require inspection, much less inspection every year. Rather, it says the system or procedure must be "reasonable, effective for the purposes intended, and … based on *generally accepted commercial practices in the country of export*." 19 C.F.R. §351.519(a)(4)(i) (emphasis added). In other words, Vietnam must adopt a reasonable, effective system based on *Vietnam's commercial practices*.

Further, the Government overlooks much of Vietnam's substantial oversight system. For instance, EPEs must annually submit extremely detailed customs settlement reports that reconcile to their accounting documentation. The government can live-check companies' imports and exports during the year at any time. Additionally, the government of Vietnam conducts three types of inspections, geared toward ensuring companies most at risk of error are inspected more frequently. Every company undergoes a physical inspection upon the establishment of an EPE. Then the government conducts customs settlement report inspections and a broader post-customs clearance inspection. While these inspections are not conducted annually for every EPE, that is also not required under Vietnam accounting standards. Rather, as verified, these different

inspections are scheduled based on the assessment of the CRMS risk-management system. The relevant requirement is what Vietnam requires, not the U.S. But even the U.S. agencies do not conduct regular in-person inspections. Commerce has imposed a burden not required by the regulation.

## CONCLUSION

For these reasons, Commerce's *Final Results* were not supported by substantial evidence or in accordance with the law. Boviet respectfully requests that the Court remand this case for redetermination of the issues presented in its briefs.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang
**INTER-GLOBAL TRADE LAW GROUP**
Suite 1101
1156 15th St., N.W.
Washington, D.C., 20005
email: gmenegaz@igtlaw.com

C. Kevin Marshall
Hannah L. Templin
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
email: ckmarshall@jonesday.com

*Co-Counsel to Boviet Solar Technology Co., Ltd.*

Dated: November 12, 2026

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,469** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**Inter-Global Trade Law Group**